UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

|  |  |
|---|---|
| PLANNED PARENTHOOD GULF COAST, INC.; JANE DOE #1; JANE DOE #2; and JANE DOE #3, | |
| Plaintiffs, | Case No. 3:15-cv-00565-JWD-SCR |
| v. | |
| KATHY KLIEBERT, Secretary, Louisiana Department of Health and Hospitals, | |
| Defendant. | |

## ORDER ON PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## I.      INTRODUCTION

Before the Court is the Renewed Motion for Temporary Restraining Order and Preliminary Injunction filed by Planned Parenthood Gulf Coast, Inc. ("PPGC" or "Planned Parenthood"), appearing on behalf of both itself and three patients—Jane Does #1, 2, and 3

("Individual Plaintiffs")[1] (collectively, "Plaintiffs"). (Doc. 45.) The arguments made in support of this motion appear in the Memorandum of Law in Support of Plaintiffs' Renewed Motion for Temporary Restraining Order and Preliminary Injunction ("Plaintiffs' Renewed Memorandum"), (Doc. 46), and Memorandum Regarding Availability of State Remedy ("Plaintiffs' Remedy Memorandum"), (Doc. 52). Plaintiffs' request is opposed by Louisiana's Department of Health and Hospitals ("DHH"), whose head, Secretary Kathy Kliebert, is being sued in her official capacity and is therefore this matter's named defendant ("Kliebert" or "Defendant").[2] Defendant's arguments are put forth in the Motion to Dismiss Complaint for Lack of Subject Matter Jurisdiction and Failure to State a Claim ("Motion to Dismiss"), (Doc. 53), supported by the attached Memorandum in Support of Motion to Dismiss Complaint for Lack of Subject Matter Jurisdiction and Failure to State a Claim ("Defendant's Memorandum"), (Doc. 53-1). Although no evidentiary hearing has yet been held, the matter has been thoroughly briefed and argued. The Court has carefully considered the pleadings and briefings to date, which are discussed in more detail below.[3] The Court has also carefully considered the oral arguments and

---

[1] The Individual Plaintiffs "appear pseudonymously because of the private and personal nature of the medical care that they receive at PPGC, and their desire not to have that information become public in order for them to assert their legal rights." (Doc. 1 at 5.) Plaintiffs' unopposed motion seeking permission to use these pseudonyms was filed on August 25, 2015, (Doc. 5), and granted on August 26, 2015, (Doc. 11).

[2] As permitted by precedent, *Ex parte Young*, 209 U.S. 123, 152, 28 S. Ct. 441, 451, 52 L. Ed. 714 (1908); *accord Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 530 n.24 (1st Cir. 2009), Plaintiffs sue for injunctive relief against Ms. Kliebert in her official capacity, (Doc. 1 at 5). To wit, the true defendant here is Louisiana, not Ms. Kliebert or even DHH. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). In light of this duality, this Court will therefore alternate between feminine and third person pronouns throughout this opinion.

[3] These motions include the first Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("Motion for TRO"), (Doc. 4); first Memorandum of Law in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("Plaintiffs' Memorandum"), (Doc. 4-1); Defendant's Opposition to Plaintiffs' Motion for Temporary

representations of counsel at hearings held on September 2, 2015 ("First Hearing"), and on October 16, 2015 ("Second Hearing").

For the reasons more fully set forth below, the Court determines that Plaintiffs have met their burden for a temporary restraining order to maintain the *status quo*. The Court therefore temporarily restrains Defendant for a period of fourteen (14) days from the date of the entry of this order from suspending Medicaid payments to PPGC for services rendered to Medicaid beneficiaries, including but not limited to the Individual Plaintiffs. The temporary restraining order will remain in force for fourteen (14) days from the date of its entry unless, pursuant to Federal Rule of Civil Procedure 65(b)(2),[4] the Court, for good cause shown or with the agreement of the Parties, extends it. For the reasons set forth hereinafter, the Court declines to require security under Rule 65(c) from PPGC or the Individual Plaintiffs.

The Court defers ruling on the Plaintiffs motion for a preliminary injunction in order that the parties be given an opportunity to perform discovery and present evidence and any additional arguments at a preliminary injunction hearing.

A telephone status conference is set for Monday, October 19, 2015, at 2:30 p.m., Central Standard Time ("CST"), for the purpose of discussing the extension of this order during discovery, setting a scheduling order for discovery, a hearing date for the preliminary injunction, and setting other appropriate cut-offs. The Plaintiffs will arrange for the conference call and circulate the number to the Court and counsel by 1:00 p.m., CST, on October 19, 2015.

---

Restraining Order ("Defendant's Opposition"), (Doc. 13); Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Motion for Temporary Restraining Order ("Plaintiffs' Reply Memorandum"), (Doc. 22); the Statement of Interest of the United States ("Statement of Interest"), (Doc. 24),; and Defendant's Reply to the U.S. Department of Justice's Statement of Interest ("Defendant's Reply"), (Doc. 31).

[4] Any and all references to "Rule" or "Rules" in this order are to the Federal Rules of Civil Procedure unless otherwise noted.

## II.   FACTUAL AND STATUTORY BACKGROUND

### A.   PARTIES

Defendant is sued in her official capacity, as she is the head of DHH, (Doc. 1 ¶ 19 at 4; Doc. 53-1 at 3, 4). DHH administers this state's Medicaid Program, a dual state-federal assistance program for families and individuals with low income and limited resources encoded in 42 U.S.C. 1396 *et seq.* ("Medicaid Act").[5] (*See also, e.g.*, Doc. 1 ¶ 20 at 5; Doc. 13-1 ¶¶ 1–4 at 1–2; Doc. 43 ¶ 11 at 4; Doc. 53-1 at 1–4.) DHH does so by monitoring the allocation of federal-state funds in Louisiana and submitting a state plan for medical assistance for review and approval to the Center for Medicare and Medicaid Services ("CMS"), operating under a delegation of authority from the Secretary for the Department of Health and Human Services ("DHHS"). LA. R.S. §§ 46:437:2(B), 46:437.13;[6] 42 U.S.C. § 1396a(a).[7] In accordance with the Louisiana Medical Assistance Programs Integrity Law ("MAPIL"), Medicaid providers must sign a contract with DHH. LA. R.S. §§ 46:437:11, 46:437.13. (*See also* Doc. 13-1 ¶¶ 1–4 at 1–2.) DHH's powers are circumscribed by statute while its official regulations appear in Title 50 of the

---

[5] Created by the addition of Title XIX to the Social Security Act, Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286 (codified as amended at 42 U.S.C. § 1396 *et seq.*), Medicaid "furnishes . . . medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services," 42 U.S.C. § 1396-1. Medicaid offers the "States a bargain: Congress provides federal funds in exchange for the States' agreement to spend them in accordance with congressionally imposed conditions" and the statute's implementing regulations. *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1382, 191 L. Ed. 2d 471 (2015); 42 U.S.C. § 1396a; 42 C.F.R. § 430.15.

[6] In this opinion, any reference to "Section 46:437.11" or "§ 46:437.11" is to this statutory subsection unless otherwise noted.

[7] In this opinion, any reference to "Section 1396a(a)" or "§ 1396a(a)" is to this section of the Medicaid Act unless otherwise noted.

Louisiana Administrative Code.[8] (Doc. 53-1 at 2–4; *see also* Doc. 13-1 ¶ 3 at 1.)

PPGC is a charitable organization, so classified under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(1). (Doc. 43 ¶ 10 at 4.) Headquartered in Houston, Texas, it maintains its legal domicile in the Lone Star State, U.S. DEP'T OF THE TREASURY, INTERNAL REVENUE SERV., FORM 990 at 1 (2012), but is licensed to do business in Louisiana, (Doc. 43 ¶ 10 at 4; *see also* Doc. 1 ¶ 9 at 3.) At present, PPGC operates family planning centers and clinics in the Houston area of Texas and in Louisiana. (Doc. 43 ¶¶ 10–11 at 4; *see also* Doc. 1 ¶ 10 at 3–4.) Its first center founded in 1984, PPGC's two Louisiana clinics—the Baton Rouge Health Center ("BRHC") and the New Orleans Health Center ("NOHC")—participate in Louisiana's Medicaid Program, "providing medical services to low-income enrollees in both underserved communities." (Doc. 1 ¶ 10 at 3–4; Doc. 43 ¶ 11 at 4.)

The two facilities in Louisiana serve approximately 5200 patients. (*See, e.g.*, Doc. 43 ¶ 13 at 4; Doc. 1 ¶ 40 at 11; Hr'g Tr. 8:23–24, Sept. 2, 2015.)  "Nearly 75%" of the visits to BRHC were by patients enrolled in Medicaid; "[n]early 40%" of appointments at NOHC were with similarly classified individuals. (Doc. 3 ¶¶ 9–10 at 3–4; Doc. 43 ¶ 11 at 4.) The services offered by these two centers include "physical exams, contraception and contraceptive counseling, screening for breast cancer, screening and treatment for cervical cancer, testing and treating for certain sexually transmitted diseases . . ., pregnancy testing and counseling, and certain procedures[,] including colposcopy." (Doc. 3 ¶ 10 at 3–4; Doc. 43 ¶ 11 at 4.)

Neither BRHC nor NOHC performs abortions. (Doc. 1 ¶ 11 at 4; Doc. 43 ¶ 12 at 4.)

The Individual Plaintiffs rely upon Medicaid and receive their medical care from one of PPGC's two facilities. (Doc. 4-3, 4-4, 4-5.) They wish to continue to obtain their reproductive

---

[8] In this opinion, any reference to "Title 50" is to this part of Louisiana's administrative code.

care from PPGC. (Doc. 4-3 ¶¶ 6–7 at 2; Doc. 4-4 ¶ 8 at 2; Doc. 4-5 ¶ 6 at 2.) In this proceeding,

they are intended to represent the interests of many of PPGC's other Louisiana Medicaid

patients. (*See, e.g.*, Doc. 49-1 at 10; Doc. 46 at 29–30.)


B.      **PRECIPITATING EVENTS**

In July 2015, the Center for Medical Progress ("CMP") released a series of edited videos

which purported to document discussions regarding the acquisition of tissue samples between

various Planned Parenthood affiliates' officials and disguised actors. *See* Kevin Litten, *Bobby*

*Jindal Announces Investigation into Planned Parenthood*, THE TIMES-PICAYUNE, July 14, 2015;

*Planned Parenthood Exposed: Examining the Horrific Abortion Practices at the Nation's*

*Largest Abortion Provider: Hearing Before the H. Comm on Judiciary*, 114th Cong. 192–201

(2015) (Analysis of CMP Video by Fusion GPS). Thereafter, DHH exercised its "oversight over

all health facilities in the state" and requested that PPGC "answer some simple questions about . .

. [its] current operations and planned operations in Louisiana." Letter from Kathy Kliebert,

Sec'y, Dep't of Health & Hosps., State of Louisiana, to Melaney Linton, Pres., Planned

Parenthood Gulf Coast, Inc. (July 15, 2015) ("Defendant's July Letter"). DHH gave PPGC until

July 24, 2015, to respond. *Id.*

On July 24, 2015, PPGC did so. Letter from Melaney A. Linton, Pres. & CEO, Planned

Parenthood Gulf Coast, Inc., to Kathy Kliebert, Sec'y, Dep't of Health & Hosps., State of

Louisiana (July 24, 2015) ("PPGC's July Letter"). This letter recaps PPGC's history in Louisiana

and denies the accusations made by CMP. *Id.* at 1. In it, Ms. Melaney A. Linton, PPGC's

President and Chief Executive Officer and this letter's author ("Ms. Linton"), clarifies that PPGC

"does not offer abortion services" in Louisiana. *Id.* at 2.  PPGC acknowledged its link to Planned

Parenthood Center for Choice, Inc. ("PPCFC"), a "standalone corporation" and a department of

PPGC until 2005, and described itself as an "affiliate" of Planned Parenthood Federation of

America ("PPFA"). *Id.* PPGC then responded to each of Defendant's questions, emphasizing that

neither PPGC nor PPCFC provide abortion services in Louisiana. *Id.* at 2, 3, 5. To the questions

of whether any PPGC "facilities, or any affiliates, subsidiaries, or associates thereof, sell or

donate any unborn baby organs or body parts"[9] and "[h]ow many clinics operated by Planned

Parenthood Gulf Coast, or any affiliates, subsidiaries, or associates thereof, do business with . . .

any . . . organizations in the business of selling or donating the remains of unborn babies," PPGC

answered, "No." *Id.* at 3.

On August 4, 2015, Defendant sent a second letter to PPGC. Letter from Kathy Kliebert,

Sec'y, Dep't of Health & Hosps., State of Louisiana, to Melaney Linton, Pres., Planned

Parenthood Gulf Coast, Inc. (Aug. 4, 2015) ("Defendant's August Letter"). This missive zeroes

in on three statements in PPGC's July Letter: "PPFCFC does not have a fetal tissue donation

program in Texas currently"; "PPCFC disposes of Pathological Waste through an entity that is

licensed for disposal of Special Waste from Health Care-Related Facilities"; and "No" to the

question of whether "any Planned Parenthood Gulf Coast facilities, or any affiliates, subsidiaries,

or associates thereof, sell or donate any unborn baby organs or body parts." *Id.* Defendant

characterized these answers as being "directly contradict[ed]" by another "recently released

video made on April 9, 2015 at the Planned Parenthood facility in Houston, Texas, in which

Melissa Farrell, Director of Research at Planned Parenthood Gulf Coast (PPGC), discusses

existing contracts for fetal tissue donation for the purpose of research." *Id.*

---

[9] Texas law apparently allows for the donation of the "products of spontaneous or induced
human abortions, regardless of the period of gestation" to certain types of organizations and for
particular purposes. 25 TEX. ADMIN. CODE §§ 1.132(40)(B), 1.133(a)(2)(B). In PPGC's July
Letter, it admitted that PPCFC disposes of such products in accordance with this law.

On August 14, 2015, PPGC responded. Letter from Melaney A. Linton, Pres. & CEO, Planned Parenthood Gulf Coast, Inc., to Kathy Kliebert, Sec'y, Dep't of Health & Hosps., State of Louisiana (Aug. 14, 2015) ("PPGC's August Letter"). (Doc. 46-1 at 63–64.) On behalf of both PPGC and PPCFC, Ms. Linton denied the existence of any contradiction, as "neither PPCFC nor PPGC currently has a fetal tissue donation program in Texas, and neither sells nor donates fetal tissue." *Id.* The letter then answers each question posed in Defendant's August Letter. *Id.* at 64–65.

### C.      OVERVIEW OF THE FIRST AND SECOND TERMINATION ACTIONS

### 1.      First Termination Letters, Kennedy Declarations, and CMS' Statement of Interest

On August 3, 2015, Defendant notified PPGC of its intent to terminate the Agreements pursuant to § 46:137.11(D)(1) via four letters ("First Termination Letters"). (Doc. 1 ¶ 30 at 8; Doc. 13 at 1.) As this statute required, DHH gave PPGC 30-days' notice from the relevant letters' receipt. (Doc. 13 at 1–2.) The letters gave no reason for DHH's decision. (Doc. 1 ¶ 32 at 8; *see also* Doc. 13 at 18, 20; Hr'g Tr. 14:6–8, Sept. 2, 2015.) In response, Plaintiffs filed their first complaint. (Doc. 1.)

On that day, the Honorable Bobby Jindal, governor of Louisiana ("Jindal" or "Governor"), published a press release announcing the Agreements' looming terminations. Press Release, Hon. Bobby Jindal, Governor of Louisiana, Governor Jindal Announces the Termination of Medicaid Contract with Planned Parenthood (Aug. 3, 2015). This document states: "Governor Jindal and DHH decided to give the required 30-day notice to terminate the Planned Parenthood Medicaid provider contract because Planned Parenthood does not represent the values of the State of Louisiana in regards to respecting human life." *Id.* It continues:

"Planned Parenthood does not represent the values of the people of Louisiana and shows a fundamental disrespect for human life," and, "It has become clear that this is not an organization that is worthy of receiving public assistance from the state." *Id.* It refers to the possibility that PPGC "could be acting in violation of Louisiana law that states no person or group contracting with the state or receiving governmental assistance shall require or recommend that any women have an abortion." *Id.* It concludes: "Pending the ongoing investigation, DHH reserves the right to amend the cancellation notice and terminate the provider agreement immediately should cause be determined." *Id.*

During the First Termination Action, among the many documents docketed by the Parties, Defendant submitted a declaration by Ms. J. Ruth Kennedy ("Ms. Kennedy"), the Medicaid Director of DHH ("First Kennedy Declaration"), (Doc. 13-2 ¶¶ 1–5 at 1). (Doc. 13 at 21–22.) The First Kennedy Declaration's sixth paragraph states: "There are no Medicaid services that only family planning clinics provide that could not be provided by other enrolled Medicaid providers in the State of Louisiana, including in New Orleans and Baton Rouge."  (*Id.* ¶ 6 at 2.) Its seventh further explains: "Any physician/physician extender and appropriately certified lab can provide family planning and related services as long as it is within their license and scope." (*Id.* ¶ 7, at 2.) Per the next paragraph, "[t]here are 1,146 actively enrolled Medicaid providers in Region 1, covering the Greater New Orleans area, and 864 actively enrolled Medicaid providers in Region 2, covering the Greater Baton Rouge area, that can provide family planning and related services." (*Id.* ¶ 8 at 2; *see also* Doc. 13 at 21.) A sorted provider list is attached; it includes dermatologists, dentists, audiologists, cosmetic surgeons, and orthopedic surgeons. (Doc. 13-2 at 5–41; *see also* Hr'g Tr. 23:18–25:2, Sept. 2, 2015.)

This First Kennedy Declaration also describes two telephonic conferences between CMS

and DHH officials. According to Ms. Kennedy, on August 6, 2015, CMS advised DHH that the latter "has the authority to withhold federal Medicaid dollars from Louisiana or seek injunctive relief for the failure to comply with the Medicaid Act." (Doc. 13-2 ¶ 10 at 2.) CMS and DHH held a second conference call on August 21, 2015, in which CMS "advised" DHH "it would be sending a letter . . . confirming what CMS and HHS counsel had verbally conveyed to the Department during the August 6, 2015 conference call." (*Id.* ¶ 11 at 2.) [10]

On August 31, 2015, CMS filed a Statement of Interest. (Doc. 24.) CMS did so due to "its strong interests in the proper operation of the Medicaid program . . . and in ensuring that the [s]tates administer their federally-subsidized Medicaid programs in a manner that is consistent with the Medicaid statute." (*Id.* at 2.) Basically, the Statement of Interest makes three broad points.

First, because DHH has sought to terminate the Agreements "without providing any justification related to PPGC's qualifications to provide medical services," DHH's proposed termination will run afoul of § 1396a(a)(23)." (*Id.*; *see also* Doc. 22 at 2, 5, 6.) To read Section 1396a(a)(23) differently would both "strip the Medicaid Act's free choice of provider provision of all meaning." (Doc. 24 at 3.) It would simultaneously "contravene clear congressional intent to give Medicaid beneficiaries the right to receive covered services from any qualified and willing provider." (*Id.*)

Second, the Statement of Interest declares that DHH's interpretation is "inconsistent"

---

[10] A second declaration submitted by Ms. Kennedy ("Second Kennedy Declaration") gives a somewhat different description of this call with CMS: "On the August 6, 2015, conference call . . . . CMS and HHS told the Department that the any willing provider provisions under § 1396a(a)(23) was not all inclusive, but illustrative and that the Department could have other reasons to remove a provider from its program that were unrelated to the provider's ability to perform the Medicaid-covered services or properly bill for those services." (Doc. 31-1 ¶ 6 at 2.) The Second Kennedy Declaration continues: "CMS and HHS advised the Department that the validity of a state's reasons for terminating a provider are made on a case by case basis." (*Id.*)

with "the overwhelming weight of authority" and with CMS' own "considered and longstanding views." (*Id.* at 3, 4, 19–22.) It describes DHH's interpretation of Section 1396a(a)(23) as "not even a plausible reading of the statute," "certainly not compelled by the text of the provision," and likely to "undermine[] the provision's purpose." (*Id.* at 20–21.) Meanwhile, DHHS "has repeatedly and consistently interpreted the qualified language in § 1396a(a)(23) to prohibit a State from denying access to a provider for reasons unrelated to the ability of that provider to perform Medicaid-covered services or to properly bill for those services." (*Id.* at 3–4.)

Finally, the Statement of Interest affirms CMS' view that "Medicaid beneficiaries" like the Individual Plaintiffs "may enforce their statutory rights under § 1396a(a)(23) to their choice of a qualified provider through a private action under 42 U.S.C. § 1983" even after *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1382, 191 L. Ed. 2d 471 (2015) ("*Armstrong*"). (*Id.* at 2; *see also* Doc. 22 at 2–5.)

### 2.   First Hearing

On September 2, 2015, the First Hearing was held. (Doc. 30.)

During its course, the Parties' positions on Section 1396a(a)(23) were clarified. Plaintiffs' counsel explained: "We're here because the termination violates the Jane Doe Plaintiffs' . . . right to free choice of provider under Section 1396a(a)(23) of the Medicaid Act." (Hr'g Tr. 4:10–12, Sept. 2, 2015.) Because PPGC is "competent to provide services," it argued that it was "qualified" within this subsection's meaning. (Hr'g Tr. 5:20–23.) The claim before the Court in the Motion for TRO was the Individual Plaintiffs' claims under this provision of the "federal Medicaid act," Plaintiffs' counsel emphasized. (Hr'g Tr. 10:17–19, Sept. 2, 2015.) In Plaintiffs'' view, whether or not PPGC held some administrative right was irrelevant, as the

Individual Plaintiffs always lacked such prerogatives. (Hr'g Tr. 10:15–19, Sept. 2, 2015.) On the

Individual Plaintiffs' behalves, PPGC contested Defendant's claim that Section 1396a(a)(23)

creates no private cause of action. (Hr'g Tr. 3:13–19, 6:23–7:4, Sept. 2, 2015.) Specifically, it

argued that it "clearly fulfills the standard set forth by the Supreme Court in *Blessing* [*v.*

*Freestone*, 520 U.S. 329, 117 S. Ct. 1353, 137 L. Ed. 2d 569 (1997) ("*Blessing*"),] and then in

the *Gonzaga* [*University v. Doe*, 536 U.S. 273, 153 L. Ed. 2d 309, 122 S. Ct. 2268 (2002)

("*Gonzaga*"),] . . . cases."[11] (Hr'g Tr. 3:13–19, Sept. 2, 2015.) In other words, this subsection

uses "rights creating language that unambiguously confers a right on Medicaid patients" and is

not "so vague and so amorphous that . . . [it would] strain judicial competence to enforce." (Hr'g

Tr. 6:6–19, Sept. 2, 2015.) Plaintiffs sought to distinguish the more recent *Armstrong* from the

body of law spawned by these cases by maintaining that it not only dealt with "a completely

different section of the Medicaid Act," one "without the same kind of rights creating language,"

but also lacked any Section 1983 claim. (Hr'g Tr. 6:24–7:4, 7:8–9, 7:1, Sept. 2, 2015.)

Defendant's counsel countered that Section 1396a(a)(30) was substantially identical to

Section 1396a(a)(23). These two subsections have "the exact same rights creating type of

language"; both "say what the state plan should provide." (Hr'g Tr. 16:17–22, Sept. 2, 2015.) He

thus urged the Court to adopt the reasoning of the plurality in *Armstrong*. (Hr'g Tr. 14:10–15:8,

16:4–10, 16:13–14, 19:21–24, 22:24, 23:13 14, Sept. 2, 2015.) Defendant's counsel also insisted

that Section 1396a(a)(23)'s "qualified" requirement was "a very vague standard." (Hr'g Tr.

18:1–2, Sept. 2, 2015.) Having proposed a number of denotations, (Doc. 13 at 8), Defendant's

counsel based this conclusion on his "conversations with CMS and the supposed

"unreasonabl[eness]" of CMS' contrary interpretation, (Hr'g Tr. 16:24–17:10, Sept. 2, 2015.)

---

[11] The relevant test is discussed later in this opinion. *See infra* Part V.

Because "qualified" is inherently vague and ambiguous, Section 1396a(a)(23) cannot meet the *Blessing* test's requirement that a right not be "so vague and amorphous as to be beyond the competence of the judiciary to enforce."[12] (*See id.*; *see also* Doc. 13 at 4, 8.)

PPGC's competence to provide the Medicaid services was also discussed. In response to this Court's question regarding whether DHH had yet "raised any suggestion or made any suggestion that the reason for terminating the contract has anything to do with competency or the adequacy of the care that is given" by PPGC "to patients who get their care at those facilities," Plaintiffs' counsel answered, "No." (Hr'g Tr. 3:19–24, Sept. 2, 2015.) When this Court posed the same question to Defendant's counsel—"There is no question . . . about the competency of these two facilities to provide Medicaid services and adequate care for the patients that they serve?"—Defendant's counsel answered, "At this time, I would agree with that." (Hr'g Tr. 11:12–16, Sept. 2, 2015.) Additionally, Defendant's counsel admitted that DHH's definition of "qualified" was "circular": PPGC was no longer a "qualified" provider because DHH had made it so by terminating their contract, a mechanism never before utilized in quite this manner. (Hr'g Tr. 21:10–13, 22–25, Sept. 2, 2015.) He also acknowledged that the "current motive" or "the motive leading up to it" (the Agreements' terminations) was CMP's video tapes. (Hr'g Tr. 12:8–16, Sept. 2, 2015.)

The Parties finally contested the capacity of this state's other Medicaid providers to absorb PPGC's patients. PPGC characterized the list included with the First Kennedy Declaration as containing "numerous examples of[,] on their face[,] providers that would not provide the care that Planned Parenthood provides, including dentists, radiologists, nursing homes, [and other] places that are not going to do breast cancer screening or give out birth

---

[12] It is unclear whether Defendant was also articulating a *Chevron* deference argument on her own behalf or simply citing to *Blessing*. Her statements can be read in both ways.

control." (Hr'g Tr. 8:18–22, Sept. 2, 2015.) PPGC maintained "that there's no way that . . . other alternative providers have the capacity to absorb our patients." (Hr'g Tr. 9:2–4, Sept. 2, 2015.)

Defendant's counsel admitted that the Individual Plaintiffs would suffer "disruption of some kind," newly forced, "to get other doctors" and "seek out other places to get their health care." (Hr'g Tr. 13:6–12, Sept. 2, 2105.) Defendant's counsel also explained the origins of the list of providers referenced in the Defendant's Opposition and the First Kennedy Declaration. (Hr'g Tr. 22:21–24:15, Sept. 2, 2015.) It reflected "typical billed" codes, and was the result of "a code run" of providers that "can provide family planning services because they have billed for them" by Defendant. (Hr'g Tr. 25:1–6, Sept. 2, 2015.)

### 3.      Third Kennedy Declaration

After the First Hearing, Defendant sought permission to amend its opposition and substitute new papers "pursuant to . . . [its] duty to provide accurate information to the Court." (Doc. 32 at 1.) Included in Defendant's proposed amendments was a third declaration by Kennedy ("Third Kennedy Declaration"). This Third Kennedy Declaration corrects the list of providers included with the First Kennedy Declaration, explaining: "I[, Ms. Kennedy,] ordered a comprehensive review of this exhibit and have since discovered that nursing facilities and dentists should not have been included." (Doc. 34-2 ¶ 8a at 2; *see also* Doc. 34 at 2.) It adds: "The other provider types included in Exhibit 1 are appropriate due to what they are allowed to do under the scope of their license." (Doc. 34-2 ¶ 8a at 2; *see also* Doc. 34 at 2.) It gives two other examples: "Anesthesiologists can be reimbursed for their role in sterilization procedures and radiologists can be reimbursed for reading ultrasounds, etc. related to reproductive/women's health issues." (*Id.*)

This same "further review of the information in [the First Kennedy Declaration] also revealed a more precise description of Medicaid providers in the New Orleans and Baton Rouge areas other than PPGC who are available to patients seeking family planning and related services." (Doc. 34 at 2.) Defendant's staff had "gather[ed] information from available Medicaid providers in proximity to the two Planned Parenthood locations in New Orleans and Baton Rouge, Louisiana." (Doc. 34-2 ¶ 8b at 2.) As a result of this additional inquiry, Ms. Kennedy had decided to cull the list of relevant providers from over one-thousand (1,000) to less than fifty (50), (*Compare* Doc. 13-2 ¶ 8 at 2, *with* Doc 34-2 at 5–6).

**4.      Abandonment of First Termination Action and Commencement of the Second Termination Action**

On September 9, 2015, Defendant chose to "rescind" the Agreements' at-will termination." (Doc. 38 at 2.) On September 14, 2015, Defendant sent four rescission letters, one for each Agreement, to PPGC. (Doc. 38 at 4, 6, 8, 10.) On September 15, 2015, Defendant followed these rescission letters with four new termination letters ("Second Termination Letters"). (Doc. 39 at 1.) While the First Termination Letters had invoked Section 46:437.11(D)(1), (Doc. 38 at 4, 6, 8, 10), the Second termination Letters rely on Section 46:437.11(D)(2), (Doc. 39-1 at 2, 5, 8, 11). This subsection of MAPIL allows for "for cause" termination of a provider agreement. LA. R.S. §§ 46:437:11(D)(2).

The Second Termination Letters specify several different grounds. The first is a settlement in *Reynolds v. Planned Parenthood Gulf Coast, Inc.* ("*Reynolds* Settlement"), Case Number 9:09-cv-124-RC, a lawsuit pursuant to the False Claims Act ("FCA") in the Eastern District of Texas between PPGC and an FCA plaintiff. (Doc. 39-1 at 2, 5, 8, 11.) According to

the letters, two violations of Title 50 were based on this settlement. First, simply by settling this action, PPGC had violated Title 50. (*Id.*) Second, since DHHS had not been informed "within ten (10) working days of when the provider knew or should have known of the violation," another violation of Title 50 had occurred. (*Id.*)

A second (or third) ground consisted of "provider audits and federal false claims cases against PPFA . . . affiliates." (*Id.*) A second Texas case, *Carroll v. Planned Parenthood Gulf Coast* ("*Carroll*"), Case Number 4:12-cv-03505, fell within this description. According to the letters, in *Carroll*, "the presiding judge found that the information already provided allows the court to draw the reasonable inference that Planned Parenthood knowingly filed false claims." (*Id.*; *see also* Hr'g Tr. 35:1–16, Oct. 16, 2015.)

The third basis for termination was Defendant's determination that PPGC's July and August Letters, *see supra* Part II.B, contained "misrepresentations" upon Defendant's further review of CMP's videos. (Doc. 39-1 at 3, 6, 9, 12.)[13] Other grounds are referenced in these letters, including audits, noncompliance with various Title 50 conditions, and more. (*Id.*)

After receiving these Second Termination Letters, Plaintiffs filed an unopposed motion to amend the complaint on October 7, 2015, (Doc. 41), a request granted on that same day, (Doc. 42). Already attached to this motion, (Doc. 41-1), the new amended complaint ("Amended

---

[13] Other grounds were hinted at in the Second Termination Letters. For example, Defendant maintained that, as Section 46:437.11(D)(2) allows for termination "immediately and without notice if a health care provider is the subject of a sanction or of a criminal, civil, or departmental proceeding," it had determined "that PPGC currently fits within this statute due to the investigations of PPGC by both DHH and the Louisiana Office of Inspector General." (Doc. 39-1 at 3, 6, 9, 12.) And finally, pursuant to Section 46:437.14(A)(l0) and (12), Defendant claimed that it "may move to revoke enrollment if a provider is found in violation of licensing or certification conditions or professional standards relating to the licensure or certification of health care providers or the required quality of goods, services, or supplies provided" as well as "for failure to meet any condition of enrollment." (*Id.*) PPGC, however, has counted three, and Defendant has not yet contradicted this grouping in writing or during the Second Hearing.

Complaint") followed on October 7, 2015, (Doc. 43).[14] Two days later, Plaintiffs filed the

Renewed Motion for TRO, (Doc. 45), and the Renewed Memorandum, (Doc. 46).

Simultaneously, Plaintiffs filed the Plaintiffs' Motion for Limited Expedited Written Discovery,

(Doc. 47), and Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Limited Expedited

Discovery, (Doc. 48). On October 14, 2015, Plaintiffs docketed the Memorandum Regarding

Availability of State Remedy. (Doc. 52 at 1.) Defendant filed the Motion to Dismiss, (Doc. 53),

and Defendant's Memorandum on October 14, 2015, (Doc. 53-1). On October 16, 2015, this

Court held the Second Hearing. The Court orally denied Plaintiffs' Motion for Limited

Expedited Written Discovery and took the remaining motions under advisement at the Second

Hearing's conclusion. Late that day, Plaintiffs filed a copy of the *Reynolds* Settlement. (Doc. 54.)

.

## D.    PARTIES' ARGUMENTS

### 1.    Plaintiffs' Arguments

In their Motion for TRO and Renewed Motion for TRO, Plaintiffs have made four

relevant arguments to why they are entitled to a temporary restraining order.

First, Plaintiffs first contend that they will likely prove that Defendant's efforts violate

federal statutory and constitutional law. They begin by arguing that Defendant's latest

termination, like the first, is prohibited by the plain meaning of Section 1396a(a)(23) and are

thus in violation of controlling federal law. (Doc. 46 at 17–22; *see also* Doc. 4-1 at 16.) This

Freedom-of-Choice Provision bars Defendant from excluding PPGC from Medicaid for a reason

---

[14] While many paragraphs in the Amended Complaint mirror exactly those in the First
Complaint, (Doc. 4 ¶¶ 1, 2, 3, 4, 9–14, 18–33, 35, 37–49, *with* Doc. 43 ¶¶ 1, 2, 3, 5, 10–15, 19–
33, 41, 43–55), or underwent slight alteration (i.e. dates), (Doc. 4 ¶ 5, *with* Doc. 43 ¶ 6),
Plaintiffs refined others so as to reflect this case's latest posture and developments, (Doc. 43 ¶¶
4, 6, 35–36), and class action claims, (Doc. 43 ¶¶ 16–19, 56–61, 68).

unrelated to its fitness to provide medical services. (Doc. 46 at 18, 21, 22; Doc. 4-1 at 11.) Because "Defendant has nowhere suggested that PPGC is not 'qualified to perform' the Medicaid services it provides," its action cannot be cohered with this subsection's language and purpose. (Doc. 4-1 at 15, 16.)

Plaintiffs concurrently maintain that this particular subsection, in contrast with 1396a(a)(30), which was the focus in *Armstrong*, does afford Plaintiffs with a right enforceable via Section 1983. (Doc. 46; Doc. 4-1.) Throughout their discussion, Plaintiffs rely on many of the same cases, including *Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960 (9th Cir. 2013) ("*Betlach*"); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962 (7th Cir. 2012) ("*Indiana*"); and *Women's Hospital Foundation v. Townsend*, No. 07-711-JJB-DLD, 2008 U.S. Dist. LEXIS 52549, 2008 WL 2743284 (M.D. La. July 10, 2008).

In the Renewed Memorandum, Plaintiffs do abandon their procedural due process claim, (Hr'g Tr. 14:17–24, Oct. 16, 2015; *compare* Doc. 43 ¶¶ 62–67, *with* Doc. 1 ¶¶ 56–57), but reiterate their two constitutional ones, (Doc. 1 ¶¶ 52–55 at 14; Doc. 43 ¶¶ 64–67 at 20). Now, Plaintiffs maintain that Defendant, without sufficient justification, is singling them out for unfavorable treatment, violating the Equal Protection Clause of the Constitution's Fourteenth Amendment, U.S. CONST. amend. XIV, § 2, and is attempting to penalize them for freely associating with other related Planned Parenthood entities, thereby contravening the freedom of association guaranteed by the First Amendment, *see* U.S. CONST. amends. I, IX, § 2; *NAACP v. Ala. ex. rel Patterson*, 357 U.S. 449, 460, 78 S. Ct. 1163, 1498, 2 L. Ed. 2d 1488 (1958). (*See, e.g.*, Doc. 46 at 22.)

Second, Plaintiffs insist that the harm to both PPGC and the Individual Plaintiffs will be irreparable if the termination comes to pass. The Individual Plaintiffs will be deprived of their

ability to exercise their federal statutory rights, and will suffer a disruption of their relationship with a preferred (and competent) provider and a reduction of their access to family planning services. (Doc. 46 at 26; *see also* Doc. 4-1 at 8–9, 17.) PPGC, in turn, will find its budget sharply curtailed, possibly forcing it to close down BRHC permanently, and will never be able to recover any monetary damages from DHH. (Doc. 46 at 27 & n.19; *see also* Doc. 4-1 at 17–18, 18 n.13.)

Third, Plaintiffs argue that the balance of harms favors them. "While PPGC and its patients will suffer irreparable harm in the absence of an injunction, the state will suffer no injury at all." (Doc. 46 at 27; *see also* Doc. 4-1 at 18.) The reason, Plaintiffs contend, is because an injunction will do no more than "require the state to maintain the funding [it] ha[s] provided to Plaintiff[] for years." (Doc. 46 at 27 (internal quotation marks omitted) (alterations in original); *see also* Doc. 4-1 at 18.)

Finally, Plaintiffs assert that the public interest favors their injunctive request. The public has a "strong" interest "in ensuring continued public access to crucial health services, especially for the many underserved and low-income patients PPGC serves." (Doc. 46 at 28; *see also* Doc. 4-1 at 18.) Such an interest is especially "acute with respect to the neediest . . . who depend on publicly funded programs." (Doc. 46 at 28; *see also* Doc. 4-1 at 19.)

As to Defendant's argument that Plaintiffs' failure to pursue a state administrative appeal of the termination renders the controversy not ripe and Plaintiffs without standing, Plaintiffs argue that PPGC is not required to pursue the state administrative appeal but can instead pursue its rights under Section 1983. (Doc. 52 at 2–3; *see also* Hr'g Tr. 6:6–10, Sept. 2, 2015.) The Individual Plaintiffs argue they have no right to administratively appeal and couldn't do so if they wanted to. (Doc. 52 at 3; *see also* Hr'g Tr. 10:9–10, Sept. 2, 2015.)

2.      **Defendant's Arguments**

Invoking Rule 12(b)(1) and (6), Defendant makes essentially three arguments.

First, Defendant contends that this Court lacks subject-matter jurisdiction over this dispute because this case is not ripe and Plaintiffs lack prudential and constitutional standing. (Doc. 53-1 at 6–9.) Defendant insists on this case's unripe state for three reasons: (1) "Plaintiffs have suffered no injury"; (2) "further procedural and factual development is required"; and (3) no hardship can be shown. (*Id.* at 6, 8.) As support for his first and second reason, Defendant argues that because PPGC may appeal this termination, during which the Agreements will remain enforce in accordance with Defendant's wishes, this "suspensive" review process leaves *all* Plaintiffs without a cognizable injury. (*Id.* at 6–7 (injury), 8 (hardship), 9 (injury for standing purposes).) Defendant's Memorandum further explains the reasons for a lack of ripeness and standing as such: "In the instant matter, PPGC is asserting a ***due process*** violation while simultaneously hinting that it may voluntarily elect ***not*** to participate in the process about which it complains." (*Id.* at 8.)

Second, Defendant argues for abstention, emphasizing these doctrines' purpose of "preserv[ing] the balance between state and federal sovereignty."  (*Id.* at 10.) Defendant cites to four abstention doctrine—*Pullman*, *Younger*, *Burford*, and *Colorado River*—and foregoes one—*Thibodaux*. (*Id.* at 10–12.) When cumulatively considered, these doctrine's "animating" principles have a "clear application" to this proceeding: "Plaintiffs should not be indulged in their attempt to invoke the jurisdiction of this Court in the absence of State agency action against them that would delineate . . . [Defendant's] interpretation of the challenged provision, and in the presence of adequate state administrative and judicial procedures if that eventuality were to occur." (*Id.* at 12.)

Third, Defendant insists Plaintiffs cannot prevail on the merits for four reasons. First, "Plaintiffs have no property interest in the Medicaid provider contracts." (*Id.* at 13; *see also* Doc 13 at 14–18.) Second, even if Plaintiffs have a property interest, Louisiana's administrative appellate process "complies with the mandates of due process" and federal regulation, for "the essence of due process is notice plus an opportunity to be heard." (Doc. 53-1 at 17.) Third, Defendant insists that Section 1396a(a)(23) does not afford the Individual Plaintiffs any private cause of action, (*Compare* Doc. 53-1 at 18–22, *with* Doc. 13 at 4–9), and is sufficiently ambiguous to permit Defendant to exercise her discretion to define "qualified" in accordance with her construction of state law, (Doc. 53-1 at 21; *see also* Doc. 4 at 8). Defendant thus insists that her authority under Section 45:437.11(D)(2) is not limited "to determining whether a provider is competent to provide . . . services." (Doc. 53-1 at 22.) She can, instead, invoke any ground derived from state law to determine whether a provider is "competent" or not. (Doc. 53-1 at 23–24.)

## IV.     RESOLUTION OF PRELIMINARY ISSUES: JURISDICTION AND ABSTENTION

### A.     RIPENESS

### 1.     Defendant's Arguments

Defendant provides the correct standard by which to measure its argument that this case is not ripe: for the purposes of this doctrine, "a court must evaluate (1) the fitness of the issues for judicial resolution, and (2) the potential hardship to the parties by declining court consideration," (Doc. 53-1 at 6 (quoting *Lopez v. City of Houston*, 617 F.3d 336, 342 (5th Cir. 2010)). Defendant maintains the case is not ripe for three reasons: (1) "Plaintiffs have suffered

no injury"; (2) "[F]urther procedural and factual development is required, as demonstrated by Plaintiffs' due process claim . . .and their request to conduct expedited discovery in this proceeding"; and (3) no hardship exists because "the review process is suspensive," a third point substantively identical to its first (Doc. 53-1 at 6, 8). At the Second Hearing, her counsel stressed one aspect of the Constitution's ripeness requirement: "There is absolutely no injury"; "[T]here is absolutely no harm to them at all"; "[T]hey have no injury"; and, "There's no concrete injury to any of the Planned Parenthood or to any of the Jane Doe Plaintiffs because, again, there simply is no injury." (Hr'g Tr. 3:21–23, 4:18–22, 7:24–8:1, Oct. 16, 2015.)

## 2.  Analysis

Mostly, albeit not entirely, drawn from Article III, U.S. Const. art. III, § 2; *Reno* v. *Catholic Soc. Servs., Inc.,* 509 U.S. 43, 57 n. 18, 113 S. Ct. 2485, 2495 n.18, 125 L. Ed. 2d 38 (1993), ripeness is "a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties," *Nat'l Park Hospitality Ass'n v. U.S. Dep't of Interior*, 538 U.S. 807–08, 123 S. Ct. 2026, 2030, 155 L. Ed. 2d 1017 (2003). It generally incorporates, as Defendant rightly notes, (Doc. 53-1 at 6), consideration of two discrete elements: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 808 (citing to *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S. Ct. 1507, 1515, 18 L. Ed. 2d 681 (1967) ("*Abbott Labs.*")). For five reasons, Defendant's argument that no ripeness exists fails.

The primary reason is well-rooted in ripeness jurisprudence:  "In evaluating ripeness, the central focus is on whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1250 (10th Cir. 2011) (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1097 (10th Cir. 2006)). However, an injury need not be actual in a physical sense for a plaintiff's case to cross the ripeness threshold. Rather, if a plaintiff is "immediately in danger of sustaining some direct injury as the result of the challenged official conduct," ripeness will often be found. *Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010); *see also Whole Woman's Health v. Cole*, 790 F.3d 563, 582 (5th Cir. 2015) (quoting *id.*). It is enough that "an injury that has not yet occurred is sufficiently likely to happen to justify judicial intervention" or "when the court would be in no better position to adjudicate the issues in the future than it is now." *Pearson*, 624 F.3d at 684.

Thus, "ripeness is seldom an obstacle to a pre-enforcement challenge . . .  where the plaintiff faces a credible threat of enforcement"; in such cases, the plaintiff is typically "not . . . required to await and undergo [enforcement] as the sole means of seeking relief." *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 907 (10th Cir. 2012); *see also, e.g.*, *Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 49 (D.C. Cir. 2000) (holding that declaratory judgment action was ripe for judicial review under the Administrative Procedures Act where plaintiff's "only alternative to obtaining judicial review now is to violate EPA's directives . . . and then defend an enforcement proceeding on the grounds it raises here"). Indeed, as the Court has recently written, an agency's prospective, not yet consummated, action will be found ripe for review if "the scope of the controversy has been reduced to more manageable proportions . . .  by *some concrete action* applying the regulation to the claimant's situation in a fashion that harms

or *threatens to harm* him." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 808.

Under this precedent, Defendant's Second Termination Letters amount to certain threats, classifiable as "concrete action[s]" that "threaten to harm" Plaintiffs. Here, the existing record amply supports this determination: Defendant has made it clear she intends to terminate the Medicaid provider agreements, the only thing changing since the initial termination letters being the reason. In effect, by her own actions, she has triggered the application of a general rule, federal courts having "consistently found a case or controversy in suits between state officials charged with enforcing a law and private parties potentially subject to enforcement," *Consumer Data Indus. Ass'n*, 678 F.3d at 905. A case's ripeness simply does not depend on whether the injury has already been inflicted, and "specific threat[s] of enforcement" like those the Defendant has already made are more than enough to satisfy this constitutional minimum. *Reynolds v. City of Valley Park*, No. 4:06CV01487 ERW, 2006 U.S. Dist. LEXIS 83210, at *25, 2006 WL 3331082, at *6 (E.D. Mo. Nov. 15, 2006); *see also, e.g.*, *Cass Cnty. v. United States*, 570 F.2d 737 (8th Cir. 1978) ("Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."). In so holding, then, this Court does no more than adhere to a higher tribunal's advisement: "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201, 103 S. Ct. 1713, 1721, 75 L. Ed. 2d 752 (1983) (quoting *Pennsylvania* v. *West Virginia*, 262 U.S. 553, 593, 43 S. Ct. 658, 663, 67 L. Ed. 1117 (1923)). The Agreements' termination has been threatened repeatedly since August 2015, and Defendant has now only swapped no reason for three. (*Compare* Doc. 13, *with*

Doc. 39-1.) Based on these circumstances and well-settled law, Plaintiffs' threatened injury is clear.

Two admissions by Defendant's counsel at the Second Hearing strengthen this conclusion. First, though only indirectly, he himself conceded that a kind of "harm" may have already come to pass: in arguing why no cognizable injury had yet transpired, he emphasized possible contingencies: "I think that one of the contingencies that could happen is their rights could be ***restored*** . . . . [The] suspension could be ***lifted***." (Hr'g Tr. 16:19–23, Oct. 16, 2015 (emphasis added).) This highlighted language implies that Plaintiffs' rights have already been curtailed and a suspension already imposed;[15] either would be a sufficiently credible threat to render this case ripe. Indeed, Defendant's counsel later confirmed these statements' implication. To the Court's question—"the Secretary has terminated the contract, but . . . has said that termination is suspended pending appeal?"—he answered: "That's correct." (Hr'g Tr. 18:13–16, Oct. 16, 2015; *see also* Doc. 53-1 at 9–10.) Thus, even if the termination is suspended, it will occur automatically but for this Court's intervention. That its practical enforcement may be stayed does not change the key fact: using *Pearson*'s terms, Plaintiffs are in "danger of sustaining some direct injury as the result of the challenged official conduct," *Pearson*, 624 F.3d at 684. A final exchange cinches this conclusion. When Plaintiffs' counsel revealed PPGC's intent "to proceed in federal court" and not "to pursue the administrative remedy," and the Court observed, "Well, then it seems to me you've got a very, very ripe situation," and asked Defendant's counsel, "Am I missing something on that?" he answered, "No." (Hr'g Tr. 19:6–20, Oct. 16, 2015.)

Equally worthy of note, Defendant quotes but dismisses the import of a principle

---

[15] For something to be "restored" it must first have been taken, and for something to be "lifted" it must first have been imposed.

embedded in ripeness case law: "[A] case is generally ripe if any remaining questions are purely legal ones," *Lopez*, 617 F.3d at 341. As any fair reading of the complaint and motions filed in this case indicates, the issue involves at least one, if not three, "purely . . . legal question[s]"; the precise meaning of Section 1396a(a)(23) and the applicability of two constitutional clauses. (*See, e.g.*, Doc. 1 at 1; Doc. 43 at 1.) In *Abbott Labs.*, the seminal case in ripeness jurisprudence, the Court concluded that the issues presented were appropriate for judicial resolution because the facial challenge to the regulation involved the purely legal question of whether the regulation at issue exceeded the scope permitted by the underlying statute. *See Abbott Labs.*, 387 U.S. at 149. This kind of challenge, found ripe in *Abbott Labs.*, resembles the challenge that PPGC now makes, with "consideration of the underlying legal issues" *not* "necessarily be[ing] facilitated if they were raised in the context of a specific attempt to [apply and/or] enforce the regulations," *Gardner v. Toilet Goods Ass'n*, 387 U.S. 158, 171, 87 S. Ct. 1526, 1528, 18 L. Ed. 2d 704 (1967). "Predominantly legal questions" like a statute's plain meaning are nearly always ripe. *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1164 (11th Cir. 2008); *see also, e.g.*, *LeClerc v. Webb*, 419 F.3d 405, 414 (5th Cir. 2005); *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997). Plaintiffs' present action presents precisely such questions.

Third, this Court finds Defendant's application of the ripeness doctrine to be predicated on a fundamental misunderstanding of these claims. In its final paragraph, Defendant's Memorandum summarizes her view of Plaintiffs' case: "In the instant matter, PPGC is asserting a due process violation while simultaneously hinting that it may voluntarily elect ***not*** to participate in the process about which it complains." (Doc. 53-1 at 8 (emphasis in original).) At the Second Hearing, Defendant again reduces all of Plaintiffs' claims to "a disguised due process challenge." (Hr'g Tr. 7:2–3, Oct. 16, 2015.) This assertion, however, ignores the explicit

constitutional and federal statutory bases of Plaintiffs' Amended Complaint, (*see, e.g.*, Doc. 1 at 1; Doc. 43 at 1), as Plaintiffs' counsel expressly declared at the Second Hearing, (Hr'g Tr. 14:17–24, Oct. 16, 2015). Consequently, the fact that Defendant dismisses the Individual Plaintiffs' claims as "derivative" of PPGC's, (Hr'g Tr. 8:4–10, Oct. 16, 2015) based wholly on cases explicating the requirements of procedural due process, (Doc. 53-1 at 13 (citing *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577 (2d Cir. 1989); *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 177 (2d Cir. 1991); and *Senape v. Constantino*, 936 F.2d 687 (2d Cir. 1991); *see also* Doc. 13 at 16–17), cannot be ignored. When statutes like Section 1396a(a)(23) provide the case's gravamen and no procedural due process claim is made, Defendant's cases cannot be deemed legally relevant. *See Planned Parenthood of Ind., Inc.*, 699 F.3d at 977 (rejecting the relevance of *Kelly Kare* and similar cases because "[t]his is not a due-process case"). Indeed, this conclusion seems especially appropriate when at least one of the cases cited by Defendant conceded that "there may be a property interest in a provider's status as a qualified health-care provider,"[16] *Kelly Kare*, 930 F.2d at 176. (*See* Doc. 53-1 at 14–15.)

Fourth, the jurisprudence construing the hardship requirement is clear. The Fifth Circuit "has found hardship to inhere in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being force[d] . . . to modify [one's] behavior in order to avoid future adverse consequence." *Choice Inc. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (alteration in original) (internal quotation marks omitted). Discrete formulations, a plaintiff can meet the ripeness doctrine's hardship prong by satisfying just one. *Id.* As the Court's own decisions clarify, the first test has

---

[16] In *Kelly Kare*, moreover, the Second Circuit actually noted that its case law was not necessarily consistent, contrasting *Plaza Health*, upon which Defendant relies, with a second case, which seemingly holds the opposite. *Kelly Kare*, 930 F.2d at 175.

been met when an agency proposes to "grant, withhold, or modify any formal legal license, power or authority," *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733, 118 S. Ct. 1665, 1670, 140 L. Ed. 2d 921 (1988), and the second is fulfilled when "the impact of the administrative action could be said to be felt immediately by those subject to it in conducting their day-to-day affairs," *Gardner*, 387 U.S. at 164. Quite simply, Defendant's conduct here cannot be described in any different terms, while Defendant has effectively swapped the familiar ripeness test ("imminent injury") with administrative law's exhaustion one ("final decision"). *See Legacy Community Health Servs., Inc. v. Janek*, No. 4:15-CV-25, 2015 U.S. Dist. LEXIS 8610, at *12–13, 2015 WL 4064270, at *5 (S.D Tex. July 2, 2015) (finding case ripe even when a party did not allege any actual instance of enforcement). Since a threat suffices, to conclude differently would be to find no case ripe when an administrative option remains for one of many plaintiffs and a statutory right and remedy exists for all, a result contrary to the many opinions that have confronted claims under Section 1396a(a)(23). *See infra* Part V; s*ee also, e.g.*, *Sabree v. Richman*, 367 F.3d 180, 193 & n.29 (3d Cir. 2004) ("A] plaintiff's ability to invoke § 1983 cannot be defeated simply by the availability of administrative mechanisms to protect the plaintiff's interests."); *cf. Cathedral Rock of N. Coll. Hill, Inc. v. Shalala*, 223 F.3d 354, 366 (6th Cir. 2000) (noting that "the Medicaid Act does not have a provision . . . incorporating § 405(h) and its exclusive jurisdiction limitation to channel legal challenges through the administrative procedures set forth").

Finally, Defendant oversells the significance of the Plaintiffs' own motion to expedite discovery, (Doc. 47). According to Defendant, this request attests to the need for factual development that proves ripeness' absence, (Doc. 53-1 at 6); Plaintiff disagrees, (Hr'g Tr. 41:8–19, Oct. 16, 2015). While the motion makes clear that such discovery is being sought for

purposes of strengthening Plaintiffs' animus allegations, (Doc. 48 at 2), the ripeness doctrine demands no more than a threatened injury to the plaintiff, not a complete evidentiary record. Indeed, Defendant's logic would render any federal case unripe if discovery remains essential, without any regard for the reason, a position sufficiently farcical to underscore the weakness of this argument. Even if Plaintiffs' first amendment claims require, like almost all claims often do, more discovery, that possibility says nothing about the ripeness of their two other claims. In the vast majority of cases in which ripeness is not found, "additional factual development" is absolutely "necessary," a feature wholly absent from a proceeding focused on the outer parameters of a statute's meaning. *See, e.g.*, *Baldwin v. Daniels*, 250 F.3d 943, 946 (5th Cir. 2001); *John Corp. v. City of Houston*, 214 F.3d 573, 586 (5th Cir. 2000).[17]

For all these reasons, this Court finds this case ripe for its review, joining the Eastern District of Arkansas in *Planned Parenthood Ark. & E. Okla. v. Selig*, No. 15-cv-00566-KGB ("*Selig*"), (Doc. 46-9), and the District of Utah in *Planned Parenthood Association of Utah v. Herbert*, No. 15-cv-693-CW ("*Herbert*"), (Doc. 46-10). In concurring with these courts, this Court finds it significant that Defendant has yet to adequately address either case. Rather, in attempting to distinguish only the former, Defendant offered one reason: "It's my understanding that [the right to an administrative appeal] was not a suspensive process," while "[t]his is a fully suspensive process," (Hr'g Tr. 9:6–7, Oct. 16, 2015). This lone purported difference, however, is incorrect, as Arkansas law, like Louisiana law, suspends a termination's enforcement upon a provider's proper appeal. *See* ARKANSAS MEDICAID PROVIDER MANUAL 161.500.

---

[17] Even in procedural due process cases, ripeness is not an issue when a facial attack is made. *See, e.g.*, *Cornell Cos. v. Borough of New Morgan*, 512 F. Supp. 2d 238, 256 (E.D. Pa. 2007).

**B.   STANDING**

**1.   Defendant's Arguments**

In contesting standing, Defendant insists PPGC lacks it in full. In her words, "Plaintiffs have not suffered nor are they about to suffer 'an injury in fact' which is concrete and particularized, or actual or imminent." (Doc. 53-1 at 9.) At the Second Hearing, this point was emphasized in the following terms: "There's no concrete injury to . . . Planned Parenthood or to any of the Jane Doe Plaintiffs because, again, there simply is no injury." (Hr'g Tr. 16:14–18, Oct. 16, 2015.)

**2.   Analysis**

Closely related to the ripeness inquiry, *Choice Inc. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012), standing implicates a slightly different series of concerns. Generally, ripeness is concerned with "*when* an action may be brought," but "standing focuses on *who* may bring a ripe action." *Jt. Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 174 (3d Cir. 2001) (emphasis added). The "irreducible [constitutional] minimum" of standing contains three elements": "(1) an injury-in-fact," defined as "an invasion of a legally protected interest which is (a) concrete and particularized" and "(b) actual or imminent, not conjectural or hypothetical," that is (2) fairly traceable to the defendant's allegedly unlawful conduct" and that is (3) likely to be redressed by the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992). Notably "[s]tanding and ripeness are closely related doctrines that overlap most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical." *New York Civil Liberties Union v. Grandeau*, 528 F.3d 122, 130 n.8 (2d Cir. 2008).

Indeed, "in measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing." *Jt. Stock Soc'y*, 266 F.3d at 174. The injury need not be inflicted already; imminence will do. *Warth v. Seldin*, 422 U.S. 490, 499, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975). Naturally, therefore, as more than one court has asserted, the threat of future harm is sufficiently immediate to constitute a cognizable injury-in-fact for purposes of both the standing and the ripeness doctrines. *E.g.*, *Comsat Corp. v. FCC***,** 250 F.3d 931, 936 (5th Cir. 2001) ("A threatened injury satisfies the injury in fact requirement so long as that threat is real[.]"); *Prestage Farms, Inc. v. Bd. of Supervisors of Noxubee Cnty., MS*, 205 F.3d 265, 268 (5th Cir. 2000) ("[T]he risk of injury may be founded on a likely and credible chain of events."); *see also, e.g.*, *Baur v. Veneman*, 352 F.3d 625, 633 (2d Cir. 2003) (collecting cases standing for the proposition that "threatened harm in the form of an increased risk of future injury may serve as injury-in-fact for Article III standing purposes"); *Employers Ass'n of New Jersey v. State of New Jersey*, 601 F. Supp. 232, 238 (D.N.J. 1985) ("[T]hreatened injury is sufficient for standing . . .without compelling litigants to await the consummation of threatened injury.") (quoting *Pac. Gas & Elec. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 200, 103 S. Ct. 1713, 1721, 75 L. Ed. 2d 752,  (1983)). While a truly "uncertain potentiality" may deprive a plaintiff of standing, *Prestage*, 205 F.3d at 268, a decent probability will confer it, *see Walters v. Edgar*, 163 F.3d 430, 434 (7th Cir. 1998) (collecting cases standing for the proposition that "[a] probabilistic harm, if nontrivial, can support standing"); *cf. Loa-Herrera v. Trominski*, 231 F.3d 984, 988 (5th Cir. 2000) ("Mere threatened injury is sufficient" if "the threat . . . is real.").

Per this law, as with this Court's ripeness inquiry, Defendant's threat of harm is sufficiently clear to establish Plaintiff's standing. In her motions, as at the First Hearing,

Defendant has insisted that she can terminate the Medicaid provider agreement with PPGC for any reason, and she has repeatedly made clear that she intends and hopes to do so. There is thus no question that she has made a cognizable threat to Plaintiff's interest, having already attempted to do via Section 46:437.11(D)(1) what she now seeks to do via Section 46:437.11(D)(2). (Doc. 38 at 2; Doc. 39-1 at 2 –13.) That she may not succeed concerns the precariousness of her own position, but has no bearing on whether the threat she poses is not real and the harm her action portends is not imminent. Precisely because it is, Plaintiffs' standing is established.[18] *See, e.g.*, *Susan J. v. Riley*, 254 F.R.D. 439 (M.D. Ala. 2008) (rejecting a defendant's standing challenge to a plaintiff proceeding under Section 1396a(a)(8)).

## C.    ABSTENTION

### 1.    Defendant's Arguments

Defendant urges this Court to abstain. (Doc. 53-1 at 10–12.) She argues for the applicability of the four main abstention doctrines—*Pullman*, *Younger*, *Burford*, and *Colorado River*. (*Id.* at 10–12.) Rather than applying the discrete elements of these varied doctrines, Defendant refers to their occasional "overlap to some degree in . . . scope and application" and reduces all four to a single formulation: (1) "where state administrative proceedings and judicial review afford claimants adequate opportunity to test the constitutionality of state law,"  and (2) "the exercise of federal jurisdiction would jeopardize state efforts to establish state policy on matters of public concern," abstention "should" follow. (*Id.* at 12.)

---

[18] PPGC's third-party standing may be a more complicated issue. Defendant, however, has raised no such objection, instead focusing on the doctrine's "injury" prong, and PPGC and the Individual Plaintiffs allege discrete, albeit related, harms. (Doc. 1; Doc. 43.)

2.      **Analysis**

When one examines the requirements of each of these doctrines, it is clear that none of

them applies.

Named after its founding decision, *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496,

61 S. Ct. 643, 85 L. Ed. 971 (1941), *Pullman* abstention is proper only when there is (1) a federal

constitutional challenge to a state action and (2) an unclear issue of state law that if resolved

would make it unnecessary to rule on the constitutional question. *Nationwide Mut. Ins. Co. v.

Unauth. Prac. of L. Comm.,  State Bar of Tex.*, 283 F.3d 650, 653 (5th Cir. 2002). The Fifth

Circuit has also taken the stance that this doctrine should be invoked in only narrow and limited

special circumstances and applied where the state court decision could avoid a federal question

and would also avoid a possible strain of the federal and state relationship. *Moore v. Tangipahoa

Parish Sch. Bd.*, 507 F. App'x 389, 396 (5th Cir. 2013) (citing *Reetz v. Bozanich*, 397 U.S. 82,

86–87, 90 S. Ct. 788, 25 L. Ed. 2d 68 (1970)).

In essence, for *Pullman* to govern, an uncertain state law must be central to the federal

proceeding. Here, however, there is no state statute central to this controversy. Rather, the

Defendant's interpretation of a *federal* statute and the extent to which her termination, regardless

of its state law basis, violates the United States Constitution are the only issues. In addition, as

*Pullman* requires that state law be confused and uncertain, Defendant's failure to bring to this

Court's attention even one Louisiana case evidencing a persistent discord regarding the meaning

of either Section 46:437.11(D)(1) or Section 46:437.11(D)(2) counsels against its invocation. On

these bare facts, *Pullman* abstention is inappropriate. *See, e.g.*, *Planned Parenthood of Idaho,

Inc. v. Wasden*, 376 F. Supp. 2d 1012, 1021 (D. Idaho 2005); *Planned Parenthood of Idaho, Inc.

v. Wasden*, 376 F.3d 908, 932 (9th Cir. 2004).

Articulated in *Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971), the Fifth Circuit has conceived of *Younger* abstention as a three-prong test: (1) there must be an ongoing state proceeding that is judicial in its nature, (2) the state must have an important interest in regulating the subject matter of that claim, and (3) there must be adequate opportunity in the state proceeding to raise constitutional challenge. *Rickhoff v. Willing*, 457 F. App'x 355, 358 (5th Cir. 2012) (citing *Wightman v. Tex. Supreme Court*, 84 F.3d 188, 189 (5th Cir. 1996)). Thus, *Younger* requires an ongoing state proceeding "judicial in nature." *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 627–28, 106 S. Ct. 2718, 2722–23, 91 L. Ed. 2d 512 (1986). But, as Defendant's counsel has conceded, no administrative proceeding commences until or unless PPGC appeals, (Doc. 53-1 at 22; *see also* Hr'g Tr. 16:8–17:9, Oct. 16, 2015), and PPGC has foresworn that option, (Hr'g Tr. 19:6–10, Oct. 15, 2015). Meanwhile, the Individual Plaintiffs cannot possibly initiate such a proceeding as a matter of state law, as Defendant's two lawyers have admitted and Plaintiffs contend. (Hr'g Tr. 8:7–10, Oct. 16, 2015; Hr'g Tr. 9:11–19, 14:22–25, Sept. 2, 2015; Doc. 22 at 2–5; Doc. 46 at 18 n.13.) Regardless, no evidence has been adduced that any state quasi-judicial action predated the First Complaint's filing; *Younger* requires as much. Indeed, having rescinded the First Termination Letters, Defendant's prospective agency action by definition will post-date the commencement of this federal proceeding. These facts render *Younger* inapplicable to this proceeding.[19]

*Colorado River* abstention, derived from *Colorado River Water Conservation Dist. v. U. S.*, 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976), is exceptionally narrow. In this Circuit, six elements must be satisfied:

---

[19] *Younger* is also subject to three exceptions, at least two of which arguably apply. *Bice v. Louisiana Pub. Defender Bd.*, 677 F.3d 712, 716 n.3 (5th Cir. 2012).

1) assumption by either court of jurisdiction over a res, 2) relative inconvenience

of the forums, 3) avoidance of piecemeal litigation, 4) the order in which

jurisdiction was obtained by the concurrent forums, 5) to what extent federal law

provides the rules of decision on the merits, and 6) the adequacy of the state

proceedings in protecting the rights of the party invoking federal jurisdiction.

*African Methodist Episcopal Church v. Lucien*, 756 F.3d 788, 798 (5th Cir. 2014) (citing *Stewart*

*v. W. Heritage Ins. Co.*, 438 F.3d 488, 491 (5th Cir. 2006)). In the case cited therein, the Fifth

Circuit has found it applicable when there is a parallel suit in the state court at the time of the

federal suit also being brought with the same parties and the same issues. *Stewart*, 438 F.3d at

491. As such, as with *Younger*, the absence of any parallel proceeding in a state agency or a state

court initiated before this federal suit's filing must foreclose *Colorado River*'s application to the

instant matter.

Traceable to *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S. Ct. 1098, 87 L. Ed. 1424 (1943),

this final doctrine contemplates the presence of a state-created avenue of relief put where the

state has a degree of specialized competence to hear such cases is present. *See Romano*, 721 F.3d

at 380 (listing five factors). Put another way, *Burford* abstention is only appropriate when there

is a danger that federal court review will "disrupt the [s]tate's attempt to ensure uniformity in the

treatment of an essentially local problem." *New Orleans Public Service, Inc. v. Council of City of*

*New Orleans*, 491 U.S. 350, 364 (1989).

Such is not the case here. It is the meaning of Section 1396a(a)(23), a federal statute, and

two constructional provisions which constitute the central controversies. In fact, in interpreting

Section 1396a(a)(8), whose language perfectly mirrors Section 1396a(a)(23), the Fifth Circuit

rejected this same Defendant's request for *Burford* abstention in no uncertain terms:

> None of these factors weighs in favor of abstention in this case. The cause of
> action arises under federal law, there are no apparent issues of state law or local
> facts, the interest in proper application of federal Medicaid law is paramount, and
> there is no special state forum for judicial review.

*Romano*, 721 F.3d at 380. As with *Colorado River*, *Younger*, and *Pullman*, the prerequisites for *Burford*'s invocation are absent from this case. It is too inapposite.


**D.      CONCLUSION**

Based on well-settled law, this Court therefore rejects Defendant's jurisdictional challenges and declines to abstain. As to both ripeness and standing, there is an imminent threat of harm. Applying the appropriate abstention factors to the facts of this case, abstention is inappropriate. Instead, it is the Court's "strict duty to exercise the jurisdiction conferred upon . . . [it] by Congress." *Quakenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716, 116 S. Ct. 1712, 1720, 135 L. Ed. 2d 1 (1996).


**V.      DISCUSSION: TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**A.      APPLICABLE STANDARDS**

A plaintiff must establish four elements to secure a temporary restraining order ("TRO"): (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury

if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *E.g.*, *Janvey v. Alguire,* 647 F.3d 585, 595 (5th Cir. 2011)*; Women's Med. Center of Nw. Houston v. Bell,* 248 F.3d 411, 419, n. 15 (5th Cir. 2001).[20] Long deemed "an extraordinary remedy," *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009); *see also Douthit v. Dean*, 568 F. App'x 336, 337 (5th Cir. 2014) (similarly characterizing a preliminary injunction), a temporary restraining order aims "to preserve the status quo and prevent irreparable harm just so long as is necessary to hold a hearing, and no longer," *Granny Goose Foods v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439, 94 S. Ct. 1113, 1124, 39 L. Ed. 2d 435 (1974); *see also, e.g.*, *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 627 (5th Cir. 1985). By circumstance and necessity, in considering whether either a preliminary injunction or a temporary restraining order should issue, a court is "almost always" forced to rely upon "[an] abbreviated set of facts." *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 958 (3d Cir. 1984) (discussing preliminary injunctions).

## B.   FIRST ELEMENT: LIKELY SUCCESS ON THE MERITS

Plaintiffs bring this civil action pursuant to Section 1983 based on Defendant's alleged violation of rights secured by the Medicaid Act and the United States Constitution. Specifically, Plaintiffs claim that Defendant's attempt to terminate the Agreements violates the rights of the Individual Plaintiffs under Section 1396a(a)(23)(A) ("Free-Choice-of-Provider Provision") and PPGC's rights under both the Equal Protection Clause and the Freedom of Speech Clause of the

---

[20] The standard for granting a preliminary injunction is identical. *See Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *accord, e.g.*, *Wilson v. Office of Violent Sex Offender Mgmt.*, 584 F. App'x 210, 212 (5th Cir. 2014). Their distinction lies in timing. FED. R. CIV. P. 65.

United States Constitution. (Doc. 43 ¶¶ 62–67 at 19–20.) In relevant part,[21] Defendant contends

that Section 1396a(a)(23) does not create a private cause of action for either PPGC or the

Individual Plaintiffs and relies primarily on *Armstrong*. (Doc. 53-1 at 18–24; *see also* Doc. 13 at

3–13.) If the Plaintiffs were to prevail on their Section 1396a(a)(23) claim and/or PPGC was to

prevail on either its constitutional claims, the same remedy—a permanent injunction—would be

due, and any potential action by Defendant would be similarly affected. Accordingly, this Court

need not conclude that Plaintiffs have a substantial likelihood of prevailing on all claims

advanced in the Amended Complaint for a temporary restraining order to issue at this time. In

other words, if Plaintiffs satisfy the elements needed to show a substantial likelihood of success

on the Individual Plaintiffs' Section 1396a(a)(23) claim only, so long as the other factors are

met, a temporary restraining order is appropriate.

## 1.     Mandate of 1396a(a)(23)

### (a)     *Existence of a Private Right of Action under Section 1396a(a)(23)*

Section 1396a(a)(23), the section under which the Individual Plaintiffs now sue, reads:

"A [s]tate plan for medical assistance *must* . . . provide . . . *any individual* eligible for medical

assistance (including drugs) may obtain such assistance from any institution, agency, community

pharmacy, or person, qualified to perform the service or services required . . .who undertakes to

provide him such services." 42 U.S.C. § 1396a(a)(23) (emphasis added). Even now, the seminal

holdings of three Court cases—*Wilder v. Virginia Hospital Association*, 496 U.S. 498, 110 S. Ct.

2510, 110 L. Ed. 2d 455 (1990); *Blessing v. Freestone*, 520 U.S. 329, 117 S. Ct. 1353, 137 L. Ed.

---

[21] Defendant's argument s regarding Plaintiffs' property interest and procedural due process, (Doc. 13 at 14–19; Doc. 53-1 at 13–18), are no longer viable in light of the Amended Complaint, (Doc. 43).

2d 569 (1997); and *Gonzaga University v. Doe*, 536 U.S. 273, 122 S. Ct. 2268, 153 L. Ed. 309

(2002)—remain binding and undisturbed. This fact has been recognized by multiple courts, *see,*

*e.g.*, Doc. 45 at 12, *Planned Parenthood Ark. & E. Okla. v. Selig*, No. 15-cv-00566-KGB

("*Selig*"); *see also Emma C. v. Eastin*, No. 96-cv-04179-TEH, 2015 U.S. Dist. LEXIS 113355, at

*17, 2015 WL 5029283, at *5 (N.D. Cal. Aug. 25, 2015) (distinguishing *Armstrong* as "a

Medicaid case wherein the Court considered whether there was an implied right of action under

the Supremacy Clause"); cf. *Tohono O'odham Nation v. Ducey*, No. CV-15-01135-PHX-DGC,

2015 U.S. Dist. LEXIS 124979, at *30 –31 (D. Ariz. Sept. 17, 2015) (distinguishing *Armstrong*

in a case not involving the Medicaid Act); *J.E. v. Wong***,** No. 14-00399 HG-BMK, 2015 U.S.

Dist. LEXIS 114094, at *21 –22 (D. Haw. Aug. 27, 2015) (same), and acknowledged by

Defendant's counsel, (Hr'g Tr. 15:9–14, Sept. 2, 2015).

  These precedents thus supply the three-part test that this Court must employ to determine

whether § 1396a(a)(23) awards the Individual Plaintiff with a right enforceable under § 1983.

*Equal Access for El Paso, Inc. v. Hawkins*, 509 F.3d 697, 702 (5th Cir. 2007). Thus, if Congress

"intended" that § 1396a(a)(23) "benefit the [individual] plaintiff[s]," "the right assertedly

protected by th[is] statute is not so vague and amorphous that its enforcement would strain

judicial competence," and it "unambiguously impose[s] a binding obligation on the [s]tates,"

Plaintiffs may proceed to sue Defendant for violating Section 1396a(a)(23) pursuant to § 1983,

having "advanc[ed] a violation of a 'federal law.'" *Hood*, 235 F.3d at 924–25 (quoting *Blessing*,

520 U.S. at 340–41), *rev'd on other grounds*; *as observed in Hawkins*, 509 F.3d at 701 n.4. Not

voidable by one decision's dicta or a plurality's construal of a different subsection, this *Gonzaga*

and *Blessing* standard for unearthing congressional intent to create a private cause of action

governs still.

Read plainly, § 1396a(a)(23) easily satisfies each prong. It contains rights-creating and mandatory language, and it has an unmistakable individual focus. 42 U.S.C. § 1396a(a)(23). Indeed, with its terms so comprehensive and clear, court after court forced to peruse this provision has reached the same conclusion: "[W]e hold that the Medicaid Act's free-choice-of-provider requirement confers a private right of action under 42 U.S.C. § 1983." *Betlach*, 727 F.3d at 963; *accord, e.g.*, Doc. 45 at 12, *Selig*; *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 968 (7th Cir. 2012) ("*Indiana*"); *Harris v. Olszewski*, 442 F.3d 456, 459 (6th Cir. 2006). True, as Defendant notes, some of these courts applied § 1396a(a)(23) pre-*Armstrong*. Yet, their distinctive factual predicates do not affect the more uniform applicability (and cogency) of these courts' interpretation of the unchanged statute at issue here in accordance with the standard laid out in *Wilder* and its progeny. Presented with the same exact subsection, they discerned a private cause of action within it. In following *Betlach*, *Indiana*, *Harris*, and *Selig*, this Court simply endorses a statutory construction predicated on venerable canons and binding precedent.

Crucially, this reading of § 1396a(a)(23) finds ample support in this section's other provisions as construed by other courts, a fact that this Court cannot ignore pursuant to familiar canons of interpretation. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S. Ct. 441, 449, 151 L. Ed. 2d 339 (2001) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)). Containing the same words prominent in § 1396a(a)(23)— "individual" and "must," most obviously—the Medicaid Act's Reasonable Promptness Provision requires that a state plan for medical assistance "provide that *all individuals* wishing to make application for medical assistance under the plan *shall* have opportunity to do so, and that such

assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8) (emphasis added). In *Romano*, the Fifth Circuit applied *Blessing*'s three-part test as modified by *Gonzaga* and found that this section, linguistically identical to Section 1396a(a)(23), creates a private cause of action enforceable under § 1983. 721 F.3d at 375, 378–80. Similar in tone, Section § 1396a(a)(3) reads: "A [s]tate plan for medical assistance must . . . provide for granting an opportunity for a fair hearing before the State agency to *any individual* whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3) (emphasis added). As *Romano* described Section 1396a(a)(8), this court described the similarly worded Section 1396a(a)(3): "[The] language is mandatory, the provision contains rights-creating language, and there is an individual focus." *Detgen v. Janek*, 945 F. Supp. 2d 746, 754 (N.D. Tex. 2013).

Another section states: "In the case of services furnished by a [FQHC] . . . pursuant to a contract between the center or clinic and a managed care entity . . ., the State plan *shall* provide for payment to *the center or clinic* by the State." 42 U.S.C. § 1396a(bb)(5) (emphasis added). This subparagraph too, the First Circuit observed, speaks in "individualistic terms, rather than at the aggregate level of institutional policy or practice," refers to "specific, discrete beneficiary group," and contains mandatory and "highly specific terms," and therefore creates a right subject to enforcement under § 1983. *Rio Grande Cmty. Health Ctr., Inc.*, 397 F.3d at 74, 75. In sum, an overwhelming majority of courts confronted with language in the Medicaid Act identical to that before the Court now have found it to impart a right of action cognizable under § 1983.

### (b)    *Defendant's Misplaced Emphasis on* **Armstrong**

While Defendant urges this Court to discard this consensus on the basis of the more

recent *Armstrong*, (Hr'g Tr. 19:19–24, Sept. 2, 2015; Hr'g Tr. 7:4–5, Oct. 16, 2015), this

decision cannot bear the weight placed upon it by Defendant. The *Selig* court said it well:

*Armstrong* "does not overrule, or even significantly undermine, the precedent that informed the

reasoning of the Sixth, Seventh, and Ninth Circuits in recognizing a private right of action under

42 U.S.C. § 1396a(a)(23)." Doc. 45 at 12, *Selig*. *Armstrong* cannot do this for three reasons.

First, *Armstrong* is narrower than Defendant says. The *Armstrong* plurality did not dissect

§ 1396a(a)(23); it did not even delve into the meaning of a similarly worded provision like §

1396a(a)(3) or (a)(8). Instead, *Armstrong* focused on § 1396a(a)(30), which compels a state plan

to "provide such methods and procedures relating to the utilization of, and the payment for, care

and services available under the plan . . . as may be necessary to safeguard against unnecessary

utilization of such care and services and to assure that payments are consistent with efficiency,

economy, and quality of care." 42 U.S.C. § 1396a(a)(30). *Armstrong* limited its analysis to the

import of this Equal Access Provision, no more and no less, which lacks the right-creating and

individual-focused language so prominent in Section 1396a(a)(23). To quote Justice Scalia's

plurality, even if the former does not, as a purely lexicographical matter, the latter does,

peppered with "rights-creating language." *Armstrong*, 135 S. Ct. at 482 (Scalia, J., plurality). For

Defendant to claim that § 1396a(a)(23) and (a)(30) contain "the same rights creating type of

language," as she did before this Court, (Hr'g Tr. 16:17–21, Sept. 2, 2015; Hr'g Tr. 7:4–5, Oct.

16, 2015), based purely on the introductory words of the overall section—"a [s]tate plan must . .

."—is to ignore any reference to "individual" and the use of "must" in Section 1396a(a)(23).

Using *Armstrong*, Defendant then urges this Court to rewrite a plain statute, a task plainly at

odds with its judicial duty "to ascertain — neither to add nor to subtract, neither to delete nor to

distort" a statute's enacted terms. *Ariz. State Bd. for Charter Sch. v. U.S. Dep't of Educ.*, 464

F.3d 1003, 1007 (9th Cir. 2006).

Second, Defendant has extended *Armstrong*'s "rationale" far beyond its own stated limits. True, *four* justices went farther, specifically dismissing respondents' arguments for "a cause of action" predicated on "the Medicaid Act itself," but no majority coalesced around this proposition. *Id.* (Breyer, J., concurring in part and concurring in judgment.) As such, in accordance with the Fifth Circuit's binding command that a "joint opinion is . . . considered the holding of the Court . . . [only] as [to] the narrowest position supporting the judgment," *Cole*, 790 F.3d at 571, this Court refuses to take *Armstrong* beyond the confines of § 1396a(a)(30), the only provision upon whose interpretation a majority could agree. In fact, as Defendant conceded at the First Hearing, (Hr'g Tr. 15:9–14, Sept. 2, 2015), *Armstrong* did not overrule *Gonzaga* or *Wilder*, and it was *Gonzaga* that formed the basis of the Fifth Circuit's interpretation of § 1396a(a)(8) in *Romano*, 721 F.3d at 378–80.

Third, just because § 1396a(a)(30) and (a)(23) are subparts of one act does not make them identical in form and effect, as Defendant impliedly contends by seeking to expand *Armstrong* beyond its narrow ambit. Rather, "[t]he mere fact that all the Medicaid laws are embedded within the requirements for a state plan does not, by itself, make all of the Medicaid provisions into ones stating a mere institutional policy or practice rather than creating an individual right." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 74, 74 (1st Cir. 2006). This command, in fact, is implicit in a whole other subsection: "In an action brought to enforce a provision of this chapter [which includes the Medicaid statutes], such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan." 42 U.S.C. § 1320a-2.

*(c)*     ***Defendant's Misplaced Deference Argument***

Defendant argues that, even if the Individual Plaintiffs have the right to choose a

qualified provider and enforce that right via Section 1983, PPGC is not "qualified" under Section

1396a(a)(23) because DHH can deem it so by exercising Section 46:437.11(D)(2). (Hr'g Tr.

9:18–10:5, Oct. 16, 2015; Doc. 53-1 at 21.) In clear and persuasive terms, the court in *Selig*

rightly rejected that argument.

> Here, the dispute is whether the Government, either through the Governor or
>
> through [Arkansas Department of Human Services' ("ARDS")] actions,
>
> impermissibly interfered with the Jane Does' choice of a qualified provider when
>
> it terminated PHH as a provider in the manner and for the reason it articulates. If
>
> this right found in 42 U.S.C. § 1396a(a)(23) and conferred on Medicaid recipients
>
> is to have the meaning ascribed to it by the Court in *O'Bannon* [*v. Town Court*
>
> *Nursing Center,* 447 U.S. 773, 787 (1980], ADHS cannot be permitted to declare
>
> a provider unqualified and then to use that declaration  to put out of reach any
>
> future challenges to its conduct by Medicaid recipients."

Doc. 45 at 19, *Selig*. Indeed, counsel for Defendant conceded this argument is "circular." (Hr'g

Tr. 20:12-13, Sept. 2, 2015.) If so, then it cannot stand, for no statute can be interpreted so as to

render its specific terms superfluous or divorced from "the phrase in which it is embedded."

*Betlach*, 727 F.3d at 960. This Court's duty "to give effect, if possible, to every . . . word of a

statute" compels rejecting an interpretation that Defendant herself concedes makes Section

1396a(a)(23) either absurd or illogical. *United States v. Menasche*, 348 U.S. 528, 538, 75 S. Ct.

513, 520, 99 L. Ed. 615 (1955).

Underlying Defendant's argument that its interpretation of "qualified," which would leave Section 1396a(a)(23) as too "vague" and "amorphous" to satisfy the second *Blessing* prong, must be respected is a plea for deference under either *Chevron* or *Skidmore*. However, in cases of statutory interpretation, no deference is owed where the term in question is clear on its face. In determining the meaning of a statutory term, the rules of interpretation and construction are clear: a court must begin with the relevant language. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685, 105 S. Ct. 2297, 2301, 85 L. Ed. 2d 692 (1985); *see also Temp. Emp't Servs. v. Trinity Marine Grp.*, 261 F.3d 456, 462 (5th Cir. 2001) (citing *id.*). If the meaning is plain and unambiguous and the statutory scheme is both "coherent and consistent," *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S. Ct. 843, 846, 136 L. Ed. 2d 808 (1997); *see also Salazar v. Maimon*, 750 F.3d 514, 518 (5th Cir. 2014) (citing *id.*), "the sole function of the courts is to enforce it according to its terms," *Caminetti* v. *United States*, 242 U.S. 470, 485, 37 S. Ct. 192, 194, 61 L. Ed. 442 (1917); *see also, e.g.*, *Meredith v. Time Ins. Co.*, 980 F.2d 352, 356 & n.18 (9th Cir. 1993) (quoting *id.*); *In re* McCarthy, 391 B.R. 372, 375 (Bankr. N.D. Tex. 2008) (same).

Under these rules, Section 1396a(a)(23) is no quandary. Linguistically, "qualified" means "[p]ossessing the necessary qualifications; capable and competent." *Qualified*, BLACK'S LAW DICTIONARY (10th ed. 2014). Inputing this definition of "qualified" into § 1396a(a)(23), it is clear that a "qualified" provider is one who is "capable and competent" of "perform[ing]" the "service or services required" by the Medicaid eligible individual seeking "medical assistance." 42 U.S.C. § 1396a(a)(23). To discern that Section 1396a(a)(23) requires that a state's determination of a provider's "qualified" be related to that provider's ability to "perform the

service or services required" thus requires no specialized expertise, but follows naturally from this provision's plain meaning, as illuminated by the surrounding text. To the extent that "qualified" is truly ambiguous, its context, both "specific" and "general," clarifies its outer parameters, the Medicaid Act's statutory scheme making clear that any analysis of "qualified" must relate to the relevant provider's actual competence to undertake the services for which it has been contracted. *See Betlach*, 727 F.3d at 965. And, "if the intent of Congress is clear," as evidenced by the use of an unambiguous word, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. Accordingly, in asserting, as Defendant does, that "qualified" can be redefined at the agency's discretion without regard to the whole of Section 1396a(a)(23), she has forfeited any right to a court's deference. *Chevron*, 467 U.S. at 842–43 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.") Accordingly, in conceding that PPGC is qualified to provide the services required by the Agreements and by the Medicaid Act, (Hr'g Tr. 11:10–16, Sept. 2, 2015), Defendant has admitted that PPGC is "qualified" within the statute's most minimal meaning. In concluding that Plaintiffs will likely show that Defendant has contravened Section 1396a(a)(23), this Court echoes the Ninth Circuit: "Nowhere in the Medicaid Act has Congress . . . indicated that each state is free to define . . . ['qualified'] for purposes of its own Medicaid program however it sees fit." *Betlach*, 727 F.3d at 970.

Even if this Court were to regard "qualified" as ambiguous, however, DHH's interpretation would deserve no *Chevron* deference. As noted above, for *Chevron* to apply, an agency interpretation must concern an ambiguous statute, be imbued with precedential effect, and be reasonable. *See supra* Part V.A. Defendant contends that "qualified" is an ineradicably

ambiguous term, so unfettered in content that no outer bounds but her own opinion can be set,

(Doc. 13 at 8; Doc. 53-1 at 21), so that this one word has become "an interpretive wormhole,

whose supposed ambiguity leads to a galaxy of unfettered agency discretion," *Wheaton v.

McCarthy*, 800 F.3d 282, 288 (6th Cir. 2015). Not the product of considered rulemaking, DHH

has yet to provide even one bit of evidence that it has ever so construed "qualified" to exclude a

provider whose competence is not at issue. Her present position has not even "embodied in

opinion letters, policy statements, agency manuals, and enforcement guidelines," which though

"lack the force of law," but deserve some respect. *Christensen v. Harris County*, 529 U.S. 576,

587, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000). Even in citing the various meanings that

"qualified" may have, she gives no source to credit her unique interpretation. (Doc. 13 at 8; Doc.

53-1 at 21.) In fact, her lawyer called her denotation of "qualified" "circular," (Hr'g Tr. 21:12–

13, Sept. 2, 2015), thereby rendering it unpersuasive. *White v. Black*, 190 F.3d 366, 368-69 (5th

Cir. 1999); *see also FAA v. Cooper*, 132 S. Ct. 1441, 1449, 182 L. Ed. 2d 497 (2012) (rejecting

the use of a "a general (and notably circular) definition). This decision to adopt such a definition,

then, bears none of the marks of considered rulemaking or an exercise of some agency particular

expertise, as the most minimal deference doctrines require. *See Vigil v. Leavitt*, 381 F.3d 826,

835 (9th Cir. 2004).

      Finally, as a factual matter, this Court finds no merit in Defendant's factual contentions

regarding the recent nature of CMS' interpretation. Before this Court, Defendant has claimed

that CMS' counsel provided her "with some contending views as to what qualified mean[s]."

(Hr'g Tr. 19:2–7, Sept. 2, 2015.) In Defendant's Reply, she accused CMS of advancing an

interpretation of "qualified" in the Statement of Interest never before evidenced or proclaimed.

(Doc. 31 at 4.) Both these statements, however, reek of disingenuousness, presumably

unintended. The first assertion appears to be based on the First (and Second and Third) Kennedy Declarations, yet in none did Ms. Kennedy so describe her conversation with CMS. Rather, per the First Kennedy Declaration, CMS did no more than "advise[]" DHH that it "has the authority to withhold federal Medicaid dollars from Louisiana or seek injunctive relief for failure to comply with the Medicaid Act." Such language, even if it is most generously construed in Defendant's favor, simply does not imply that CMS acceded to Defendant's premise—that "qualified" as sufficiently "ambiguous" as to be indefinable—or acknowledged DHH's authority to define it in a manner inconsistent with CMS' understanding of § 1396a(a)(23).

Meanwhile, DHH has seemingly overlooked an Informational Bulletin, dated June 1, 2011, sent by CMS to every state Medicaid agency. In this short bulletin, a matter of public record, CMS addressed "some inquiries as to whether States may exclude certain providers from participating in Medicaid based on their scope of practice," offering a cogent "review of longstanding federal law." CMS, CMCS INFORMATIONAL BULLETIN 1 (June 1, 2011). As this bulletin continues, "[s]tates are not . . . permitted to exclude providers from the program solely on the basis of the range of medical services they provide"; a determination of the extent to which a Medicaid provider is "qualified" for purposes of § 1396a(a)(23), it explains, must be related to the actual "scope of services" offered by the relevant provider. *Id.* at 1–2. In other words, more than four years before DHH attempted to terminate the Agreements, CMS endorsed the interpretation of § 1396a(a)(23) that it has repeated in the Statement of Interest: "[T]erminating PPGC from . . . [Louisiana's] Medicaid program without providing any justification related to PPGC's qualifications to provide medical services would violate . . . § 1396a(a)(23)," (Doc. 24 at 2).

*(d)*     *Considering Defendants' Reasons for Claiming PPGC is Unqualified*

Like the *Selig* and *Herbert* courts, this Court finds it likely that Plaintiffs will prevail on their Section 1396a(a)(23) claim. This subsection awards a private cause of action, and Defendant has already conceded that PPGC is "qualified" as that term must be naturally (and plainly) defined, as the Seventh and Ninth Circuits concluded in *Indiana* and *Betlach.* For the purposes of a preliminary injunction, their likelihood of success has been established. They have provided more than enough precedent, evidence and argument to lead this Court to believe they have "a reasonable probability of success." *See* 11A CHARLES A. WRIGHT *ET AL.*, FEDERAL PRACTICE AND PROCEDURE § 2948.3; *see also Dine Citizens Against Ruining Our Env't v. Jewell*, No. CIV 15-0209 JB/SCY, 2015 U.S. Dist. LEXIS 109986, at *57 n.10, 2015 WL 4997207, at *21 n.10 (D.N.M. Aug. 14, 2015) ("It is not entirely clear what a preliminary-injunction movant's burden of proof is vis-à-vis the case's merits, as [t]he courts use a bewildering variety of formulations of the need for showing some likelihood of success—the most common being that plaintiff must demonstrate a reasonable probability of success." (alteration in original) (internal quotation marks omitted)).

Nonetheless, given Defendant's recent invocation of Section 46:437.11(D)(2) and not Section 46:437.11(D)(1), this Court feels compelled to address the facial credibility of Defendant's new grounds for termination. In the Second Termination Letters, Defendant gives three "violations" justifying its terminations: first, PPGC's settlement of an FCA suit in Texas which it did not report to DHH; second, the involvement of a PPGC affiliate in a pending Texas case which survived a Rule 12(b)(6) dismissal and third, PPGC's alleged misrepresentations in a letter responding to inquiries about the video tapes. (Doc. 39-1.) Having subjected these reasons to scrutiny, this Court concludes that, even if Defendant's definition of "qualified" prevails,

DHH's reasons for disqualifying PPGC likely will not.

The first of Defendant's reasons, the *Reynolds* Settlement, is likely to fail. The claim was brought by an FCA plaintiff, not the government.[22] The settlement expressly disavows PPGC's liability. (Doc. 54-1 at 5.) It therefore falls into the exception set forth in Title 50 for certain FCA actions: "If a False Claims Act action or other similar civil action is brought by a Qui-Tam plaintiff, no violation of this provision has occurred until the defendant has been ***found*** liable in the action." LA. ADMIN. CODE tit. 50, § 4147(12)(c) (emphasis added). Title 50 plainly and unambiguously requires that liability either be "found," whether by admission or by some fact-finder. Since *Reynolds* involved no such finding, Defendant's first stated reason contradicts DHH's own code. With no citation to authority, Defendant's counsel asks the Court to reject the "literal" language, (Hr'g Tr. 36:7–8, Oct. 16, 2015), in defiance of every well-known rule of interpretation. Urging the Court to adopt what he "think[s] that means," he asks this Court to rewrite a plain provision, a task far beyond a judge's proper province and the Secretary's actor's prescribed powers. Beyond that fact, Plaintiffs have credibly shown that DHH was aware of the *Reynolds* Settlement long before October 14, 2015, with Defendant's own emails suggesting that it did not find it sufficient to provide "credible evidence" of Medicaid fraud. (Doc. 46-3 at 2.) On these facts, Plaintiffs are likely to succeed on proving the irrelevance of the *Reynolds* Settlement.

Defendant's second ground for alleging fraud—the *Carroll* case—rests on a quote drawn from a judge's ruling on a motion to dismiss, as revealed by that opinion's full text: per Rule 12(b), "[t]he court concludes that Carroll has adequately pleaded factual content that allows the court to draw the reasonable inference that Planned Parenthood knowingly filed false claims."

---

[22] That the government had to sign off on the agreement is a statutory requirement. It does not mean that the government was a proper party. *See United States ex rel. Carter v. Bridgepoint Educ., Inc.*, 305 F.R.D. 225, 230–31 (S.D. Cal. 2014) (explaining the complex subtleties involved in the FCA).

Doc. 31 at 17, No. 12-cv-03505 (S.D. Tex. May 14, 2014.) Contrary to Defendant's allegation

that the court in *Carroll* found, "that the information already provided 'allow the court to draw

the reasonable inference" that fraud took place, (Doc. 39-1 at 2). Rather, as counsel for

Defendant conceded in oral argument, for purposes of the motion before that court, the plaintiff's

allegations were only assumed to be true, as Rule 12(b) requires. (Hr'g Tr. 35:2–11, Oct. 16,

2015.) That court never made a factual finding of fraud. (Hr'g Tr. 35:8–11, Oct. 16, 2015.)

Instead, it ruled only that the plaintiff had plead his case "adequate[ly]." Doc. 31 at 17, No. 12-

cv-03505. In fact, the *Carroll* case appears to still be in discovery. (Hr'g Tr. 26:5–8, Oct. 16,

2015.) In other words, the second ground in the Second Termination letters cannot satisfy the

language of Title 50.

Finally, Defendant's third asserted ground consists merely of untold and unspecified

misrepresentations. Not one is substantiated in her letter or by her attorneys, and each, on the

record now before the Court, has been credibly contradicted in PPGC's August Letter. In this

Court's opinion, it is telling that the letter cites no "found" violation of licensure or certification

requirements and any specific failure to meet any condition of enrollment. (Doc. 39-1 at 3.) It is

too revealing that Defendant cites to the final clause of Section 46:437.11(D)(2), which allows

for termination if a provider is "the subject of a sanction or of a criminal, civil, or departmental

proceeding," and deems an allusion to investigations by DHH and the Louisiana Office of

Inspector General sufficient, (Doc. 39-1), a position rejected once before, *New Orleans Home for

Incurables, Inc. v. Greenstein*, 911 F. Supp. 2d 410, 411–12 (E.D. La. 2012). When this Court

asked him to substantiate these alleged misrepresentations, Defendant's counsel could not. (Hr'g

Tr. 33:3–8, Oct. 16, 2015.) In sum, Plaintiffs will likely be able to show that Defendant's actions

violated Louisiana's Administrative Code.

In fact, the apparent fragility of the Second Termination Letters' stated reasons raises another specter, for not one appears to be a supported factual allegation of the kind of fraud and ill-practice with which MAPIL is concerned. *See Mortg. Elec. Registration Sys. v. Bynum*, 879 So. 2d 807, 811 (La. Ct. App. 2004). Here, the facts matter, for as the Supreme Court of Louisiana explained in the spring of 2015, "[a]n agency exercising delegated authority is not free to pursue any and all ends, but can assert authority only over those ends which are connected with the task delegated by the legislative body." *Dep't of Children & Family Servs. ex rel. A. L. v. Lowrie*, 167 So. 3d 573, 587–88 (La. 2015); *see also State v. Alfonso*, 753 So. 2d 156, 161 (La. 1999) ("When the legislative body, in delegating powers, clearly expresses its policy and provides sufficient standards, judicial review of the exercise of the means chosen by the agency in exercising its delegated power provides a safeguard against abuse by the agency.") Axiomatically, "[t]he open-ended discretion to choose ends is the essence of legislative power; it is this power that the legislative body possesses, but its agents lack." *Lowrie*, 167 So.3d at 587. Section 46:437.11(D)(2) is but one part of a law directed towards narrow ills, and that the legislature logically expected the powers awarded by this provision to be employed so as "to combat and prevent fraud and abuse" and to secure the "fiscal and programmatic integrity" of a program otherwise endangered by "persons who engage in fraud, misrepresentation, abuse, or other ill practices" as expressly defined in MAPIL alone. *See* LA. R.S. § 46:437.2. Based on the evidence it has so far presented and if no actual evidence of a MAPIL-worthy-misdeed is adduced, Defendant has likely run afoul of this state's statutory law.

### C.    SECOND ELEMENT: IRREPARABLE HARM

In this regard, both the standard—"Irreparable in the injunction context means not

rectifiable by the entry of a final judgment," *Walgreen Co. v. Sara Creek Property Co.*, 966 F.2d 273, 275 (7th Cir. 1992)—and the record are clear.

Based on their uncontroverted affidavits, the Individual Plaintiffs greatly depend on PPGC, and if the Agreements are terminated, they will be unable to visit their Medicaid provider of choice. (Doc. 4-2, 4-3, 4-4.) Approximately, 5,200 other women visit BRHC and NOHC and likely depend upon it equally. (Doc. 41-1 ¶¶ 12 –18 at 4–5.) At this stage of the proceeding, the Court is persuaded that, absent this termination, the patients of PPGC in Louisiana will have their healthcare disrupted. Counsel for Defendant has already conceded this to be the case. (Hr'g Tr. 12:6–12.) Presented with similar facts, other courts have found irreparable harm. *See, e.g.*, Doc. 45 at 22, *Selig*; Doc. 21 at 1–2, No. 15-cv-693; *Planned Parenthood of Ind., Inc.*, 497 F. Supp. 2d at 912; *Camacho*, 325 F. Supp. 2d 794 at 802.

Based on its own unquestioned assertions, PPGC will also likely suffer irreparable harm. Regardless of the precise dollars in revenue it may receive from the state, PPGC has made clear that it may have to close BRHC upon the Agreements' termination. (Doc. 46 at 27.) Often, such results have been considered irreparable. *Planned Parenthood of Ind., Inc.*, 794 F. Supp 2d at 912; *see also Canterbury Career School, Inc. v. Riley*, 833 F. Supp. 1097, 1105 (D.N.J. 1993) ("Where the result of denying injunctive relief would be the destruction of an on-going business, such a result generally constitutes irreparable injury."). The fact that the Eleventh Amendment forbids PPGC from ever collecting monetary damages, even if Defendant's conduct is later found illegal, also militates in favor of deeming its likely harm to be irreparable, *Green*, 474 U.S. at 68, an allegation made by Plaintiffs, (Doc. 46 at 27 n.19), and never denied by Defendant. In addition, "potential reputational harm is present," Doc. 12 at 1, No. 15-cv-693-CW, as Defendant's termination may lead others to believe PPGC is not a competent provider despite

her own stated contrary belief, (Hr'g Tr. 11:12–16, Sept. 2, 2015). Cumulatively, these harms are irreparable. *See, e.g.*, *United Healthcare Ins. Co. v. Advance PCS*, 316 F.3d 737, 741 (8th Cir. 2002); *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991).

Defendant has sought to allay these concerns with the First, Second, and Third Kennedy Declarations. *See supra* Part II. Yet, these declarations' manifold oversights and constant tinkering leave this Court with the decided impression that not even DHH can ensure that PPGC's current patients will have some ready and convenient outlet. Indeed, even the most recent version contains a number of specialized providers who do not accept patients like PPGC's own. *See supra* Part II.

### D.     THIRD ELEMENT: BALANCE OF HARMS

Although the harms to Plaintiffs appear many, in her papers, Defendant gives the Court only two: (1) "The granting of a TRO would prevent the LDHH from their ability to govern the Medicaid program under the authority granted by the Medicaid Act," and, (2) "It would also contravene the Louisiana Legislature's intent to give the LDHH a right to terminate a Medicaid provider agreement at-will when she chooses to do so."  (Doc. 13 at 20.) The second obviously bears no more relevance, as Section 46:436.11(D)(1) no longer applies. An injunction will have no financial effect, as DHH will still need to pay the Medicaid benefits of every PPGC Medicaid-eligible patient. *See* Doc. 12 at 1, No. 15-cv-693-CW, *Marlo M. ex rel. Parris v. Cansler*, 679 F. Supp. 2d 635, 638 (E.D.N.C. 2010). In dollars and cents, maintaining this status quo costs DHH nothing.

Furthermore, in terms of her ability to "govern the Medicaid program," an injunction will not strip DHH of its statutory powers. It will not suddenly deprive of the ability to pursue

legitimate claims of Medicaid fraud or ensure that Louisiana citizens are obtaining "competent" medical care; she will still be able "to govern the Medical program." At worst, it will halt its exercise of a particular power as to a single provider as to whose medical competency it has admitted. Indeed, at worst, such an injunction will do no more than convince DHH to invoke its powers under MAPIL more clearly and consistently in the future. *New Orleans Home for Incurables, Inc.*, 911 F. Supp. 2d at 411–12. It would, in other words, force DHH to act as the statute implicitly demands. Other cases have so ruled. *See, e.g.*, Doc. 45 at 30, No. 15-cv-00566-KGB. With them, this Court agrees.

Nor is this Court persuaded by Defendant's efforts to distinguish Plaintiffs' cases. One case that Defendant had previously attempted to distinguish as being predicated on Section 46:437.11(D)(2), (Doc. 13 at 21), the very section she has now invoked, did so. *New Orleans Home for Incurables, Inc.*, 911 F. Supp. 2d at 410–11. Taking her at her word, Defendant's latest termination has now made this case particularly relevant. True, the second—*Giovanni Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002)—"involved a State that enforced restrictions likely to be found unconstitutional," (Doc. 13 at 21.) Yet, the same can be said about an injunction intended to foreclose application of restrictions likely to be found contrary to preeminent federal statutory law designed to help the neediest of this state's citizens.

In sum, even if Defendant's criticism is given weight, the balance of harms would still favor Plaintiffs.


### E.      FINAL ELEMENT: PUBLIC INTEREST

In light of Plaintiffs' likely irreparable harm and the balanced equities, this final factor favors an injunctive relief too. For decades, PPGC has served numerous at-risk individuals and

helped DHH combat a host of diseases, and, in the process, become the regular provider of over 5,000 women, including the Individual Plaintiff. Like its brethren, this Court **"**believes that . . . vulnerable population[s] should only be uprooted if practically necessary and legally warranted." *Greenstein*, 911 F. Supp. 2d at 412. As the Ninth Circuit stated in considering this same factor in a Medicaid case, the public interest is most acute in regards to "ensuring access to health care" absent any misdeed's demonstration. *Indep. Living Ctr. of S. Cal, Inc. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2002), *vacated and remanded on other grounds* 132 S. Ct. 1204 (2012). Defendant herself has urged this Court to employ this factor: "[I]t is certainly true that the public has an interest in the neediest of its members having access to healthcare." (Doc. 13 at 21.) Like *Selig* and *Herbert*, this Court adopts this reasoning and finds the public interest favors Plaintiffs.

In contesting Plaintiffs' public interest arguments, Defendant has offered up only the following statement of purported fact: "[T]here has been no evidence presented that shows Medicaid recipients in the New Orleans and Baton Rouge areas will not have access to family planning and related services." (Doc. 13 at 21.) As support, she asked this Court to rely upon the First Kennedy Declaration. (*Id.*) As noted above, the Kennedy Declarations have been advanced, retracted, and again proposed, leaving this Court wary of relying on Defendant's protean assertions of fact. It instead turns to the uncontested and unquestioned facts—PPGC serves 5,200 poor and needy women, and PPGC has repeatedly been deemed a "competent" provider by DHH—and honors the public interest in affording these women access to their provider of choice.

## F.    CONCLUSION

Four elements are necessary before a court may issue an injunction. Every element has

been shown by Plaintiffs in this proceeding in regards to their Section 1396a(a)(23) claim. A TRO will therefore issue.

**VI.**   **FINAL ISSUES**

**A.**   **UNNECESSITY OF ANY SECURITY**

Rule 65 allows a court to "issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). This requirement, however, may be waived where the gravity of interest is great and no proper showing of a harm's likelihood or a probable loss is made. *See, e.g.*, *Kaepa, Inc. v. Achilles Corp.,* 76 F.3d 624, 628 (5th Cir. 1996); *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Feb. 1981). Here, as in *Selig*, Defendant has neither requested a security were this Court to issue an injunction nor presented any evidence that it would be financially harmed if it were wrongfully enjoined. In addition, as Plaintiffs note, "[w]hether these individuals obtain these services at PPGC (their provider of choice) or elsewhere will have no effect on Louisiana's budget." (Doc. 46 at 28.) Based on these facts and on Defendant's failure to ask for a bond or plead an economic harm, this Court sees no credible reason to force a bond's execution.

**B.**   **CLASS INJUNCTION**

Plaintiffs argue that they have been singled out because of the alleged (but disputed) conduct of a separate but connected company that appeared in one of CMP's videos and that Plaintiffs played no role in that conduct. (Doc. 45-1 at 2–3.) Plaintiffs argue that Defendant has

attempted to terminate its contracts because of the personal animus against it. This animus, they contend, is unrelated to the admittedly competent services that it renders in Louisiana which are, in turn, unrelated to the conduct in the videos. In fact, the uncontradicted evidence in the record at this time is that PPGC does not perform abortions in Louisiana, is not involved in the sale of fetal tissue and none of the conduct in question occurred at the PPGC's two Louisiana facilities. Based on the record before it, it appears likely that Plaintiff will be able to prove that the attempted terminations against it are motivated and driven, at least in large part, by reasons unrelated to its competence and unique to it. However, the Court finds it is not necessary and therefore it need not at this time rule on Plaintiffs' equal protection argument. *See, e.g.*, *Lyng v. Nw. Indian Cemetry Protective Ass'n*, 485 U.S. 439, 445, 108 S. Ct. 1319, 1323, 1323, 99 L. Ed. 2d 534 (1988) ("A fundamental and long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."); *cf.* BRYAN A. GARNER & ANTONINA SCALIA, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 249–51 (2012) (discussing this rule's bases).

Nonetheless, the uncontradicted evidence in the record is that BRHC relies to a significant degree on Medicaid reimbursements. The Court finds that if the Agreements are terminated, this facility would suffer significant financial loss and might have no choice but to close. In order to insure that meaningful relief is given to the Jane Doe Plaintiffs and that these Individual Plaintiffs have their free choice of provider, which claim they have established (at least at this preliminary stage), the Court's temporary restraining order will extend to all DHH-PPGC provider agreements applicable to all Medicaid-enrolled patients. The Court therefore defers action at this time on Plaintiffs' alternative request for class certification to a more appropriate date and time.

## VII.   CONCLUSION

For the foregoing reasons, PPGC and the Individual Plaintiffs have met their burden, demonstrating every element necessary for the issuance of a temporary restraining order with credible evidence and persuasive precedent. Accordingly,

Defendant's Motion to Dismiss (Doc. 53) is DENIED.

Plaintiffs; Renewed Motion for Temporary Restraining Order and for Preliminary Injunction (Doc. 46) is GRANTED IN PART. Effective October 18, 2015, at 11:59 p.m., CST, Defendant is ENJOINED from terminating any of its Medicaid provider agreements with PPGC, including, but not limited to, Provider Numbers 91338, 133689, 45802, and 133673. The temporary restraining order will remain in force for fourteen (14) days from the date of its entry unless, pursuant to Rule 65(b)(2), the Court, for good cause shown or with the agreement of the Parties, extends it.

A telephone status conference is set for Monday, October 19, 2015, at 2:30 p.m., for the purpose of discussing the extension of this order during discovery, setting a scheduling order for discovery, a hearing date for the preliminary injunction, and setting other appropriate cut-offs. The Plaintiffs will arrange for the conference call and circulate the number to the Court and counsel by 1:00 p.m., Central Standard Time, on October 19, 2015.

Plaintiffs' Motion for Preliminary Injunction will be DEFERRED but remain pending and will be set for a date that will allow the parties adequate time for discovery.

Signed in Baton Rouge, Louisiana, on October 18, 2015

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**