UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

PLANNED PARENTHOOD GULF
COAST, INC.; JANE DOE #1; JANE
DOE #2; and JANE DOE #3,

                        Plaintiffs,

VERSUS

KATHY KLIEBERT, Secretary,
Louisiana Department of Health and
Hospitals,

                        Defendant.

CIVIL ACTION

No. 3:15-cv-00565-JWD-SCR

**AMENDED RULING ON DEFENDANT'S MOTION TO DISMISS AND RULING ON
PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

       Before the Court is the Renewed Motion for Temporary Restraining Order and

Preliminary Injunction filed by Planned Parenthood Gulf Coast, Inc. ("PPGC" or "Planned

Parenthood"), appearing on behalf of both itself and three patients—Jane Does #1, 2, and 3

("Individual Plaintiffs")[1] (collectively, "Plaintiffs")—and based on Section 1396a(a)(23)(A) of

the United States Code's Forty-Second Title ("Medicaid Act")[2]  and the First and Fourteenth

---

[1] The Individual Plaintiffs "appear pseudonymously because of the private and personal nature of
the medical care that they receive at PPGC, and their desire not to have that information become
public in order for them to assert their legal rights." (Doc. 1 at 5.) Plaintiffs' unopposed motion
seeking permission to use these pseudonyms was filed on August 25, 2015, (Doc. 5), and granted
on August 26, 2015, (Doc. 11).

[2] In this opinion, any reference to "Section 1396a(a)" or "§ 1396a(a)" is to this section of the
Medicaid Act unless otherwise noted. Section 1396a(a)(23) will thus be referred to as "Section
1396a(a)(23)" or "§ 1396a(a)(23)" or by its oft-used title, "free-choice-of-provider" provision.

Amendments of the United States Constitution. (Doc. 46 at 17–26; Doc. 53 ¶¶ 62–67 at 19–20;

Doc. 45 at 1–2.) The arguments made in support of this motion appear in the Memorandum of

Law in Support of Plaintiffs' Renewed Motion for Temporary Restraining Order and Preliminary

Injunction ("Plaintiffs' Renewed Memorandum"), (Doc. 46), and Memorandum Regarding

Availability of State Remedy ("Plaintiffs' Remedy Memorandum"), (Doc. 52). Plaintiffs' request

is opposed by Louisiana's Department of Health and Hospitals ("DHH"), whose head, Secretary

Kathy H. Kliebert, is being sued in her official capacity and is therefore this matter's named

defendant ("Kliebert" or "Defendant").[3]  Defendant's arguments are put forth in the Motion to

Dismiss Complaint for Lack of Subject Matter Jurisdiction and Failure to State a Claim ("Motion

to Dismiss"), (Doc. 53), supported by the attached Memorandum in Support of Motion to

Dismiss Complaint for Lack of Subject Matter Jurisdiction and Failure to State a Claim

("Defendant's Memorandum"), (Doc. 53-1). Although no evidentiary hearing was held, the

matter was thoroughly briefed and argued. The Court has carefully considered the pleadings and

briefings to date, which are discussed in more detail below.[4] The Court also thoroughly

considered the oral arguments and representations of counsel at hearings held on September 2,

---

[3] As permitted by precedent, *Ex parte Young*, 209 U.S. 123, 152, 28 S. Ct. 441, 451, 52 L. Ed. 714 (1908); *accord Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 530 n.24 (1st Cir. 2009), Plaintiffs sue for injunctive relief against Ms. Kliebert in her official capacity, (Doc. 1 at 5). To wit, the true defendant here is Louisiana, not Ms. Kliebert or even DHH. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). In light of this duality, this Court will therefore alternate between feminine and third person pronouns throughout this opinion.

[4] These motions include the first Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("Motion for TRO"), (Doc. 4); Memorandum of Law in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("Plaintiffs' Memorandum"), (Doc. 4-1); Defendant's Opposition to Plaintiffs' Motion for Temporary Restraining Order ("Defendant's Opposition"), (Doc. 13); Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Motion for Temporary Restraining Order ("Plaintiffs' Reply Memorandum"), (Doc. 22); the Statement of Interest of the United States ("Statement of Interest"), (Doc. 24); and Defendant's Reply to the U.S. Department of Justice's Statement of Interest ("Defendant's Reply"), (Doc. 31).

2015 ("First Hearing"), and on October 16, 2015 ("Second Hearing").

On Sunday, October 18, this Court issued an order denying Defendant's motion to dismiss and granting Plaintiffs' request for a temporary restraining order, (Doc. 55). It set a status conference for the following day.  At that status conference, all parties agreed that no further discovery and no further argument was necessary for this Court to make its determination on whether to issue a preliminary injunction, (Doc. 58). Both parties expressed "no objection to converting the temporary restraining order to a preliminary injunction." (*Id.*) This agreement was reaffirmed in a telephone status conference on October 28, 2015. (Doc. 62.) By the Parties' express consent, the evidentiary record has therefore been finalized, and any factual allegations left uncontroverted must be accepted as true.

On October 28, 2015, by way of Notice of Supplemental Authority, Plaintiffs brought to the Court's attention a case decided the same day which addresses the identical issue confronting this Court, in which the court granted a preliminary injunction enjoining the Governor of Alabama and others from suspending Medicaid payments to Planned Parenthood Southeast, Inc. and from failing to reinstate the State's provider agreement with that entity. (Doc. 61 (attaching Doc. 63, *Planned Parenthood Se., Inc. v. Bentley*, No. 2:15-cv-620-MHT-TFM (M.D. Ala. October 28, 2015) (Opinion) ("*Bentley*")).)[5]

For the reasons first set out in the Order on Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, (Doc. 55), and more fully set forth below, the Court determines that Plaintiffs have met their burden for a preliminary injunction to maintain the *status quo*. The Court therefore enjoins from suspending Medicaid payments to PPGC for

---

[5] In referencing these recent cases, this Court cites to the original decision and docket rather than its number, as an attachment, in this case's docket. For example, the relevant decision in *Bentley* bears Docket Number 63 in its own docket, but it appears in this proceeding as Document Number 61. Both document numbers will be given when the decision is first cited.

services rendered to Medicaid beneficiaries, including but not limited to the Individual Plaintiffs

pursuant to Federal Rule of Civil Procedure 65(b)(2).[6] The preliminary injunction will remain in

effect until it is revised, if at all, by this Court's own further order or by a decision of the United

States Court of Appeals for the Fifth Circuit ("Fifth Circuit"). For the reasons set forth

hereinafter, the Court declines to require security under Rule 65(c) from PPGC or the Individual

Plaintiffs.


## II.  FACTUAL AND STATUTORY BACKGROUND

## A.  PARTIES

Defendant is sued in her official capacity, as she is the head of DHH, (Doc. 1 ¶ 19 at 4;

Doc 43 ¶ 20 at 6; Doc. 53-1 at 1). DHH administers this state's Medicaid Program, a dual state-

federal assistance program for families and individuals with low income and limited resources

encoded in 42 U.S.C. 1396 *et seq*.[7] (*See also, e.g.*, Doc. 1 ¶ 20 at 5; Doc. 13-1 ¶¶ 1–4 at 1–2;

Doc. 43 ¶ 20 at 6; Doc. 53-1 at 1–4.) DHH does so by monitoring the allocation of federal-state

funds in Louisiana and submitting a state plan for medical assistance for review and approval to

the Centers for Medicare and Medicaid Services ("CMS"), operating under a delegation of

---

[6] Any and all references to "Rule" or "Rules" in this order are to the Federal Rules of Civil
Procedure unless otherwise noted.

[7] Created by the addition of Title XIX to the Social Security Act, Social Security Amendments of
1965, Pub. L. No. 89-97, 79 Stat. 286 (codified as amended at 42 U.S.C. § 1396 *et seq.*),
Medicaid "furnishes . . . medical assistance on behalf of families with dependent children and of
aged, blind, or disabled individuals, whose income and resources are insufficient to meet the
costs of necessary medical services," 42 U.S.C. § 1396-1; *see also* John V. Jacobi, *Multiple
Medicaid Missions: Targeting, Universalism, or Both?*, 15 YALE J. HEALTH POL'Y L. & ETHICS
89, 89, 91–92, 98 (2015) (discussing the Act's manifold purposes). Medicaid offers the "States a
bargain: Congress provides federal funds in exchange for the States' agreement to spend them in
accordance with congressionally imposed conditions" and the statute's implementing
regulations. *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1382, 191 L. Ed. 2d 471
(2015); 42 U.S.C. § 1396a; 42 C.F.R. § 430.15.

authority from the Secretary for the Department of Health and Human Services ("DHHS"). LA.

R.S. §§ 46:437:2(B), 46:437.13;[8] 42 U.S.C. § 1396a(a); 42 C.F.R. 431.10. In accordance with the

Louisiana Medical Assistance Programs Integrity Law ("MAPIL"), Medicaid providers must

sign a contract with DHH and satisfy several requirements. LA. R.S. §§ 46:437:11, 46:437.13.

(*See also* Doc. 13-1 ¶¶ 1–4 at 1–2.) DHH's powers are circumscribed by statute while many of

its relevant regulations appear in Title 50 of the Louisiana Administrative Code.[9] (Doc. 53-1 at

2–4; *see also* Doc. 13-1 ¶ 3 at 1.) In this case, DHH initially invoked Section 46:437.11(D)(1),

(Doc. 13 at 1–2, 13, 18; Doc. 53-1 at 1; Hr'g Tr. 11:25–12:8, Sept. 2, 2015), and presently relies

upon Sections 46.437(D)(2) and 46:437.14(A) and Title 50, (Doc. 39-1 at 1–2, 5–6, 8–9, 11–12;

Doc. 53-1 at 3–4, 24).

PPGC is a charitable organization, so classified under section 501(c)(3) of the Internal

Revenue Code, 26 U.S.C. § 501(c)(1), U.S. DEP'T OF THE TREASURY, INTERNAL REVENUE SERV.,

FORM 990 at 1 (2012). (Doc. 43 ¶ 10 at 4; *see also* Doc. 4-2 ¶ 5 at 2.) Headquartered in Houston,

Texas, it maintains its legal domicile in the Lone Star State, FORM 990 at 1, but is licensed to do

business in Louisiana, (Doc. 43 ¶ 10 at 4; *see also, e.g.*, Doc. 1 ¶ 9 at 3; Doc. 4-2 ¶ 5 at 2.) PPGC

operates family planning centers and clinics in the Houston area of Texas and in Louisiana.

(Doc. 43 ¶¶ 10–11 at 4; *see also* Doc. 1 ¶ 10 at 3–4.) Its first center founded in 1984, PPGC's

two Louisiana clinics—the Baton Rouge Health Center ("BRHC") and the New Orleans Health

Center ("NOHC")—participate in Louisiana's Medicaid Program, "providing medical services to

low-income enrollees in both underserved communities." (Doc. 1 ¶ 10 at 3–4; Doc. 43 ¶ 11 at 4;

*see also* Hr'g Tr. 10:25–11:6, Sept. 2, 2015.)

---

[8] In this opinion, any reference to "Section 46:437" or "§ 46:437" is to this statutory section
unless otherwise noted.

[9] In this opinion, any reference to "Title 50" is to this part of Louisiana's administrative code.

In fiscal year 2014, the two facilities in Louisiana served over 5,200 Medicaid patients and were visited by over 10,000 women. (*See, e.g.*, Doc. 43 ¶ 13 at 4; Doc. 1 ¶ 40 at 11; Hr'g Tr. 8:23–24, Sept. 2, 2015.)  "Nearly 75%" of the visits to BRHC were by patients enrolled in Medicaid; "[n]early 40%" of appointments at NOHC were with similarly classified individuals. (Doc. 3 ¶¶ 9–10 at 3–4; Doc. 43 ¶ 11 at 4.) "[C]urrently, over 60% of PPGC's Louisiana visits are for patients enrolled in the Medicaid program." (Doc. ¶ 13 at 4.) The services offered by these two centers include "physical exams, contraception and contraceptive counseling, screening for breast cancer, screening and treatment for cervical cancer, testing and treating for certain sexually transmitted diseases . . ., pregnancy testing and counseling, and certain procedures[,] including colposcopy." (Doc. 1 ¶ 10 at 3–4; Doc. 4-2 ¶ 8 at 3; Doc. 43 ¶ 11 at 4; Hr'g Tr. 7:24–8:7, 8:16–9:9, Sept. 2, 2015.)

Neither BRHC nor NOHC performs abortions. (Doc. 1 ¶ 11 at 4; Doc. 43 ¶ 12 at 4; Doc. 46-1 ¶ 5 at 2; Hr'g Tr. 21:22–25:3, Oct. 16, 2015.) Neither currently has or has ever had a fetal tissue donation program. (Doc. 46 at 11; Doc. 46-1 ¶ 21 at 6.)

The Individual Plaintiffs rely upon Medicaid and receive their medical care from one of PPGC's two facilities. (Doc. 4-3, 4-4, 4-5.) They wish to continue to obtain their reproductive care from PPGC and do not know where they could elsewhere get the same kind of care. (Doc. 4-3 ¶¶ 6–7 at 2; Doc. 4-4 ¶ 8 at 2; Doc. 4-5 ¶ 6 at 2; Hr'g Tr. 8:23–9:9, Sept. 2, 2015.) Jane Doe #2 became a patient at NOHC after her former doctor refused to accept Medicaid, (Doc. 4-4 ¶ 3 at 1), and Jane Doe #2 has found it "very difficult to find doctors in Baton Rouge who will accept Medicaid," (Doc. 4-5 ¶ 3 at 1). In this proceeding, they are intended to represent the interests of many of PPGC's other Medicaid patients throughout the state of Louisiana. (*See, e.g.*, Doc. 46 at 29–30; Doc. 49-1 at 10.)

**B.     PRECIPITATING EVENTS**

On February 19, 2014, pursuant to the concurrent resolutions of Louisiana's House of Representatives and Senate, the Louisiana Legislative Auditor ("Auditor") reviewed "a sample of Medicaid payments DHH during calendar year 2012 to determine if they were appropriate and supported." (Doc. 46-1 at 14 (Louisiana Legislative Auditor, Response to Senate Concurrent Resolution No. 57 and House Resolution No. 105, 2013 Regular Session 1 (Feb. 19, 2014)).[10] "Overall," the resulting report ("Legislative Audit") "found that DHH [only] made payments to Planned Parenthood for allowable family planning procedure codes under Medicaid" and unearthed no "indication that Planned Parenthood recommended an abortion or performed an abortion for th[ose] patients."[11] (*Id.*) More specifically, having "extracted and analyzed claims data for *all* 25,936 claims DHH paid to Planned Parenthood for Medicaid reimbursements during calendar year 2012," the Legislative Auditor "did not find any evidence that Medicaid payments to Planned Parenthood were not made . . . for allowable Family Planning procedure codes." (*Id.* at 15 (emphasis added).) From these 25,936 claims, the Auditor "identified 22 patients that subsequently suffered a miscarriage" and failed to find "any indication that Planned Parenthood recommended an abortion or performed an abortion for these patients." (*Id.*)[12] Under Louisiana law, the Legislative Audit is "a public document" and was "distributed to appropriate public officials." (*Id.*)

---

[10] The Audit Report also appears as an attachment to the Motion for TRO. (Doc. 4-2 at 19–22.)

[11] This report would be mentioned during the First Hearing. (Hr'g Tr. 4:21–5:2, Sept. 2, 2015.)

[12] In essence, therefore, the Legislative Audit seems to ratify a statement made by a DHH official in an email sent on July 25, 2013: "At this point in time, we do not have credible evidence of Medicaid fraud by Planned Parenthood in Louisiana that would permit the Department from withholding or ceasing payment for Medicaid services." (Doc. 46-3 at 2.)

In July 2015, the Center for Medical Progress ("CMP") released a series of edited videos which purported to document discussions regarding the acquisition of tissue samples between various Planned Parenthood affiliates' officials and disguised actors. *See* Kevin Litten, *Bobby Jindal Announces Investigation into Planned Parenthood*, THE TIMES-PICAYUNE, July 14, 2015; *Planned Parenthood Exposed: Examining the Horrific Abortion Practices at the Nation's Largest Abortion Provider: Hearing Before the H. Comm on Judiciary*, 114th Cong. 192–201 (2015) (Analysis of CMP Video by Fusion GPS). Thereafter, DHH exercised its "oversight over all health facilities in the state" and requested that PPGC "answer some simple questions about . . . [its] current operations and planned operations in Louisiana." (Doc. 46-1 at 51–52 (Letter from Kathy Kliebert, Sec'y, Dep't of Health & Hosps., State of Louisiana, to Melaney Linton, Pres., Planned Parenthood Gulf Coast, Inc. (July 15, 2015)) ("Defendant's July Letter"). DHH gave PPGC until July 24, 2015, to respond. (*Id.* at 51.)

On July 24, 2015, PPGC did so. (Doc. 46-1 at 54–58 (Letter from Melaney A. Linton, Pres. & CEO, Planned Parenthood Gulf Coast, Inc., to Kathy Kliebert, Sec'y, Dep't of Health & Hosps., State of Louisiana (July 24, 2015)) ("PPGC's July Letter"). This letter recaps PPGC's history in Louisiana and denies the accusations made by CMP. (*Id.* at 54–55.) In it, Ms. Melaney A. Linton, PPGC's President and Chief Executive Officer and this letter's author ("Ms. Linton"), clarifies that PPGC "does not offer abortion services" in Louisiana. (*Id.* at 55.) PPGC acknowledged its link to Planned Parenthood Center for Choice, Inc. ("PPCFC"), a "standalone corporation" and a department of PPGC until 2005, and described itself as an "affiliate" of Planned Parenthood Federation of America ("PPFA"). (*Id.*) PPGC then responded to each of Defendant's questions, emphasizing that neither PPGC nor PPCFC provide abortion services in Louisiana. (*Id.* at 55, 57.) To the question of whether any PPGC "facilities, or any affiliates,

subsidiaries, or associates thereof, sell or donate any unborn baby organs or body parts,"[13] PPGC answered, "No." (*Id.* at 56.) To another—"How many clinics operated by Planned Parenthood Gulf Coast, or any affiliates, subsidiaries, or associates thereof, do business with . . . any . . . organizations in the business of selling or donating the remains of unborn babies?"—PPGC answered, "None". (*Id.*)

On August 4, 2015, Defendant sent a second letter to PPGC. (*Id.* at 60–61 (Letter from Kathy Kliebert, Sec'y, Dep't of Health & Hosps., State of Louisiana, to Melaney Linton, Pres., Planned Parenthood Gulf Coast, Inc. (Aug. 4, 2015)) ("Defendant's August Letter"). It zeroes in on three statements in PPGC's July Letter: "PPCFC does not have a fetal tissue donation program in Texas currently"; "PPCFC disposes of Pathological Waste through an entity that is licensed for disposal of Special Waste from Health Care-Related Facilities"; and its "No" response to the question of whether "any Planned Parenthood Gulf Coast facilities, or any affiliates, subsidiaries, or associates thereof, sell or donate any unborn baby organs or body parts." (*Id.* at 60.) Defendant characterized these answers as being "directly contradict[ed]" by another "recently released video made on April 9, 2015 at the Planned Parenthood facility in Houston, Texas, in which Melissa Farrell, Director of Research at Planned Parenthood Gulf Coast (PPGC), discusses existing contracts for fetal tissue donation for the purpose of research." (*Id.*)

On August 14, 2015, PPGC responded. (Doc. 46-1 at 63 (Letter from Melaney A. Linton, Pres. & CEO, Planned Parenthood Gulf Coast, Inc., to Kathy Kliebert, Sec'y, Dep't of Health & Hosps., State of Louisiana (Aug. 14, 2015) ("PPGC's August Letter")) ("PPGC's August

---

[13] Texas law apparently allows for the donation of the "products of spontaneous or induced human abortions, regardless of the period of gestation" to certain types of organizations and for particular purposes. 25 TEX. ADMIN. CODE §§ 1.132(40)(B), 1.133(a)(2)(B). In PPGC's July Letter, it admitted that PPCFC disposes of such products in accordance with this law.

Letter") On behalf of both PPGC and PPCFC, Ms. Linton denied the existence of any

contradiction, as "neither PPCFC nor PPGC currently has a fetal tissue donation program in

Texas, and neither sells nor donates fetal tissue." (*Id.* at 63.) The letter proceeds to address each

new question posed in Defendant's August Letter. (*Id.* at 64–65.)


## C.   OVERVIEW OF THE FIRST AND SECOND TERMINATION ACTIONS

### 1.   First Termination Letters, Kennedy Declarations, and CMS' Statement of Interest

On August 3, 2015, Defendant notified PPGC of its intent to terminate the Agreements

pursuant to § 46:137.11(D)(1) via four letters ("First Termination Letters"). (Doc. 1 ¶ 30 at 8;

Doc. 13 at 1.) As this statute required, DHH gave PPGC 30-days' notice from the relevant

letters' receipt. (Doc. 13 at 1–2.) The letters gave no reason for DHH's decision. (Doc. 1 ¶ 32 at

8; *see* also Doc. 13 at 18, 20; Hr'g Tr. 14:6–8, Sept. 2, 2015.) In response, Plaintiffs filed their

first complaint. (Doc. 1.)

On that day, the Honorable Piyush "Bobby" Jindal, governor of Louisiana ("Jindal" or

"Governor"), published a press release announcing the Agreements' looming terminations. Press

Release, Hon. Bobby Jindal, Governor of Louisiana, Governor Jindal Announces the

Termination of Medicaid Contract with Planned Parenthood (Aug. 3, 2015).[14]  This document

states: "Governor Jindal and DHH decided to give the required 30-day notice to terminate the

Planned Parenthood Medicaid provider contract because Planned Parenthood does not represent

the values of the State of Louisiana in regards to respecting human life." *Id.* It continues:

"Planned Parenthood does not represent the values of the people of Louisiana and shows a

fundamental disrespect for human life," and, "It has become clear that this is not an organization

---

[14] While never submitted as an exhibit, the press release was incorporated by reference in
Plaintiffs' first complaint. (Doc. 1 ¶¶ 32–33 at 8.)

that is worthy of receiving public assistance from the state." *Id.* It refers to the possibility that PPGC "could be acting in violation of Louisiana law that states no person or group contracting with the state or receiving governmental assistance shall require or recommend that any women have an abortion." *Id.* It concludes: "Pending the ongoing investigation, DHH reserves the right to amend the cancellation notice and terminate the provider agreement immediately should cause be determined." *Id.*

During the First Termination Action, among the many documents docketed by the Parties, Defendant submitted a declaration by Ms. J. Ruth Kennedy ("Ms. Kennedy"), the Medicaid Director of DHH ("First Kennedy Declaration"), (Doc. 13-2 ¶¶ 1–5 at 1). (Doc. 13 at 21–22.) The First Kennedy Declaration's sixth paragraph states: "There are no Medicaid services that only family planning clinics provide that could not be[ ]provided by other enrolled Medicaid providers in the State of Louisiana, including in New Orleans and Baton Rouge." (Doc. 13-2 ¶ 6 at 2.) Its seventh further explains: "Any physician/physician extender and appropriately certified lab can provide family planning and related services as long as it is within their license and scope." (*Id.* ¶ 7, at 2.) Per the next paragraph, "[t]here are 1,146 actively enrolled Medicaid providers in Region 1, covering the Greater New Orleans area, and 864 actively enrolled Medicaid providers in Region 2, covering the Greater Baton Rouge area, that can provide family planning and related services." (*Id.* ¶ 8 at 2; *see also* Doc. 13 at 21.) A sorted provider list is attached; it includes dermatologists, dentists, audiologists, cosmetic surgeons, and orthopedic surgeons. (Doc. 13-2 at 5–41; *see also* Hr'g Tr. 23:18–25:2, Sept. 2, 2015.)

This First Kennedy Declaration also describes two telephonic conferences between CMS and DHH officials. According to Ms. Kennedy, on August 6, 2015, CMS advised DHH that the latter "has the authority to withhold federal Medicaid dollars from Louisiana or seek injunctive

relief for the failure to comply with the Medicaid Act." (Doc. 13-2 ¶ 10 at 2.) CMS and DHH

held a second conference call on August 21, 2015, in which CMS "advised" DHH "it would be

sending a letter . . . confirming what CMS and HHS counsel had verbally conveyed to the

Department during the August 6, 2015 conference call." (*Id.* ¶ 11 at 2.) [15]

On August 31, 2015, the United States Department of Justice, on behalf of CMS and

DHHS, filed a Statement of Interest. (Doc. 24.) The United States did so due to "its strong

interests in the proper operation of the Medicaid program . . . and in ensuring that the [s]tates

administer their federally-subsidized Medicaid programs in a manner that is consistent with the

Medicaid statute." (*Id.* at 2.) Basically, the Statement of Interest makes three broad points.

First, because DHH has sought to terminate the Agreements "without providing any

justification related to PPGC's qualifications to provide medical services," DHH's proposed

termination will run afoul of § 1396a(a)(23). (*Id.*; *see also* Doc. 22 at 2, 5, 6.) To read Section

1396a(a)(23) differently would both "strip the Medicaid Act's free choice of provider provision

of all meaning." (Doc. 24 at 3.) It would simultaneously "contravene clear congressional intent

to give Medicaid beneficiaries the right to receive covered services from any qualified and

willing provider." (*Id.*)

Second, the Statement of Interest declares that DHH's interpretation is "inconsistent"

with "the overwhelming weight of authority" and with DHHS' own "considered and

---

[15] A second declaration submitted by Ms. Kennedy ("Second Kennedy Declaration") gives a
somewhat different description of this call with CMS, offering up far more detail about the
content of these conversations: "On the August 6, 2015, conference call . . . CMS and HHS told
the Department that the any willing provider provisions under § 1396a(a)(23) was not all
inclusive, but illustrative and that the Department could have other reasons to remove a provider
from its program that were unrelated to the provider's ability to perform the Medicaid-covered
services or properly bill for those services." (Doc. 31-1 ¶ 6 at 2.) The Second Kennedy
Declaration continues: "CMS and HHS advised the Department that the validity of a state's
reasons for terminating a provider are made on a case by case basis." (*Id.*)

longstanding views." (*Id.* at 3, 4, 19–22.) It describes DHH's interpretation of Section 1396a(a)(23) as "not even a plausible reading of the statute," "certainly not compelled by the text of the provision," and likely to "undermine[] the provision's intent." (*Id.* at 20.) Meanwhile, DHHS "has repeatedly and consistently interpreted the 'qualified' language in § 1396a(a)(23) to prohibit a State from denying access to a provider for reasons unrelated to the ability of that provider to perform Medicaid-covered services or to properly bill for those services." (*Id.* at 3–4.) Its view "is eminently reasonable," verified by a dictionary, and recognizes "[a] role for States to set reasonable restrictions related to a provider's ability to provide competent and skilled services" without "read[ing]" Section 1396a(a)(23) "out of the statute altogether, as Louisiana desires." (*Id.* at 21.) It contends that this interpretation, made by CMS "under authority delegated to it by Congress," merits deference. (*Id.*)

Finally, the Statement of Interest affirms CMS' view that "Medicaid beneficiaries" like the Individual Plaintiffs "may enforce their statutory rights under § 1396a(a)(23) to their choice of a qualified provider through a private action under 42 U.S.C. § 1983" even after *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1382, 191 L. Ed. 2d 471 (2015) ("*Armstrong*"). (Doc. 24 at 2, 21; *see also* Doc. 22 at 2–5.)

## 2.     First Hearing

On September 2, 2015, the First Hearing was held. (Doc. 30.)

During its course, the Parties' positions on Section 1396a(a)(23) were clarified. Plaintiffs' counsel explained: "We're here because the termination violates the Jane Doe Plaintiffs' . . . right to free choice of provider under Section [1396]a(a)(23) of the Medicaid Act." (Hr'g Tr. 4:10–12, Sept. 2, 2015.) Because PPGC is "competent to provide services," it argued

that it was "qualified" within this subsection's meaning. (Hr'g Tr. 4:16–5:12, Sept. 2, 2015.) The claim before the Court in the Motion for TRO was the Individual Plaintiffs' claims under this provision of the "federal Medicaid act," Plaintiffs' counsel emphasized. (Hr'g Tr. 10:17–19, Sept. 2, 2015.) In Plaintiffs'' view, whether or not PPGC held some administrative right was irrelevant, as the Individual Plaintiffs always lacked such prerogatives. (Hr'g Tr. 10:15–19, Sept. 2, 2015.) On the Individual Plaintiffs' behalves, PPGC contested Defendant's claim that Section 1396a(a)(23) creates no private cause of action. (Hr'g Tr. 4:10–15, 6:23–7:15, Sept. 2, 2015.) Specifically, it argued that it "clearly fulfills the standard set forth by the Supreme Court in *Blessing* [*v. Freestone*, 520 U.S. 329, 117 S. Ct. 1353, 137 L. Ed. 2d 569 (1997) ("*Blessing*"),] and then in the *Gonzaga* [*University v. Doe*, 536 U.S. 273, 153 L. Ed. 2d 309, 122 S. Ct. 2268 (2002) ("*Gonzaga*"),] . . . cases."[16] (Hr'g Tr. 6:13–19, Sept. 2, 2015.) In other words, this subsection uses "rights creating language that unambiguously confers a right on Medicaid patients" and is not "so vague and amorphous that . . . [it would] strain[] judicial competence to enforce." (Hr'g Tr. 6:15–19, Sept. 2, 2015.) Plaintiffs sought to distinguish the more recent *Armstrong* from the body of law spawned by these cases by maintaining that it not only dealt with "a completely different section of the Medicaid Act," one "without the same kind of rights creating language," but also lacked any Section 1983 claim. (Hr'g Tr. 6:24–7:4, 7:7–15, Sept. 2, 2015.)

Defendant's counsel countered that Section 1396a(a)(30) was substantially identical to Section 1396a(a)(23). These two subsections have "the exact same rights creating type of language"; both "say what the state plan should provide." (Hr'g Tr. 16:17–22, Sept. 2, 2015.) He thus urged the Court to adopt the reasoning of the plurality in *Armstrong*. (Hr'g Tr. 14:10–15:8,

---

[16] The relevant test is discussed later in this opinion. *See infra* Part V.

16:4–10, 16:13–14, 19:21–24, 22:24, 23:13 14, Sept. 2, 2015.) Defendant's counsel also insisted

that Section 1396a(a)(23)'s "qualified" requirement was "a very vague standard." (Hr'g Tr.

18:1–2, Sept. 2, 2015.) Having proposed a number of denotations, (Doc. 13 at 8), Defendant's

counsel based this conclusion on his "conversations" with CMS and the supposed

"[un]reasonabl[eness]" of CMS' contrary interpretation, (Hr'g Tr. 16:24–17:10, 17:24–18:9,

Sept. 2, 2015). Because "qualified" is inherently vague and ambiguous, Section 1396a(a)(23)

cannot meet the *Blessing* test's requirement that a right not be "so vague and amorphous as to be

beyond the competence of the judiciary to enforce."[17] (Doc. 13 at 4, 8.) Defendant promised to

"flesh out" her position in a response to the Statement of Interest. (Hr'g Tr. 17:1–2, Sept. 2,

2015.)

      PPGC's competence to provide the Medicaid services was also discussed. In response to

this Court's question regarding whether DHH had yet "raised any suggestion or made any

suggestion that the reason for terminating the contract has anything to do with competency or the

adequacy of the care that is given" by PPGC "to the patients who get their care at those

facilities," Plaintiffs' counsel answered, "No." (Hr'g Tr. 3:19–24, Sept. 2, 2015.) When this

Court posed the same question to Defendant's counsel—"There is no question . . . about the

competency of these two facilities to provide Medicaid services and adequate care for the

patients that they serve, would you agree with that?"—Defendant's counsel answered, "At this

time, I would agree with that." (Hr'g Tr. 11:11–16, Sept. 2, 2015.) Additionally, when asked,

"They're not qualified because you're terminating their contract?" Defendant's counsel

---

[17] It is unclear whether Defendant was also articulating a deference argument on her own behalf
or simply trying to meet the second *Blessing* prong. Her statements can be read in both ways, as
arguing that "qualified" is either so ambiguous as to confer interpretive discretion on DHH or so
vague as to not satisfy *Blessing*. Either approach, however, fails to account for the statute's plain
language and much precedent. *See infra* Part V.B.1.

answered, "Exactly," and admitted that DHH's definition of "qualified" was "circular": PPGC was no longer a "qualified" provider because DHH had made it so by terminating their contract, a mechanism he then stated had never before been utilized in quite this manner. (Hr'g Tr. 21:10–13, 22–25, 22:10–13, Sept. 2, 2015.) He also acknowledged that the "current motive" or "the motive leading up to" the Agreements' termination was CMP's video tapes. (Hr'g Tr. 12:8–16, Sept. 2, 2015; *see also* Hr'g Tr. 35:12–19, Oct. 16, 2015.)

The Parties finally contested the capacity of this state's other Medicaid providers to absorb PPGC's patients. PPGC characterized the list included with the First Kennedy Declaration as containing "numerous examples of[,] on their face[,] providers that would not provide the care that Planned Parenthood provides, including dentists, radiologists, nursing homes, [and other] places that are not going to do breast cancer screening or give out birth control." (Hr'g Tr. 8:18–22, Sept. 2, 2015.) PPGC maintained that "there's no way that . . . other alternative providers have the capacity to absorb our patients." (Hr'g Tr. 9:2–4, Sept. 2, 2015.)

Defendant's counsel admitted that the Individual Plaintiffs would suffer "disruption of some kind," being forced, "to get other doctors" and "seek out other places to get their health care." (Hr'g Tr. 13:6–12, Sept. 2, 2105.) Defendant's counsel also clarified the origins of the list of providers referenced in the Defendant's Opposition and the First Kennedy Declaration. (Hr'g Tr. 23:18–25:9, Sept. 2, 2015.) It reflected "typically billed" codes, and was the result of "a code run" of providers that "can provide family planning services because they have billed for them" by Defendant. (Hr'g Tr. 24:4–6, 25:1–6, Sept. 2, 2015.)

### 3.    Third Kennedy Declaration

After the First Hearing, Defendant sought permission to amend its opposition and

substitute new papers "pursuant to . . . [its] duty to provide accurate information to the Court." (Doc. 32 at 1.) Included in Defendant's proposed amendments was a third declaration by Ms. Kennedy ("Third Kennedy Declaration"). This Third Kennedy Declaration corrects Defendant's first list of providers, explaining: "I[, Ms. Kennedy,] ordered a comprehensive review of this exhibit and have since discovered that nursing facilities and dentists should not have been included." (Doc. 34-2 ¶ 8a at 2; *see also* Doc. 34 at 2.) It adds: "The other provider types included in Exhibit 1 are appropriate due to what they are allowed to do under the scope of their license." (Doc. 34-2 ¶ 8a at 2; *see also* Doc. 34 at 2.) It gives two other examples: "[A]nesthesiologists, who can be reimbursed for their role in sterilization procedures[,] and radiologists, who can be reimbursed for reading ultrasounds, etc. related to reproductive/women's health issues." (*Id.*)

This "review of the information in [the First Kennedy Declaration] also revealed a more precise description of Medicaid providers in the New Orleans and Baton Rouge areas other than PPGC who are available to patients seeking family planning and related services." (Doc. 34 at 2.) Defendant's staff had "gather[ed] information from available Medicaid providers in proximity to the two Planned Parenthood locations in New Orleans and Baton Rouge, Louisiana." (Doc. 34-2 ¶ 8b at 2.)

As a result of this additional inquiry, Ms. Kennedy had decided to cull the list of relevant providers from over one-thousand (2,000) to twenty-nine (29), (*Compare* Doc. 13-2 ¶ 8 at 2, *with* Doc 34-2 at 5–6). This amended document includes two entries for the City of New Orleans Health Department, whose titles suggest one primarily serves and another mostly the homeless. (*Id.* at 5.) The Court also notes that the name of some of the other entities listed suggest that their patent base is similarly limited, e.g. "NO/Aids Task Force," "New Orleans Musicians' Clinic".

(*Id.*)

While five providers in the Baton Rouge area are identified in the corrected Declaration, "LSU Health-OLOL" appears twice. (*Id.*) One location's medical doctors do not accept new patients, and neither clinic provides contraception of any kind. (*Id.*) Finally, only one Baton Rouge center has an approximate wait time of less than one week ("1-3 days, same day for est. pt."). (*Id.*)

**4.    Abandonment of First Termination Action and Commencement of the Second Termination Action**

On September 9, 2015, Defendant chose to "rescind" her earlier at-will terminations. (Doc. 38 at 2.) On September 14, 2015, Defendant sent the First Termination Letters, one for each Agreement, to PPGC. (Doc. 38 at 4, 6, 8, 10; Doc. 46-1 at 18–36.) On September 15, 2015, Defendant followed these rescission letters with four new termination letters ("Second Termination Letters"). (Doc. 39 at 1; Doc. 46-1 at 37–49.) While the First Termination Letters had invoked Section 46:437.11(D)(1), (Doc. 38 at 4, 6, 8, 10), the Second Termination Letters rely on Sections 46:437.11(D)(2) and 46:437.14 and Title 50. (Doc. 39-1 at 2–3, 5–6, 8–9, 11–12; Doc. 46-1 at 37–49). Both MAPIL sub-provisions, Section 46:436.11(D)(2) allows for "for cause" termination of a provider agreement, and Section 46:437.14 identifies a number of violations, LA. R.S. §§ 46:437:11(D)(2), 46:437.14. The Second Termination Letters specify several different grounds.

The first is a settlement in *Reynolds v. Planned Parenthood Gulf Coast, Inc.*, Case Number 9:09-cv-124-RC (E.D. Tex.) ("*Reynolds* Settlement"), a lawsuit pursuant to the False Claims Act ("FCA") in the Eastern District of Texas between PPGC and an FCA plaintiff. (Doc.

39-1 at 2, 5, 8, 11.) According to the letters, two violations of Title 50 were based on this settlement. First, simply by settling this action, PPGC had violated Title 50. (*Id.*) Second, since DHHS had not been informed "within ten (10) working days of when the provider knew or should have known of the violation," another violation of Title 50 had occurred. (*Id.*)

A second (or third) ground consisted of "provider audits and federal false claims cases against PPFA . . . affiliates." (*Id.*) Another Texas case, *Carroll v. Planned Parenthood Gulf Coast*, Case Number 4:12-cv-03505 (S.D. Tex.) ("*Carroll*"), fell within this description. According to the letters, in *Carroll*, "the presiding judge found that the information already provided allows the court to draw the reasonable inference that Planned Parenthood knowingly filed false claims." (Doc. 39-1 at 2, 5, 8, 11; *see also* Hr'g Tr. 36:2–22, Oct. 16, 2015.) Relying on this interpretation of *Carroll*, the Second Terminations Letters cite Louisiana law— "Providers and providers-in-fact are required to ensure that all their agents and affiliates are in compliance with all federal and state laws as well as rules, policies and procedures of the Medicaid program"—and concluded: "PPGC and its parent organization PPFA has failed to do so and has failed to notify DHH of violations and misconduct by affiliates and providers-in-fact[,] . . . violations of . . . Title 50." (Doc. 39-1 at 2, 5, 8, 11.)

The third basis for termination was Defendant's determination that PPGC's July and August Letters, *see supra* Part II.B, contained "misrepresentations" upon Defendant's further review of CMP's videos. (Doc. 39-1 at 3, 6, 9, 12.) These alleged misrepresentations were described as violations of Sections 46:437.11(D)(2) and 46:437.14(A)(1). (*Id.*) Although other grounds are referenced in these letters, including audits, noncompliance with various Title 50 conditions, and more, unidentified misrepresentations constitute the third effective category.[18]

---

[18] For example, Defendant maintained that, as Section 46:437.11(D)(2) allows for termination "immediately and without notice if a health care provider is the subject of a sanction or of a

(*Id.*)

After receiving these Second Termination Letters, Plaintiffs filed an unopposed motion to amend the complaint on October 7, 2015, (Doc. 41), a request granted on that same day, (Doc. 42). Already attached to the motion to amend, (Doc. 41-1), a new amended complaint ("Amended Complaint") followed on October 7, 2015, (Doc. 43).[19] Two days later, Plaintiffs filed the Renewed Motion for TRO, (Doc. 45), and the Renewed Memorandum, (Doc. 46). Simultaneously, Plaintiffs filed the Plaintiffs' Motion for Limited Expedited Written Discovery, (Doc. 47), and Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Limited Expedited Discovery, (Doc. 48). On October 14, 2015, Plaintiffs docketed the Memorandum Regarding Availability of State Remedy. (Doc. 52 at 1.) Defendant filed the Motion to Dismiss, (Doc. 53), and Defendant's Memorandum on October 14, 2015, (Doc. 53-1). On October 16, 2015, this Court held the Second Hearing. The Court orally denied Plaintiffs' Motion for Limited Expedited Written Discovery and took the remaining motions under advisement at the Second Hearing's conclusion. Late that day, Plaintiffs filed a copy of the *Reynolds* Settlement. (Doc. 54.)

On Sunday, October 18, 2015, this Court issued an order denying Defendant's motion to dismiss and granting Plaintiffs' request for a temporary restraining order. (Doc. 55.) It set a

---

criminal, civil, or departmental proceeding," it had determined "that PPGC currently fits within this statute due to the investigations of PPGC by both DHH and the Louisiana Office of Inspector General." (Doc. 39-1 at 3, 6, 9, 12.) And finally, pursuant to Section 46:437.14(A)(l0) and (12), Defendant claimed that it "may move to revoke enrollment if a provider is found in violation of licensing or certification conditions or professional standards relating to the licensure or certification of health care providers or the required quality of goods, services, or supplies provided" as well as "for failure to meet any condition of enrollment." (*Id.*) PPGC, however, has counted three, and Defendant has not yet contradicted this grouping in writing or during the Second Hearing. (Hr'g Tr. 25:16–29:10, Oct. 16, 2015.)

[19] While many paragraphs in the Amended Complaint mirror exactly those in the First Complaint, (Doc. 4 ¶¶ 1, 2, 3, 4, 9–14, 18–33, 35, 37–49, *with* Doc. 43 ¶¶ 1, 2, 3, 5, 10–15, 19–33, 41, 43–55), or underwent slight alteration (i.e. dates), (Doc. 4 ¶ 5, *with* Doc. 43 ¶ 6), Plaintiffs refined others so as to reflect this case's latest posture and developments, (Doc. 43 ¶¶ 4, 6, 35–36), and class action claims, (Doc. 43 ¶¶ 16–19, 56–61, 68).

status conference for the following day. (*Id.* at 59.)  At that status conference, all parties agreed that no further discovery and no further argument was necessary for this Court to make its determination on whether to issue a preliminary injunction. (Doc. 58.) The Parties expressed "no objection to converting the temporary restraining order to a preliminary injunction." (*Id.*)

On October 28, 2015, Plaintiffs filed the Notice of Supplemental Authority. (Doc. 61.) The Notice includes as an attachment a copy of "a preliminary injunction," issued by the Middle District of Alabama, "in a case substantially similar to the instant action." (*Id.* at 1.) Later that same day, at Defendant's request, this Court held a second telephonic status conference. (Doc. 62.) Once more, the Parties affirmed that they regarded the record as complete and sufficient for the issuance of a preliminary injunction. (*Id.*)

.

## D.    OVERVIEW OF PARTIES' ARGUMENTS

## 1.    Plaintiffs' Arguments

In their Motion for TRO and Renewed Motion for TRO, Plaintiffs have made four relevant arguments to why they are entitled to a temporary restraining order.

First, Plaintiffs contend that they will likely prove that Defendant's efforts violate federal statutory and constitutional law. They begin by arguing that Defendant's latest termination, like the first, is prohibited by the plain meaning of Section 1396a(a)(23) and are thus in violation of controlling federal law. (Doc. 46 at 17–22; *see also* Doc. 4-1 at 16.) This Free-Choice-of-Provider Provision bars Defendant from excluding PPGC from Medicaid for a reason unrelated to its fitness to provide medical services. (Doc. 46 at 18, 21, 22; Doc. 4-1 at 11.) Because "Defendant has nowhere suggested that PPGC is not 'qualified to perform' the Medicaid services it provides," its action cannot be cohered with this subsection's language and purpose. (Doc. 4-1

at 15, 16; *see also* Doc. 46 at 17.)

Plaintiffs concurrently maintain that this particular subsection, in contrast with Section 1396a(a)(30), which was the focus in *Armstrong*, does afford the Individual Plaintiffs with a right enforceable via Section 1983. (Doc. 46 at 18–19 & n.9; Doc. 4-1 at 12–13 & n.9; *see also* Hr'g Tr. 6:23–7:4, Sept. 2, 2015.) Throughout their discussion in the Renewed Memorandum, Plaintiffs rely on many of the same cases, including *Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1283, 188 L. Ed. 2d 300 (2014) ("*Betlach*"); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 2738, 186 L. Ed. 2d 193 (2013), 133 S. Ct. 2736, 186 L. Ed. 2d 193 (2013 ("*Indiana*"); and *Women's Hospital Foundation v. Townsend*, No. 07-711-JJB-DLD, 2008 U.S. Dist. LEXIS 52549, 2008 WL 2743284 (M.D. La. July 10, 2008) ("*Townsend*"). (*See, e.g.*, Doc. 46 at 17, 18 & 18 n.13.) Repeatedly, Plaintiffs emphasize that even if PPGC's action would be barred by *Armstrong* the Individual Plaintiffs retain a viable cause of action under Section 1983.

In the Renewed Memorandum, Plaintiffs do abandon their procedural due process claim, (Hr'g Tr. 15:19–16:1, Oct. 16, 2015; *compare* Doc. 43 ¶¶ 62–67 at 19–20, *with* Doc. 1 ¶¶ 56–57 at 14), but do reiterate their two constitutional ones, (Doc. 1 ¶¶ 52–55 at 14; Doc. 43 ¶¶ 64–67 at 20). Now, Plaintiffs argue that Defendant, without sufficient justification, is singling them out for unfavorable treatment, violating the Equal Protection Clause of the Constitution's Fourteenth Amendment, U.S. CONST. amend. XIV, § 2, and is attempting to penalize them for freely associating with other related Planned Parenthood entities, thereby contravening the freedom of association guaranteed by the First Amendment, *see* U.S. CONST. amends. I, IX, § 2; *Nat'l Ass'n for Advancement of Colored People v. Ala. ex. rel Patterson*, 357 U.S. 449, 460, 78 S. Ct. 1163,

1498, 2 L. Ed. 2d 1488 (1958); *Arnaud v. Odom*, 870 F.2d 304, 311 (5th Cir. 1989). (*See, e.g.*, Doc. 46 at 22.)

Second, Plaintiffs insist that the harm to PPGC and the Individual Plaintiffs will be irreparable if the termination comes to pass. The Individual Plaintiffs will be deprived of their ability to exercise their federal statutory rights, and will suffer a disruption of their relationship with a preferred (and competent) provider and a reduction of their access to family planning services. (Doc. 46 at 26; *see also* Doc. 4-1 at 8–9, 17.) PPGC, in turn, will find its budget sharply curtailed, possibly forcing it to close down BRHC permanently, and will never be able to recover any monetary damages from DHH. (Doc. 46 at 27 & n.19; *see also* Doc. 4-1 at 17–18, 18 n.13.)

Third, Plaintiffs argue that the balance of harms favors them. "While PPGC and its patients will suffer serious irreparable harm in the absence of an injunction, the state will suffer no injury at all." (Doc. 46 at 27; *see also* Doc. 4-1 at 18.) The reason, Plaintiffs contend, is because an injunction will do no more than "require the state to maintain the funding [it] ha[s] provided to . . . [PPGC] for years." (Doc. 46 at 27 (internal quotation marks omitted) (alterations in original); *see also* Doc. 4-1 at 18.)

Finally, Plaintiffs assert that the public interest favors their injunctive request. The public has a "strong" interest "in ensuring continued public access to crucial health services, especially for the many underserved and low-income patients PPGC serves." (Doc. 46 at 28; *see also* Doc. 4-1 at 18.) Such an interest is especially "acute with respect to the neediest . . . who depend on publicly funded programs." (Doc. 46 at 28; *see also* Doc. 4-1 at 19.)

As to Defendant's argument that PPGC's failure to pursue a state administrative appeal of the termination renders the controversy not ripe and deprives all Plaintiffs of standing, Plaintiffs argue that PPGC is not required to pursue the state administrative appeal but can

instead pursue its rights under Section 1983. (Doc. 52 at 2–3; *see also* Hr'g Tr. 6:6–10, Sept. 2, 2015.) The Individual Plaintiffs argue that they have no right to administratively appeal the Agreements' termination and thus could not do so if they wanted to. (Doc. 52 at 3; *see also* Hr'g Tr. 10:15–17, Sept. 2, 2015.) As such, regardless of whether or not PPGC's claims are ripe, their claims are clearly so, and their standing just as much. (*See* Doc. 52 at 1.)

### 2.    Defendant's Arguments

Invoking Rule 12(b)(1) and (6), Defendant makes essentially three arguments.

First, Defendant contends that this Court lacks subject-matter jurisdiction over this dispute because this case is not ripe and Plaintiffs lack prudential and constitutional standing. (Doc. 53-1 at 5–9.) Defendant insists on this case's unripe state for three reasons: (1) "Plaintiffs have suffered no injury"; (2) "further procedural and factual development is required"; and (3) no hardship can be shown. (*Id.* at 6, 8.) As support for his first and second reason, Defendant argues that because PPGC may appeal this termination, during which the Agreements will remain enforce in accordance with Defendant's wishes, this "suspensive" review process leaves *all* Plaintiffs without a cognizable injury. (*Id.* at 6–7 (injury), 8 (hardship), 9 (injury for standing purposes).) Defendant's Memorandum further explains the reasons for a lack of ripeness and standing as such: "In the instant matter, PPGC is asserting a due process violation while simultaneously hinting that it may voluntarily elect ***not*** to participate in the process about which it complains." (*Id.* at 8 (emphasis in original).)

Second, Defendant argues for abstention, emphasizing these doctrines' purpose of "preserv[ing] the balance between state and federal sovereignty."  (*Id.* at 10.) Defendant cites to four abstention doctrine—*Pullman*, *Younger*, *Burford*, and *Colorado River*—and foregoes one—

*Thibodaux*. (*Id.* at 10–12.) When cumulatively considered, these doctrine's "animating" principles have a "clear . . . application" to this proceeding: "Plaintiffs should not be indulged in their attempt to invoke the jurisdiction of this Court in the absence of State agency action against them that would delineate . . . [Defendant's] interpretation of the challenged provision, and in the presence of adequate state administrative and judicial procedures if that eventuality were to occur." (*Id.* at 12.)

Third, Defendant insists Plaintiffs cannot prevail on the merits for four reasons. First, "Plaintiffs have no property interest in the Medicaid provider contracts." (*Id.* at 13; *see also* Doc 13 at 14–18.) Second, even if Plaintiffs have a property interest, Louisiana's administrative appellate process "complies with the mandates of due process" and federal regulation, for "the essence of due process is notice plus an opportunity to be heard." (Doc. 53-1 at 17.) Third, Defendant insists that Section 1396a(a)(23) does not afford the Individual Plaintiffs any private cause of action, (*Compare* Doc. 53-1 at 18–22, *with* Doc. 13 at 4–9), and is sufficiently ambiguous to permit Defendant to exercise her discretion to define "qualified" in accordance with her construction of state law, (Doc. 53-1 at 21; *see also* Doc. 4 at 8). Defendant thus insists that her authority under Section 46:437.11(D)(2) is not limited "to determining whether a provider is competent to provide . . . services." (Doc. 53-1 at 22.) She can, instead, invoke any ground derived from state law, including, but not limited, the bases set forth in Section 46:437.12 and Title 50, to determine whether a provider is "competent" or not. (Doc. 53-1 at 23–24.)

## IV.   PRELIMINARY ISSUES: JURISDICTION AND ABSTENTION

### A.   RIPENESS

### 1.   Defendant's Arguments

Defendant provides the correct standard by which to measure its argument that this case is not ripe: for the purposes of this doctrine, "a court must evaluate (1) the fitness of the issues for judicial resolution, and (2) the potential hardship to the parties by declining court consideration," (Doc. 53-1 at 6 (quoting *Lopez v. City of Houston*, 617 F.3d 336, 342 (5th Cir. 2010)). Defendant maintains the case is not ripe for three reasons: (1) "Plaintiffs have suffered no injury"; (2) "[F]urther procedural and factual development is required, as demonstrated by Plaintiffs' due process claim . . . and their request to conduct expedited discovery in this proceeding"; and (3) no hardship exists because "the review process is suspensive," a third point substantively identical to its first (Doc. 53-1 at 6, 8). At the Second Hearing, her counsel stressed one aspect of the Constitution's ripeness requirement: "There is absolutely no injury"; "[T]here is absolutely no harm to them at all"; "[T]hey have no injury"; and, "There's no concrete injury to any of the Planned Parenthood or to any of the Jane Doe Plaintiffs because, again, there simply is no injury." (Hr'g Tr. 4:21–23, 9:2, 17:18–21, Oct. 16, 2015.)

### 2.   Analysis

### *(a)   Existence of Credible Threat of Concrete Harm*

Drawn from Article III but incorporating various prudential elements, U.S. CONST. art. III, § 2; *Reno* v. *Catholic Soc. Servs., Inc.,* 509 U.S. 43, 57 n. 18, 113 S. Ct. 2485, 2495 n.18, 125 L. Ed. 2d 38 (1993), ripeness is "a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over

administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties," *Nat'l Park Hospitality Ass'n v. U.S. Dep't of Interior*, 538 U.S. 807–08, 123 S. Ct. 2026, 2030, 155 L. Ed. 2d 1017 (2003) (internal quotation marks omitted). It generally incorporates, as Defendant rightly notes, (Doc. 53-1 at 6), consideration of two elements: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 808 (citing to *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S. Ct. 1507, 1515, 18 L. Ed. 2d 681 (1967) ("*Abbott Labs.*"), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 105, 97 S. Ct. 980, 984, 51 L. Ed. 2d 192 (1977))).[20]

Defendant argues that Plaintiff has suffered no injury sufficient for ripeness' purposes. This argument fails for two reasons. The primary reason is well-rooted in ripeness jurisprudence: "In evaluating ripeness, the central focus is on whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1250 (10th Cir. 2011) (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1097 (10th Cir. 2006)). However, an injury need not be actual in a physical sense for a plaintiff's case to cross the ripeness threshold. Rather, if a plaintiff is "immediately in danger of sustaining some direct injury as the result of the challenged official conduct," ripeness will often be found. *Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010); *see also Whole Woman's Health v. Cole*, 790 F.3d 563, 582 (5th Cir. 2015) (quoting *id.*). It is enough that "an injury that has not yet occurred is sufficiently likely to happen to justify judicial intervention" or "when the court would be in no better position to adjudicate the issues in

---

[20] *Abbott Labs.*' conclusion as to the Administrative Procedures Act was abrogated. It remains valid as to its ripeness' analysis and continues to be cited in that limited regard.

the future than it is now." *Pearson*, 624 F.3d at 684 (quoting *City of Los Angeles v. Lyons*, 461

U.S. 95, 101–02, 103 S. Ct. 1660, 1665, 75 L. Ed. 2d 675 (1983)). A "*future* injury" will be

deemed ripe (and establish standing) if either "the injury is certainly *impending*" or "there is

substantial *risk* that the harm will occur." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334,

2341, 189 L. Ed. 2d 246 (2014) (emphasis added); *see also Caprock Plains Fed. Bank Ass'n v.*

*Farm Credit Admin.*, 843 F.2d 840, 845 (5th Cir. 1988) (concluding that "too many ifs" that

render an injury a "mere potential[ity]," not just one or two that may render such a result into a

substantial possibility or even a probability, will make a case unripe).

    Thus, "ripeness is seldom an obstacle to a pre-enforcement challenge . . . where the

plaintiff faces a credible threat of enforcement." *Consumer Data Indus. Ass'n v. King*, 678 F.3d

898, 907 (10th Cir. 2012); *cf. Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 99 S. Ct.

2301,2308, 60 L. Ed. 2d 895 (1979) (finding standing where "a realistic danger of sustaining a

direct injury as a result of a statute's operation *or* enforcement" existed (emphasis added)). In

such cases, the plaintiff is typically "not . . . required to await and undergo [enforcement] as the

sole means of seeking relief." *Consumer Data Indus. Ass'n*, 678 F.3d at 907; *see also, e.g.*,

*Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 49 (D.C. Cir. 2000) (holding that

declaratory judgment action was ripe for judicial review under the Administrative Procedures

Act where plaintiff's "only alternative to obtaining judicial review now is to violate EPA's

directives . . . and then defend an enforcement proceeding on the grounds it raises here"). As the

Supreme Court has recently written, an agency's prospective, not yet consummated, action will

be found ripe for review if "the scope of the controversy has been reduced to more manageable

proportions . . . by *some concrete action* applying the regulation to the claimant's situation in a

fashion that harms or *threatens to harm* him." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 808

(emphasis added).

Under this precedent, Defendant's Second Termination Letters represent certain threats, classifiable as "concrete action[s]" that "threaten to harm" Plaintiffs, *id.*; *see also Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 491 (5th Cir. 2014). Here, the existing record amply supports this determination: Defendant has made it clear she intends to terminate the Agreements, the only thing changing since the initial termination letters being the reason. In effect, by her own actions, she has triggered the application of a general rule, federal courts having "consistently found a case or controversy in suits between state officials charged with enforcing a law and private parties potentially subject to enforcement," *Consumer Data Indus. Ass'n*, 678 F.3d at 905. A case's ripeness simply does not depend on whether the injury has already been inflicted; "specific threat[s] of enforcement" like those the Defendant has already made are typically more than enough to satisfy the constitutional minimum. *Reynolds v. City of Valley Park*, No. 4:06CV01487 ERW, 2006 U.S. Dist. LEXIS 83210, at *25, 2006 WL 3331082, at *6 (E.D. Mo. Nov. 15, 2006); *see also, e.g.*, *Cass Cnty. v. United States*, 570 F.2d 737, 740 (8th Cir. 1978) ("Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S. Ct. 510, 512, 85 L. Ed. 826 (1941)).

In this analysis, Defendant's own description of her actions is pivotal and telling. She has not proposed a new regulation or initiated a new round of rulemaking. (*See, e.g.*, Hr'g Tr. 33:11–14, Oct. 16, 2015; Doc. 53-1 at 1–2.) Instead, per her Second Terminations Letters, she intends to enforce what she perceives to be state law in accordance with her construction of federal

statutory law. (Doc. 39-1 at 2–3, 5–6, 8–9, 11–12.) In fact, as the First Termination Letters attest, the Agreements' termination pursuant to a MAPIL section has been threatened since at least August 2015, and Defendant has now only swapped no reason for three. (*Compare* Doc. 13, *with* Doc. 39-1.) As such, in the Tenth Circuit's words, "enforcement" has been "credib[ly] threat[ened]," her actions having made Plaintiffs' case ripe by lending substance to their pre-October 18, 2015, allegations. *Consumer Data Indus. Ass'n v. King*, 678 F.3d at 907. In such a situation, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief," for "the injury is certainly impending"—and "that is enough." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201, 103 S. Ct. 1713, 1721, 75 L. Ed. 2d 752 (1983) (quoting *Pennsylvania* v. *West Virginia*, 262 U.S. 553, 593, 43 S. Ct. 658, 663, 67 L. Ed. 1117 (1923)). Based on these circumstances and the overwhelming weight of precedent, Plaintiffs' threatened and certain injury is clear.

Two general admissions by Defendant's counsel at the Second Hearing strengthen this conclusion. First, though only indirectly, he himself conceded that a kind of "harm" may have already come to pass: in arguing why no cognizable injury had yet transpired, he emphasized possible contingencies: "I think that one of the contingencies that could happen is their rights could be *restored* . . . . [The] suspension could be *lifted*." (Hr'g Tr. 17:23–25, Oct. 16, 2015 (emphases added).) He characterized Defendant's actions as, prior to October 18, 2015, being "suspensive" if PPGC chose to appeal, and "the final action" as "suspended." (Hr'g Tr. 10:4–12, 6:1–6, Oct. 16, 2015.) Both the First and Second Termination Letters imply the same. (Doc. 38 at 4, 6, 8, 10 (informing PPGC that DHH "will be notifying you by separate communication of an exclusion/termination/revocation from the Louisiana Medicaid program for cause" and describing PPGC as possessing "rights to a *suspensive* appeal" of this

"exclusion/revocation/termination" (emphasis added)); Doc. 46-1 at 41, 44, 47, 51 ("[Y]ou are

hereby notified that the Department of Health and Hospitals (DHH) is hereby terminating *I*

revoking the PPGC provider agreement referenced above. This *action* will take *effect . . . .*"

(emphases added)).)

This highlighted language implies that Plaintiffs' rights have already been curtailed, a

suspension already imposed, and the relevant action, i.e. the Agreements' termination, already

undertaken, its "effect" alone delayed.[21] Any one of these imputations would constitute a

sufficiently credible threat to render this case ripe. Later, moreover, Defendant's counsel

unambiguously confirmed these statements' implications. To the Court's question—"the

Secretary has terminated the contract, but . . . has said that termination is suspended pending

appeal?"—he answered: "That's correct." (Hr'g Tr. 19:16–19, Oct. 16, 2015; *see also* Doc. 53-1

at 9–10.) Thus, even if the termination is suspended, it will occur automatically but for this

Court's intervention. That its practical enforcement may be stayed does not change the key fact:

using *Pearson*'s terms, Plaintiffs are in "danger of sustaining some direct injury as the result of

the challenged official conduct," *Pearson*, 624 F.3d at 684. A final exchange cinches this

conclusion. When Plaintiffs' counsel revealed PPGC's intent "to proceed in federal court" and

not "to pursue the administrative remedy," and the Court observed, "Well, then it seems to me

you've got a very, very ripe situation," and asked Defendant's counsel, "Am I missing something

on that?" he answered, "No." (Hr'g Tr. 20:18–23, Oct. 16, 2015.)

Equally worthy of note, Defendant quotes but dismisses the import of a principle

embedded in ripeness case law: "[A] case is generally ripe if any remaining questions are purely

---

[21] For something to be "restored" it must first have been taken, for something to be "lifted" it
must first have been imposed, and for something to be "suspended" it must first have been
determined.

legal ones," *Lopez*, 617 F.3d at 341. This principle holds even if "the application of the disputed rule [or the ultimate decision] remains within the agency's discretion." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005); *see also Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839, 854 (D.C. Cir. 2006) (citing *id.* and finding ripeness when "waiting to observe" an agency's final "actions would only exacerbate the . . . asserted injury while doing nothing to enable judicial review"). In this context, a truly non-legal question, notably, is often one whose resolution is necessarily "reliant on" and demands "agency expertise." *Marcum v . Salazar*, 694 F.3d 123, 129 (D.C. Cir. 2012). As any fair reading of the complaint and motions filed in this case indicates, the issue involves at least one, if not three, "purely . . . legal question[s]": the precise meaning of Section 1396a(a)(23) and the applicability of two constitutional clauses. (*See, e.g.*, Doc. 1 at 1; Doc. 43 at 1.) In *Abbott Labs.*, the seminal case in ripeness jurisprudence, the Court concluded that the issues presented were appropriate for judicial resolution because the facial challenge to the regulation involved the purely legal question of whether the regulation at issue exceeded the scope permitted by the underlying statute. *See Abbott Labs.*, 387 U.S. at 149. This kind of challenge, found ripe in *Abbott Labs.*, resembles the challenge that PPGC now makes, with "consideration of the underlying legal issues" *not* "necessarily be[ing] facilitated if they were raised in the context of a specific attempt to [apply and/or] enforce the regulations," *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 171, 87 S. Ct. 1526, 1528, 18 L. Ed. 2d 704 (1967). "Predominantly legal questions" like a statute's plain meaning and whether a person's conduct contravenes its unambiguous command are nearly always ripe. *See, e.g.*, *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1164 (11th Cir. 2008) ("The Supreme Court has long since held that where the enforcement of a statute is certain, a preenforcement challenge will not be rejected on ripeness grounds."); *Nat'l Ass'n of*

*Home Builders*, 417 F.3d aat 1282 ("Claims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues."); *cf. LeClerc v. Webb*, 419 F.3d 405, 414 (5th Cir. 2005) (noting that "actions for declaratory relief . . . by design permit pre-enforcement review" and applying two exceptions). Plaintiffs' present action presents precisely such questions.

*(b)        Existence of Requisite Hardship*

        The jurisprudence construing the hardship requirement is just as clear. The Fifth Circuit "has found hardship to inhere in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being force[d] . . . to modify [one's] behavior in order to avoid future adverse consequence." *Choice Inc. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (alteration in original) (internal quotation marks omitted). Discrete formulations, a plaintiff can meet the ripeness doctrine's hardship prong by satisfying just one. *Id.* As the Court's decisions clarify, the first test has been met when an agency proposes to "grant, withhold, or modify any formal legal license, power or authority," *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733, 118 S. Ct. 1665, 1670, 140 L. Ed. 2d 921 (1988), and the second is fulfilled when "the impact of the administrative action could be said to be felt immediately by those subject to it in conducting their day-to-day affairs," *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164, 87 S. Ct. 1520, 1524, 18 L. Ed. 2d 697 (1967).

        Quite simply, Defendant's conduct here cannot be described in any different terms. Since a threat suffices to satisfy ripeness' hardship requirement, to conclude differently would be to find no case ripe when an administrative option remains for one of many plaintiffs and a statutory right and remedy exists for all, a result contrary to the many opinions that have

confronted claims under Section 1396a(a)(23). *See infra* Part V; s*ee also, e.g.*, *Sabree v. Richman*, 367 F.3d 180, 193 & n.29 (3d Cir. 2004) ("A] plaintiff's ability to invoke § 1983 cannot be defeated simply by the availability of administrative mechanisms to protect the plaintiff's interests."); *cf. Cathedral Rock of N. Coll. Hill, Inc. v. Shalala*, 223 F.3d 354, 366 (6th Cir. 2000) (noting that "the Medicaid Act does not have a provision . . . incorporating § 405(h) and its exclusive jurisdiction limitation to channel legal challenges through the administrative procedures set forth").

Defendant maintains that the mere suspensive quality of her decision somehow unripens a case in which an injury is reasonably foreseeable and certain. Considering ripeness jurisprudence, this Court disagrees. *See, e.g.*, *Legacy Cmty. Health Servs., Inc. v. Janek*, No. 4:15-CV-25, 2015 U.S. Dist. LEXIS 8610, at *12–13, 2015 WL 4064270, at *5 (S.D Tex. July 2, 2015) (finding case ripe even when a party did not allege any actual instance of enforcement); *see also* Doc. 63 at 18–20*, Bentley* (finding that the fact of state administrative appeals process does not affect the right of the aggrieved individual party to pursue a Section 1983 claim).

### (c)   *Insufficiency of Defendant's Arguments Regarding Ripeness*

While a simple application of longstanding law leaves little doubt about this case's ripened state, Defendant's arguments merit some comment. Having examined her reasoning, this Court finds her construction and extension of the ripeness doctrine to be predicated on a fundamental misunderstanding of Plaintiffs' three claims. In its final paragraph, Defendant's Memorandum summarizes DHH's view of Plaintiffs' case: "In the instant matter, PPGC is asserting a due process violation while simultaneously hinting that it may voluntarily elect *not* to participate in the process about which it complains." (Doc. 53-1 at 8 (emphasis in original).) At

the Second Hearing, Defendant again reduces all of Plaintiffs' claims to "a disguised due process challenge." (Hr'g Tr. 8:3–4, Oct. 16, 2015.) This focus on procedural due process obscures at least three logical oversights.

First, this assertion ignores Plaintiffs' withdrawal of their due process claim in their Amended Complaint. (*See, e.g.*, Doc. 1 at 1; Doc. 43 at 1.) In fact, Plaintiffs' counsel expressly confirmed this at the Second Hearing. (Hr'g Tr. 15:19–16:1, Oct. 16, 2015.) Despite this clear abandonment, however, Defendant argues that the claims of the Individual Plaintiffs are "derivative" of PPGC's, (Hr'g Tr. 9:10–11, Oct. 16, 2015), based wholly on cases explicating the requirements of procedural due process. (Doc. 53-1 at 13 (citing *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577 (2d Cir. 1989); *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 177 (2d Cir. 1991); and *Senape v. Constantino*, 936 F.2d 687 (2d Cir. 1991)); *see also* Doc. 13 at 16–17). But when statutes like Section 1396a(a)(23) provide the case's gravamen and no procedural due process claim is made, Defendant's cases cannot be legally relevant. *See Indiana*, 699 F.3d at 977 (rejecting the relevance of *Kelly Kare* and similar cases because "[t]his is not a due-process case"). In other words, Defendant has reduced Plaintiffs' complaint to one claim already abandoned and relied on case law thereby rendered irrelevant.

Second, Defendant's emphasis on the existence of a "plan process" ignores an equally well-settled axiom when Section 1983 forms the basis of a party's claims. Defendant argues that the administrative appellate process, having been accepted as generally valid by CMS, essentially forecloses both PPGC's and the Individual Plaintiffs' resort to this (and any other) court. (Hr'g Tr. 7:23–8:6, Oct. 16, 2015; *see also* Doc. 53-1 at 3.) The process offered to PPGC (but not to the Individual Plaintiffs) must not be disturbed, she maintains, as it "is a legitimate process that has been approved," the states "required" under the Medicaid Act to "provide[]a

process for reviewing grievances by providers." (Hr'g Tr. 8:7–17, Oct. 16, 2015; *see also, e.g.*, Doc. 53-1 at 3–4.) Yet, as one court has observed, "[b]ecause § 1983 is intended to provide a federal forum, however, there will almost always be some sort of administrative or judicial avenue of relief at state law - whether compelled by federal statute or simply available under general state court jurisdiction." *Roach v. Morse*, 440 F.3d 53, 57 (2d Cir. 2006), *cited with approval in Romano v. Greenstein*, 721 F.3d 373, 376 n.8 (5th Cir. 2013) (as to exhaustion only). Thus, a congressional requirement that states establish administrative review procedures, as exists here, rarely, if ever, implies that either § 1983 plaintiffs need exhaust them or a case is unripe when the process has not been invoked but an injury plainly looms. *See Roach*, 440 F.3d at 57; Doc. 63 at 18–19, *Bentley*.

Third, Defendant's two "instructive" cases—*Rush v. Barham*, No. 14-30872, 2015 U.S. App. LEXIS 12886, 2015 WL 4467848 (5th Cir. July 22, 2015), and *Monk v. Huston*, 340 F.3d 279 (5th Cir. 2003) (Doc. 53-1 at 7–8)—do not support her ripeness argument.

*Rush*, for one, can be distinguished on both the facts and on the law. As a reading of the district court opinion there affirmed shows, "[t]he existence of parallel ['pending'] state proceedings to render[ed] Plaintiffs' cause of action unfit at each step of the fitness inquiry." *Rush v. Barham*, No. 13-cv-00723-BAJ-RLB, 2014 U.S. Dist. LEXIS 97521, at *11 (M.D. La. July 17, 2014). Here, no state proceeding predated the initiation of this federal action, so that any state action would not post-date and thus cannot parallel this proceeding from its genesis.[22]

In addition, at issue in *Rush* was the propriety of a "administrative actions" within an agency's state-based "authority—specifically, the agency's enforcement of the Louisiana Scenic Rivers[] Act"; "a challenge to *administrative regulations*" was the one before that court. *Rush*,

---

[22] This issue is also relevant to this Court's abstention analysis. *See infra* Part IV.C.2.

2014 U.S. Dist. LEXIS 97521, at *11. The basis of the Individual Plaintiffs' claim is the interpretation of Section 1396a(a)(23), a federal statute. More specifically, it is whether, independently of the state law basis of Defendant's present actions, Section 1396a(a)(23)'s plain meaning establishes the outer parameters of Defendant's discretion under state law to render a provider "unqualified." (*See* Doc. 43 ¶¶ 62–63 at 19.) PPGC's allegations, meanwhile, rest on federal constitutional provisions. (*See id.* ¶¶ 64–67 at 20.) This case is not a "challenge" to an "administrative regulation" by the one (and unquestioned) agency entitled to enforce it, but a challenge to the propriety of the secretary's exercise of discretion within and under the constraints imposed by federal statutory law. As a practical and legal matter, it is almost surely not a regulation, *cf.* 5 U.S.C. § 551, or a formal rule, LA. R.S. § 49:951(6).

In *Rush*, moreover, the Fifth Circuit thusly characterized the lower court's opinion: "The court held that in the circumstances of this particular case, further factual development will result from the pending state court proceeding and will necessarily affect the claims in this suit." *Rush*, 2015 U.S. App. LEXIS 12886, at *7, 2015 WL 4467848, at *3. As noted above, no factual development is necessary.[23] Rather, the question before this Court is one of "congressional intent" as reflected in the text of Section 1396a(a)(23). *Abbott Labs.*, 387 U.S. at 149. On the facts and the law, then, *Rush* does not fit.

The same can be said about *Monk*. As *Monk* itself states, "[a] case is generally ripe if any remaining questions are purely legal ones," *Monk*, 340 F.3d at 282, and this Court, like others, *see supra* Part IV.A.2, considers the determination of whether a federal statute is unambiguous to be such a question. In addition, *Monk* discussed ripeness in a narrow context: procedural due

---

[23] Had exhaustion been the issue, which Defendant explicitly denies, this factor may have some force. Defendant, however, has stipulated that no additional discovery is needed. (Doc. 58; Doc. 62.)

process. Thus, the opinion specifically found the case not ripe because "[t]he *constitutional right to due process* is not . . . an abstract right to hearings conducted according to fair procedural rules" but is "the right not to be deprived of life, liberty, or property without such procedural protection." *Id.* at 282–83 (emphasis added). Because any such claims have been decidedly and clearly abandoned by Plaintiffs, *Monk* will not do.

As a final note, Defendant oversells the significance of the Plaintiffs' own motion to expedite discovery, (Doc. 47). According to Defendant, this request attests to the need for factual development that proves ripeness' absence, (Doc. 53-1 at 6); Plaintiffs disagree, (*See* Hr'g Tr. 41:8–19, Oct. 16, 2015). While the motion makes clear that such discovery is being sought for purposes of strengthening Plaintiffs' animus allegations, (Doc. 48 at 2), the ripeness doctrine demands no more than a threatened injury to the plaintiff, not a complete evidentiary record. Indeed, Defendant's logic would render any federal case unripe where discovery is requested, without any regard for the reason such discovery is needed. Even if Plaintiffs' first amendment claims require, like almost all claims often do, more discovery, that possibility says nothing about the ripeness of their two other claims. In the vast majority of cases in which ripeness is not found, "additional factual development" is absolutely "necessary," a feature wholly absent from a proceeding focused on the outer parameters of a statute's meaning. *See, e.g.*, *John Corp. v. City of Houston*, 214 F.3d 573, 586 (5th Cir. 2000).[24]

*(d)*    **Conclusion**

For all these reasons, this Court finds this case ripe for its review, joining the Eastern District of Arkansas in *Planned Parenthood Ark. & E. Okla. v. Selig*, Doc. 45 (Amended and

---

[24] Even in procedural due process cases, ripeness is not an issue when a facial attack is made. *See, e.g.*, *Cornell Cos. v. Borough of New Morgan*, 512 F. Supp. 2d 238, 256 (E.D. Pa. 2007).

Substituted Preliminary Injunction Order), No. 15-cv-00566-KGB ("*Selig*"), (Doc. 46-9), and the

District of Utah in *Planned Parenthood Association of Utah v. Herbert*, Doc. 12 (Temporary

Restraining Order), No. 15-cv-693-CW ("*Herbert*"), (Doc. 46-10).[25]


## B.      STANDING

### 1.      Defendant's Arguments

In contesting standing, Defendant insists PPGC lacks it in full. In her words, "Plaintiffs

have not suffered nor are they about to suffer 'an injury in fact' which is concrete and

particularized, or actual or imminent." (Doc. 53-1 at 9.) The reason given was that "[t]he

termination of PPGC's provider contracts ha[d] not gone into effect" prior to October 19, 2015.

(*Id.*) At the Second Hearing, this point was emphasized: "There's no concrete injury to . . .

Planned Parenthood or to any of the . . . [Individual] Plaintiffs because, again, there simply is no

injury." (Hr'g Tr. 17:18–21, Oct. 16, 2015.)


### 2.      Analysis

Closely related to the ripeness inquiry, *Choice Inc. v. Greenstein*, 691 F.3d 710, 715 (5th

Cir. 2012), standing implicates a slightly different series of concerns. Ripeness is concerned with

"*when* an action may be brought," but "standing focuses on *who* may bring a ripe action." *Jt.*

*Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 174 (3d Cir. 2001) (emphasis added); *see also*

---

[25] In concurring with these courts, this Court finds it significant that Defendant has yet to
comprehensively address either case. In attempting to distinguish only the former, Defendant
offered one reason: "It's my understanding that [the right to an administrative appeal] was not a
suspensive process," while "[t]his is a fully suspensive process," (Hr'g Tr. 9:6–7, Oct. 16, 2015).
This lone purported difference, however, is incorrect, as Arkansas law, like Louisiana law,
apparently suspends a termination's enforcement upon a provider's proper appeal. *See*
ARKANSAS MEDICAID PROVIDER MANUAL 161.500.

*Ind. Right to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007) (citing *id.*). The "irreducible

[constitutional] minimum" of standing contains three elements": "(1) an injury-in-fact," defined

as "an invasion of a legally protected interest which is (a) concrete and particularized" and "(b)

actual or imminent, not conjectural or hypothetical," that is (2) fairly traceable to the defendant's

allegedly unlawful conduct" and that is (3) likely to be redressed by the requested relief. *Lujan v.

Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992).

Having both evolved from Article III, "[s]tanding and ripeness are closely related doctrines that

overlap most notably in the shared requirement that the plaintiff's injury be imminent rather than

conjectural or hypothetical." *New York Civil Liberties Union v. Grandeau*, 528 F.3d 122, 130 n.8

(2d Cir. 2008).

 Indeed, "in measuring whether the litigant has asserted an injury that is real and concrete

rather than speculative and hypothetical, the ripeness inquiry merges almost completely with

standing." *Jt. Stock Soc'y*, 266 F.3d at 174. The injury need not be inflicted already; imminence

will do. *Warth v. Seldin*, 422 U.S. 490, 499, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975). Naturally,

therefore, as more than one court has found, the threat of future harm is sufficiently immediate to

constitute a cognizable injury-in-fact for purposes of both the standing and the ripeness

doctrines. *E.g.*, *Comsat Corp. v. FCC*, 250 F.3d 931, 936 (5th Cir. 2001) ("A threatened injury

satisfies the injury in fact requirement so long as that threat is real[.]"); *Prestage Farms, Inc. v.

Bd. of Supervisors of Noxubee Cnty., MS*, 205 F.3d 265, 268 (5th Cir. 2000) ("[T]he risk of

injury may be founded on a likely and credible chain of events."); *see also, e.g.*, *Baur v.

Veneman*, 352 F.3d 625, 633 (2d Cir. 2003) (collecting cases standing for the proposition that

"threatened harm in the form of an increased risk of future injury may serve as injury-in-fact for

Article III standing purposes"); *Employers Ass'n of New Jersey v. State of New Jersey*, 601 F.

Supp. 232, 238 (D.N.J. 1985) ("[T]hreatened injury is sufficient for standing . . .without compelling litigants to await the consummation of threatened injury.") (quoting *Pac. Gas & Elec.*, 461 U.S. at 200))). While a truly "uncertain potentiality" may deprive a plaintiff of standing, *Prestage*, 205 F.3d at 268, a decent probability will confer it, *see Walters v. Edgar*, 163 F.3d 430, 434 (7th Cir. 1998) (collecting cases standing for the proposition that "[a] probabilistic harm, if nontrivial, can support standing"); *cf. Loa-Herrera v. Trominski*, 231 F.3d 984, 988 (5th Cir. 2000) ("Mere threatened injury is sufficient" if "the threat . . . is real.").

Per this law, as with this Court's ripeness inquiry, *see supra* Part IV.A.2, Defendant's threat of harm is sufficiently clear to establish Plaintiff's standing. In her motions, as at the First Hearing, Defendant has insisted that she can terminate the Medicaid provider agreement with PPGC for any reason, and she has repeatedly made clear that she intends and hopes to void every Agreement. There is thus no question that she has made a cognizable threat to Plaintiff's interest, having already attempted to do via Section 46:437.11(D)(1) what she now seeks to do via Section 46:437.11(D)(2). (Doc. 38 at 2; Doc. 39-1 at 2 –13.) That she may not succeed concerns the precariousness of her own position, but has no bearing on whether the threat she poses is not real and the harm her action portends is not imminent. Precisely because it is, Plaintiffs' minimal standing has been established.[26] *See, e.g.*, *Susan J. v. Riley*, 254 F.R.D. 439 (M.D. Ala. 2008) (rejecting a defendant's standing challenge to a plaintiff proceeding under Section 1396a(a)(8)).

---

[26] PPGC's third-party standing may be a more complicated issue. Defendant, however, has raised no such objection, instead focusing on the doctrine's "injury" prong, and PPGC and the Individual Plaintiffs allege discrete, albeit related, harms. (Doc. 1; Doc. 43.)

**C.     ABSTENTION**

**1.     Defendant's Arguments**

Defendant urges this Court to abstain. (Doc. 53-1 at 10–12.) She argues for the applicability of the four main abstention doctrines—*Pullman*, *Younger*, *Burford*, and *Colorado River*. (*Id.*) Rather than applying the discrete elements of these varied doctrines, Defendant refers to their occasional "overlap to some degree in . . . scope and application" and reduces all four to a single formulation: (1) "where state administrative proceedings and judicial review afford claimants adequate opportunity to test the constitutionality of state law,"  and (2) "the exercise of federal jurisdiction would jeopardize state efforts to establish state policy on matters of public concern," abstention "should" follow. (*Id.* at 12.)

**2.     Analysis**

In general, "the circumstances in which federal courts should decline to exercise their jurisdiction" and abstain "are carefully defined and remain the exception, not the rule." *Hoye v. City of Oakland*, 653 F.3d 835, 844 (9th Cir. 2011) (*Younger*); *see also, e.g.*, *Colorado River Water Conservation Dist. v. U. S.*, 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976) (*Colorado River*); *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728, 116 S. Ct. 1712, 135 L. Ed. 2d 1 (1996) (*Burford*). Due to this principle, each abstention doctrine must be carefully assessed, and every relevant element must be shown. *Cf. Wilson v. Valley Elec. Membership Corp.*, 8 F.3d 311, 314 (5th Cir. 1993) (commenting that "[m]ultiple factor tests are difficult to apply"). In this case, when one examines the requirements of each of these doctrines, none clearly apply.

*(a)*    **Pullman** *Abstention*

Named after its founding decision, *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496,

61 S. Ct. 643, 85 L. Ed. 971 (1941), *Pullman* abstention is proper only when there is (1) a federal

constitutional challenge to a state action and (2) an unclear issue of state law that if resolved

would make it unnecessary to rule on the constitutional question. *Nationwide Mut. Ins. Co. v.*

*Unauth. Prac. of L. Comm., State Bar of Tex.*, 283 F.3d 650, 653 (5th Cir. 2002). The Fifth

Circuit has also taken the stance that this doctrine should be invoked in only narrow and limited

special circumstances and applied where the state court decision could avoid a federal question

and would also avoid a possible strain of the federal and state relationship. *Moore v. Tangipahoa*

*Parish Sch. Bd.*, 507 F. App'x 389, 396 (5th Cir. 2013) (citing *Reetz v. Bozanich*, 397 U.S. 82,

86–87, 90 S. Ct. 788, 25 L. Ed. 2d 68 (1970)).

In essence, then, for *Pullman* to govern, an uncertain state law must be central to the

federal proceeding. Here, however, there is no state statute central to this controversy. Rather,

the Defendant's interpretation of a *federal* statute and the extent to which her termination,

regardless of its state law basis, violates the United States Constitution are the only issues. In

addition, as *Pullman* requires that state law be confused and uncertain, Defendant's failure to

bring to this Court's attention even one Louisiana case evidencing a persistent discord regarding

the meaning of either Section 46:437.11(D)(1) or Section 46:437.11(D)(2) counsels against its

invocation. On these bare facts, with no clarification of state law needed for this Court to

determine whether Defendant's "final action," (Hr'g Tr. 6:2, Oct. 16, 2015), contravenes federal

statutory and constitutional law, *Pullman* abstention is inappropriate. *See, e.g.*, *Planned*

*Parenthood of Idaho, Inc. v. Wasden*, 376 F. Supp. 2d 1012, 1021 (D. Idaho 2005); *Planned*

*Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 932 (9th Cir. 2004), *cert. denied*, 544 U.S.

948, 125 S. Ct. 1694, 161 L. Ed. 2d 524 (2005).

*(b)*   **Younger** *Abstention*

Articulated in *Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971), *Younger* abstention applies if three circumstances arise: (1) there must be an ongoing state proceeding that is judicial in its nature, (2) the state must have an important interest in regulating the subject matter of that claim, and (3) there must be adequate opportunity in the state proceeding to raise constitutional challenge. *Rickhoff v. Willing*, 457 F. App'x 355, 358 (5th Cir. 2012) (citing *Wightman v. Tex. Supreme Court*, 84 F.3d 188, 189 (5th Cir. 1996)). First and foremost, *Younger* requires an ongoing state proceeding "judicial in nature." *Ohio Civil Rights Comm'n*, 477 U.S. at 627–28.

In light of this key requirement and the suit's present posture, Defendant's own representations render *Younger* inapposite. As Defendant's counsel has conceded, no administrative proceeding commences until or unless PPGC appeals, (Doc. 53-1 at 22; *see also* Hr'g Tr. 16:8–17:9, Oct. 16, 2015), and PPGC has foresworn that option, (Hr'g Tr. 19:6–10, Oct. 16, 2015). Meanwhile, the Individual Plaintiffs cannot possibly initiate such a proceeding as a matter of state law, as Defendant's two lawyers have admitted. (Hr'g Tr. 8:10–9:1, Oct. 16, 2015; Hr'g Tr. 15:22–25, Sept. 2, 2015; Doc. 22 at 2–5; *see also* Doc. 46 at 18 n.13.) Regardless, no evidence has been adduced that any state quasi-judicial action predated the First Complaint's filing; *Younger* requires as much. Indeed, as she has rescinded the First Termination Letters, Defendant's prospective agency action will necessarily post-date the commencement of this federal proceeding. These facts alone render *Younger* inapplicable to this proceeding.[27]

---

[27] *Younger* is also subject to three exceptions, at least two of which arguably apply. *Bice v. Louisiana Pub. Defender Bd.*, 677 F.3d 712, 716 n.3 (5th Cir. 2012).

*(c)* **Colorado River** *Abstention*

*Colorado River* abstention, derived from *Colorado River Water Conservation Dist.*, 424 U.S. 800, is exceptionally narrow, *Jackson-Platts v. GE Capital Corp.*, 727 F.3d 1127, 1140 (11th Cir. 2013). In the Fifth Circuit, six elements must be satisfied:

> 1) assumption by either court of jurisdiction over a res, 2) relative inconvenience of the forums, 3) avoidance of piecemeal litigation, 4) the order in which jurisdiction was obtained by the concurrent forums, 5) to what extent federal law provides the rules of decision on the merits, and 6) the adequacy of the state proceedings in protecting the rights of the party invoking federal jurisdiction.

*African Methodist Episcopal Church v. Lucien*, 756 F.3d 788, 798 (5th Cir. 2014) (citing *Stewart v. W. Heritage Ins. Co.*, 438 F.3d 488, 491 (5th Cir. 2006)). In general, the Fifth Circuit has found *Colorado River* abstention applicable when there is a parallel suit in the state court at the time of the federal suit also being brought with the same parties and the same issues. *Stewart*, 438 F.3d at 491.

As such, as with *Younger*, the absence of any parallel proceeding in a state agency or a state court initiated before this federal suit's filing must foreclose *Colorado River*'s application to the instant matter, with any modicum of doubt favoring the exercise of the federal jurisdiction conferred by Section 1396a(a)(23) and the Constitution. *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 520 (7th Cir. 2001) ("[A]ny doubt regarding the parallel nature of the foreign suit should be resolved in favor of exercising jurisdiction[.]"); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 28, 103 S. Ct. 927, 943, 74 L. Ed. 2d 765 (1983) (holding that "[i]f there is any substantial doubt" as to whether "the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties" it would "be a serious abuse of discretion to grant the stay or dismissal at all" pursuant to *Colorado*

*River*).

(d)   **Burford** *Abstention*

Traceable to *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S. Ct. 1098, 87 L. Ed. 1424 (1943),

this final doctrine contemplates the presence of a state-created avenue of relief put where the

state has a degree of specialized competence to hear such cases is present. *See Romano*, 721 F.3d

at 380 (listing five factors). Put another way, *Burford* abstention is only appropriate when there

is a danger that federal court review will "disrupt the [s]tate's attempt to ensure uniformity in the

treatment of an essentially local problem." *New Orleans Pub. Serv., Inc. v. Council of City of

New Orleans*, 491 U.S. 350, 362, 109 S. Ct. 2506, 2515, 105 L. Ed. 2d 298 (1989). Abstention is

thus "not warranted, however, when a claim requires the federal court to decide predominating

federal issues that do not require resolution of doubtful questions of local law and policy."

*Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 474 (1st Cir. 2009) (internal quotation

marks omitted).

Such is not the case here. It is the meaning of Section 1396a(a)(23), a federal statute, and

two constructional provisions which constitute the central controversies. In fact, in interpreting

Section 1396a(a)(8), whose language perfectly mirrors Section 1396a(a)(23), the Fifth Circuit

rejected this same Defendant's request for *Burford* abstention in no uncertain terms:

> None of these factors weighs in favor of abstention in this case. The cause of
> action arises under federal law, there are no apparent issues of state law or local
> facts, the interest in proper application of federal Medicaid law is paramount, and
> there is no special state forum for judicial review.

*Romano*, 721 F.3d at 380; *see also, e.g.*, *Pub. Serv. Co. v. Patch*, 167 F.3d 15, 24 (1st Cir. 1998)

("*Burford* abstention does not bar federal court injunctions against state administrative orders

where there are predominating federal issues that do not require resolution of doubtful questions

of local law and policy.") As with *Colorado River*, *Younger*, and *Pullman*, the prerequisites for

*Burford*'s invocation are absent from this case. *See New Orleans Pub. Serv.*, 491 U.S. at 361

(refusing to abstain under this doctrine when the federal claims were not "in any way entangled

in a skein of state law that must be untangled before the federal case can proceed" (citing

*McNeese* v. *Bd. of Educ. for Cmty. Unit Sch. Dist. 187, Cahokia*, 373 U.S. 668, 674, 83 S. Ct.

1433, 1437, 10 L. Ed. 2d 622 (1963))). It too is thus inapposite.


**D.      CONCLUSION**

Based on well-settled law, this Court therefore rejects Defendant's jurisdictional

challenges and declines to abstain. For purposes of both ripeness and standing, there is an

imminent threat of harm. In addition, applying the appropriate abstention factors to the facts of

this case one-by-one, as the Fifth Circuit has long required, shows the impropriety of any one's

application. Instead, it is the Court's "strict duty to exercise the jurisdiction conferred upon . . .

[it] by Congress" via the Medicaid Act and, if later necessary, by the Constitution. *Quakenbush*,

517 U.S. at 716; *see also Indep. Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1050, 1056–57

(9th Cir. 2008) ("It is beyond dispute that federal courts have jurisdiction over suits to enjoin

state officials from interfering with federal rights.").


**V.      DISCUSSION: PRELIMINARY INJUNCTION**

**A.      APPLICABLE STANDARDS**

A plaintiff must establish four elements to secure a preliminary injunction: (1) a

substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the

injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any

harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *accord, e.g.*, *Wilson v. Office of Violent Sex Offender Mgmt.*, 584 F. App'x 210, 212 (5th Cir. 2014).[28] Long deemed an extraordinary remedy, *Douthit v. Dean*, 568 F. App'x 336, 337 (5th Cir. 2014); *see also Munaf v. Geren*, 553 U.S. 674, 689, 128 S. Ct. 2207, 2219, 171 L. Ed. 2d 1 (2008); *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) (similarly characterizing a temporary restraining order), a preliminary injunction aims "to prevent irreparable injury so as to preserve . . . [a] court's ability to render a meaningful decision on the merits," *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 627 (5th Cir. 1985) (citing to *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1975)); *accord, e.g.*, *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998); *United States v. Alabama*, 791 F.2d 1450, 1460 (11th Cir. 1986) (adding that "[p]reliminary injunctive relief may be necessary to insure that a remedy will be available" at some future date); *cf. Granny Goose Foods v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439, 94 S. Ct. 1113, 1124, 39 L. Ed. 2d 435 (1974) ("*Ex parte* temporary restraining orders . . . under federal law . . . should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer."). By circumstance and necessity, in considering whether either a preliminary injunction or a temporary restraining order should issue, a court is "almost always" forced to rely upon "[an] abbreviated set of facts." *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 958 (3d Cir. 1984); *accord Texas v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975); *see also, e.g.*,

---

[28] The standard for granting a temporary restraining order is identical. *See, e.g.*, *Janvey v. Alguire,* 647 F.3d 585, 595 (5th Cir. 2011)*; Women's Med. Ctr. of Nw. Houston v. Bell,* 248 F.3d 411, 419, n. 15 (5th Cir. 2001).

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1231 (11th Cir. 2009) (quoting *id.*).

In applying the four factor test, "none of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Seatrain Int'l, S.A.*, 518 F.2d at 180. This often "requir[es] delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury." *Klitzman*, 744 F.3d at 958;

## B.    FIRST ELEMENT: LIKELY SUCCESS ON THE MERITS

Plaintiffs bring this civil action pursuant to Section 1983 based on Defendant's alleged violation of rights secured by the Medicaid Act and the United States Constitution. Specifically, Plaintiffs claim that Defendant's attempt to terminate the Agreements violates the rights of the Individual Plaintiffs under Section 1396a(a)(23)(A) and PPGC's rights under both the Equal Protection Clause and the Freedom of Speech Clause of the United States Constitution. (Doc. 43 ¶¶ 62–67 at 19–20.) In relevant part,[29] Defendant contends that Section 1396a(a)(23) does not create a private cause of action for either PPGC or the Individual Plaintiffs and relies primarily on *Armstrong*. (Doc. 53-1 at 18–24; *see also* Doc. 13 at 3–13.)

In this first element's analysis, two overarching principles matter. First, if the Plaintiffs were to prevail on their Section 1396a(a)(23) claim and/or PPGC was to prevail on either of its two constitutional claims, the same remedy—a permanent injunction—would be due, and any potential action by Defendant would be similarly affected. Accordingly, this Court need not

---

[29] Defendant's argument s regarding Plaintiffs' property interest and procedural due process, (Doc. 13 at 14–19; Doc. 53-1 at 13–18), are no longer viable in light of the Amended Complaint, (Doc. 43 ¶¶ 62–67 at 20–21.)

conclude that all Plaintiffs have a substantial likelihood of prevailing on all claims advanced in the Amended Complaint for a preliminary injunction to issue at this time. If Plaintiffs satisfy the elements needed to show a substantial likelihood of success on the Individual Plaintiffs' Section 1396a(a)(23) claim only, so long as the other factors are met, a preliminary injunction is appropriate. *Girl Scouts of Manitou Council, Inc. v Girl Scouts of United States of America*, 549 F.3d 1079, 1096 (7th Cir. 2008) (holding that plaintiff needed to show no more than "[a] chance of success on the merits of at least one of its claims" (internal quotation marks omitted)); *see also, e.g.*, *Jackson v. N'Genuity Enters. Co.*, No. 09 C 6010, 2011 U.S. Dist. LEXIS 113511, at *23, 2011 WL 4628683, at *7 (N.D. Ill. Oct. 3, 2011) (citing *id.*). Accordingly, because the Court finds that the Individual Plaintiffs have a private right of action, *see infra* Part V.B.1, it need (and will) not decide whether PPGC also has such a right, either on its own behalf or on behalf of its recipient patients. *See also* Doc. 63 at 12 n.3, *Bentley*.

Second, the Plaintiffs must establish a "substantial likelihood of success." This phrase has been defined in different ways. *Compare* 11A CHARLES A. WRIGHT *ET AL.*, FEDERAL PRAC. & PROC. § 2948.3 (3d ed.) ("reasonable probability of success"), *with Terex Corp. v. Cubex, Ltd.*, No. 3:06-CV-1649-G ECF, 2006 U.S. Dist. LEXIS 88863, at *7–8, 2006 WL 3542706, at *2 (N.D. Tex. Dec. 7, 2006) ("more than negligible," and noting the existence of a debate regarding this element's extent among the various circuits and summarizing older Fifth Circuit case law); *see also, e.g.*, *Dine Citizens Against Ruining Our Env't v. Jewell*, No. CIV 15-0209 JB/SCY, 2015 U.S. Dist. LEXIS 109986, at *57 n.10, 2015 WL 4997207, at *21 n.10 (D.N.M. Aug. 14, 2015) ("It is not entirely clear what a preliminary-injunction movant's burden of proof is vis-à-vis the case's merits, as [t]he courts use a bewildering variety of formulations of the need for showing some likelihood of success—the most common being that plaintiff must demonstrate a

reasonable probability of success." (alteration in original) (internal quotation marks omitted));
*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) ("Under . . . [the sliding scale] approach [employed in several circuits], the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.")

Still, at such an early stage, courts are not required "to draw the fine line between a mathematical probability and a substantial possibility of success." *Dataphase Sys. v. C L Sys.*, 640 F.2d 109, 113 (8th Cir. 1981); *accord, e.g.*, *KTM N. Am., Inc. v. Cycle Hutt, Inc.*, No. 13-5033-JLV, 2013 U.S. Dist. LEXIS 67209, at *14, 2013 WL 1932797, at *5 (D.S.D. May 8, 2013). And none of the prerequisites for a preliminary injunction have "a fixed quantitative value." *Seatrain Int'l, S. A.*, 518 F.2d at 180; *see also, e.g.*, *EnVerve, Inc. v. Unger Meat Co.*, 779 F. Supp. 2d 840, 843 (N.D. Ill. 2011) ("The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." (internal quotation marks omitted) (citing *Ty, Inc. v. Jones Grp.,* 237 F.3d 891, 895–96 (7th Cir. 2001))); *Louis v. Meissner*, 530 F. Supp. 924, 925 (S.D. Fla. 1981) (citing *Seatrain Int'l, S. A.*, 518 F.2d at 180).

Regardless of what standard is applied to the record before it, and without regard to any "sliding scale," this Court finds that Plaintiffs have established a high likelihood of success on the merits, far beyond the "more than negligible" standard discussed above.

## 1.     Mandate of 1396a(a)(23)

### (a)     *Existence of a Private Right of Action under Section 1396a(a)(23)*

Section 1396a(a)(23)[30] reads: "A [s]tate plan for medical assistance *must* . . . provide . . . [that] *any individual* eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . .who undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23) (emphasis added). Plaintiffs pursue their claim as a private right of action under § 1396a(a)(23). Defendant argues that this provision is not enforceable under §1983 because, she argues, § 1396a(a)(23) does not provide a private cause of action. For the reasons which follow, the Court finds that this provision does create a private right of action which can be pursued via §1983 by the Individual Plaintiffs. *See, e.g.*, Doc. 63 at 12 –13, *Bentley*; Doc. 45 at 12–15, *Selig*; *Betlach*, 727 F.3d at 965–68; *Indiana*, 699 F.3d at 972–77; *Harris v. Olszewski*, 442 F.3d 456, 459 (6th Cir. 2006).

The seminal holdings which support the holding of these courts—*Wilder v. Virginia Hospital Association*, 496 U.S. 498, 110 S. Ct. 2510, 110 L. Ed. 2d 455 (1990); *Blessing v. Freestone*, 520 U.S. 329, 117 S. Ct. 1353, 137 L. Ed. 2d 569 (1997); and *Gonzaga University v. Doe*, 536 U.S. 273, 122 S. Ct. 2268, 153 L. Ed. 309 (2002)[31]—remain binding and undisturbed. This fact too has been recognized by multiple courts. *See, e.g.*, Doc. 45 at 12, *Selig* ("The Court determines that the Jane Does are likely to succeed in arguing that . . . [Section 1396a(a)(23)]

---

[30] Thus, in analyzing the Plaintiffs' success on the merits on this claim, PPGC's right to any administrative remedy cannot be relevant. As Defendant has twice conceded, the Individual Plaintiffs actually have no such remedy. (Hr'g Tr. 8:18–9:12, Oct. 16, 2015; Hr'g Tr. 15:22 –25, Sept. 2, 2015.) Whatever procedural due process rights afforded to PPGC under the state's approved Medicaid plan, therefore, the Individual Plaintiffs demonstrably have none, as Plaintiffs' counsel have emphasized, (Hr'g Tr. 14:17–24, Oct. 16, 2015; Hr'g Tr. 10:16–19, Sept. 2, 2015.)

[31] Leaving *Blessing* unreversed, *Gonzaga* "clarified the application of the first 'benefit' factor [in *Blessing*] and underscored the central focus of this factor should be on whether the statutory provision creates 'rights-creating' language critical to showing the requisite congressional intent to create new rights." *Johnson v. City of Detroit*, 446 F.3d 614, 621 (6th Cir. 2006).

satisfies the factors set forth in *Gonzaga . . .* and *Blessing*[.]"); *see also Briggs v. Bremby*, 792 F.3d 239, 245 (2d Cir. 2015) (applying the *Blessing* test to 7 U.S.C. § 2020(e)(3) and (9)); *Emma C. v. Eastin*, No. 96-cv-04179-TEH, 2015 U.S. Dist. LEXIS 113355, at *17, 2015 WL 5029283, at *5 (N.D. Cal. Aug. 25, 2015) (distinguishing *Armstrong* as "a Medicaid case wherein the Court considered whether there was an implied right of action under the Supremacy Clause"); *cf. Tohono O'odham Nation v. Ducey*, No. CV-15-01135-PHX-DGC, 2015 U.S. Dist. LEXIS 124979, at *30–31, 2015 WL 5475290, at *10–11 (D. Ariz. Sept. 17, 2015) (distinguishing *Armstrong* in a case not involving the Medicaid Act); *J.E. v. Wong***,** No. 14-00399 HG-BMK, 2015 U.S. Dist. LEXIS 114094, at *21–22, 2015 WL 5116774, at *7 (D. Haw. Aug. 27, 2015) (reaching the same conclusion and adding that "[t]he *Armstrong* Court's discussion regarding the lack of a private cause of action to enforce Section 1396a(a)(30) was not a departure from existing precedent"). Equally importantly, it has also been acknowledged by Defendant's counsel. (Hr'g Tr. 14:21–15:14, Sept. 2, 2015.)

These precedents thus supply the three-part test that this Court must employ to determine whether Section 1396a(a)(23) awards the Individual Plaintiff with a right enforceable under § 1983. *Equal Access for El Paso, Inc. v. Hawkins*, 509 F.3d 697, 702 (5th Cir. 2007). Thus, if (1) Congress "intended" that Section 1396a(a)(23) "benefit the [individual] plaintiff[s]," (2) "the right assertedly protected by th[is] statute is not so vague and amorphous that its enforcement would strain judicial competence," and (3) Section 1396a(a)(23) "unambiguously impose[s] a binding obligation on the [s]tates," the Individual Plaintiffs, here represented by all Plaintiffs' counsel, may proceed to sue Defendant for violating Section 1396a(a)(23) pursuant to § 1983, having "advanc[ed] a violation of a 'federal law.'" *Hood*, 235 F.3d at 924–25 (quoting *Blessing*, 520 U.S. at 340–41), *rev'd on other grounds*, *as observed in Hawkins*, 509 F.3d at 701 n.4. Not

voidable by one decision's dicta or a plurality's construal of a different subsection, this *Gonzaga* and *Blessing* standard for unearthing congressional intent to create a private cause of action governs still.

Read plainly, § 1396a(a)(23) easily satisfies each prong. It contains rights-creating and mandatory language, and it has an unmistakable individual focus. 42 U.S.C. § 1396a(a)(23). Indeed, with its terms so comprehensive and clear, court after court forced to peruse this provision has reached the same conclusion: "[W]e hold that the Medicaid Act's free-choice-of-provider requirement confers a private right of action under 42 U.S.C. § 1983." *Betlach*, 727 F.3d at 963; *accord, e.g.*, Doc. 63 at 12–19, *Bentley*; Doc. 45 at 12, *Selig*; *Indiana*, 699 F.3d at 968; *Harris*, 442 F.3d at 459. True, as Defendant notes, some of these courts applied § 1396a(a)(23) pre-*Armstrong*. Yet, their distinctive factual predicates do not affect the more uniform applicability (and cogency) of these courts' interpretation of the unchanged statute at issue here in accordance with the standard laid out in *Wilder* and its progeny. Presented with the same exact subsection, they discerned a private cause of action within it. In following *Betlach*, *Indiana*, *Harris*, and *Selig*, this Court simply endorses a statutory construction predicated on venerable canons and jurisprudence founded on binding Supreme Court precedent, *see* Nicole Huberfeld, *Where There is a Right, There Must be a Remedy (Even in Medicaid)*, 102 KY. L.J. 327, 343 (2013–14) ("When states agree to participate in the Medicaid program, they know that failure to comply with the terms of the Medicaid Act will result in either the Secretary [of DHHS] taking action to bring the state into alignment with the Act or private enforcement of the law . . . . [T]he private enforcement of the Medicaid Act is [therefore] not a surprise to the states, and it has not been for decades.").

Crucially, this reading of § 1396a(a)(23) is consistent with the construction given to other

similar provisions of the Medicaid Act, a fact that triggers the application of another familiar canon of interpretation, *see TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S. Ct. 441, 449, 151 L. Ed. 2d 339 (2001) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)).

For instance, the Medicaid Act's Reasonable Promptness Provision requires that a state plan for medical assistance "provide that *all individuals* wishing to make application for medical assistance under the plan *shall* have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8) (emphasis added). In the persuasive (and decisive) *Romano*, the Fifth Circuit itself applied *Blessing*'s three-part test as modified by *Gonzaga* and found that this section, linguistically identical to Section 1396a(a)(23), creates a private cause of action enforceable under § 1983. 721 F.3d at 375, 378–80; *accord, e.g.*, *Sabree v. Richman*, 367 F.3d 180, 192 (3d Cir. 2003) (reaching the same conclusion as to Section 1396a(a)(10) and (a)(15)).

Similar in tone to Section 1396a(a)(8) and (a)(23), Section § 1396a(a)(3) reads: "A [s]tate plan for medical assistance must . . . provide for granting an opportunity for a fair hearing before the State agency to *any individual* whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3) (emphasis added); *McCarthy v. Hawkins*, 381 F.3d 407, 411 n.3 (5th Cir. 2004) (quoting *id.*). This section self-evidently contains the same words prominent in § 1396a(a)(23), including "individual" and "must." 42 U.S.C. § 1396a(a)(3). Logically, therefore, another court similarly construed it: "[The] language is mandatory, the provision contains rights-creating language, and there is an individual focus." *Detgen v. Janek*, 945 F. Supp. 2d 746, 754 (N.D. Tex. 2013); *see also, e.g.*,

*Shakhnes v. Berlin*, 689 F.3d 244, 247, 254, 256-57 (2d Cir. 2012) (concluding that private plaintiffs can sue under § 1983 to enforce Section 1396a(a)(3)).

In a final example, Section 1396a(bb)(5) states: "In the case of services furnished by a [FQHC] . . . pursuant to a contract between the center or clinic and a managed care entity . . ., the State plan *shall* provide for payment to *the center or clinic* by the State." 42 U.S.C. § 1396a(bb)(5) (emphasis added). This subparagraph too, the First Circuit has observed, speaks in "individualistic terms, rather than at the aggregate level of institutional policy or practice," refers to "specific, discrete beneficiary group," and contains mandatory and "highly specific terms," and therefore creates a right subject to enforcement under § 1983. *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 74, 75 (1st Cir. 2005).

In sum, an overwhelming majority of courts confronted with language in the Medicaid Act identical to that before the Court now have found it to impart a right of action cognizable under § 1983. To read these identical terms differently, as Defendant now proposes, is insupportable pursuant to one "well established principle[] of statutory construction," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2073, 182 L. Ed. 2d 967 (2012). To wit, "[t]he normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning." *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860, 106 S. Ct. 1600, 1606, 89 L. Ed. 2d 855 (1986); *see also, e.g.*, *United States v. Marshall*, 798 F.3d 296, 309 (5th Cir. 2015) (applying this canon). While this rule "readily yields to context," *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2441, 189 L. Ed. 2d 372 (2014), nothing in the language of Section 1396a(a)(23) compels its abandonment.[32]

---

[32] Crucially, Defendant has given no reason reflecting "distinct statutory objects calling for different implementation strategies" that would justify construing Section 1396a(a)(23) differently than 1396a(a)(8). She has pointed the Court to *Armstrong* alone, which, as shown below, will not do. *See infra* Part V.B.1.b.

*(b)*     ***Defendant's Misplaced Emphasis on* Armstrong**

Defendant urges this Court to discard this consensus on the basis of the recent *Armstrong* decision, (Hr'g Tr. 19:19–24, Sept. 2, 2015; Hr'g Tr. 8:4–5, Oct. 16, 2015). However, this decision cannot bear the weight placed upon it by Defendant. The *Selig* court said it well: *Armstrong* "does not overrule, or even significantly undermine, the precedent that informed the reasoning of the Sixth, Seventh, and Ninth Circuits in recognizing a private right of action under 42 U.S.C. § 1396a(a)(23)." Doc. 45 at 12, *Selig*. This Court agrees: by its own terms, *Armstrong* cannot control for four different reasons.

First, *Armstrong* is narrower than Defendant says. The *Armstrong* plurality did not dissect § 1396a(a)(23); it did not even delve into the meaning of a similarly worded provision like § 1396a(a)(3) or (a)(8). Instead, *Armstrong* focused on § 1396a(a)(30), which compels a state plan to "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30). *Armstrong* stressed that this subparagraph, not every paragraph in Section 1396a(a), lacked the "rights-creating" language prominent in statutes in which a private right of action could be discerned. 135 S. Ct. at 1387 (Scalia, J., plurality). Further, the Court noted that it was not focused on the rights of an individual; instead, "[i]t is phrased as a directive to the federal agency charged with approving state Medicaid plans." *Id.* Unlike Section 1396a(a)(30), whose precise text was examined so diligently in *Armstrong*, both "rights-creating" and individual-focused language are prominent in (a)(23). *See supra* Part V.B.1.a.

As a counter, Defendant claims that § 1396a(a)(23) and (a)(30) contain "the exact same rights creating type of language." (Hr'g Tr. 16:17–22, Sept. 2, 2015; *see also* Doc. 53-1 at 20.) This contention is based purely and incorrectly on the introductory words of the overall section ("a [s]tate plan must . . ."), not the precise language of the controlling paragraph, i.e. Sections 1396a(a)(30). It thus ignores the specific reference to "individual" and the use of the word "may" in Section 1396a(a)(23): "[A]ny individual . . . may obtain from any institution . . . qualified to perform the service or services required . . . who undertakes to provide him [or her] such services." 42 U.S.C. 1396a(a)(23). True, the state "*must*" provide a plan so permitting, but Section 1396a(a)(23) quite clearly empowers a Medicaid eligible "individual" to choose amongst a set of providers competent in their selected medical field. In essence, Defendant is urging this Court to rewrite a plain statute, a task at odds with its judicial duty "to ascertain — neither to add nor to subtract, neither to delete nor to distort" an enactment's final terms. *Ariz. State Bd. for Charter Sch. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1007 (9th Cir. 2006).

Second, Defendant has extended *Armstrong*'s "rationale" far beyond its own stated limits. True, *four* justices went further, specifically dismissing respondents' arguments for "a cause of action" predicated on "the Medicaid Act itself." *Armstrong*, 135 S. Ct. at 1387 (Scalia, J., plurality). However, *Armstrong*'s next two paragraphs narrowly define the reference to "the Medicaid Act" to Section 1396a(a)(30) alone, and no majority coalesced around the broader proposition embraced by Justice Scalia, *id.* at 1387–88 (Scalia, J., plurality). Instead, Justice Breyer's concurrence, the fifth vote in *Armstrong*, specifically concentrated on the unique text of Section 1396a(a)(30), describing it as "set[ting] forth a federal mandate that is broad and nonspecific" and "appl[ying] its broad standards to the setting of rates." *Id.* at 1388 (Breyer, J., concurring in part and concurring in judgment). Continuing, Justice Breyer emphasized that "the

history of ratemaking demonstrates that administrative agencies are far better suited to this task

than judges." *Id.* As such, in accordance with the Fifth Circuit's binding command that a "joint

opinion is . . . considered the holding of the Court . . . [only] as [to] the narrowest position

supporting the judgment," *Cole*, 790 F.3d at 571, this Court refuses to take *Armstrong* beyond

the confines of § 1396a(a)(30), the only provision upon whose interpretation a majority could

agree. In fact, as Defendant conceded at the First Hearing, (Hr'g Tr. 15:9–14, Sept. 2, 2015),

*Armstrong* did not overrule *Gonzaga* or *Wilder*, and it was *Gonzaga* that formed the basis of the

Fifth Circuit's interpretation of § 1396a(a)(8) in *Romano*, 721 F.3d at 378–80. Based on the

actual majority's "rationale," (Hr'g Tr. 16:18, Sept. 2, 2015), *Armstrong* can be read as definitive

as to the breadth of Section 1396a(a)(30) but of no other section, including the Free-Choice-of-

Provider now before this Court.

Third, just because § 1396a(a)(30) and (a)(23) are subparts of one act does not make

them identical in form and effect, as Defendant contends in seeking to expand *Armstrong* beyond

its express ambit. (*See, e.g.*, Doc. 53-1 at 18–20; Hr'g Tr. 16:17–22, Sept. 2, 2015.) Rather,

"[t]he mere fact that all the Medicaid laws are embedded within the requirements for a state plan

does not, by itself, make all of the Medicaid provisions into ones stating a mere institutional

policy or practice rather than creating an individual right." *Rio Grande Cmty. Health Ctr., Inc.*,

397 F.3d at 74. This command, in fact, is rooted in a whole other subsection: "In an action

brought to enforce a provision of this chapter [which includes the Medicaid statutes], such

provision is not to be deemed unenforceable because of its inclusion in a section of this chapter

requiring a State plan or specifying the required contents of a State plan." 42 U.S.C. § 1320a-2;

*BK v. N.H. Dep't of Health & Human Servs.*, 814 F. Supp. 2d 59, 68 (D.N.H. 2011) (citing *id.*);

*Watson v. Weeks*, 436 F.3d 1152, 1158 (9th Cir. 2006) ("Congress responded to . . . [*Wilder*] by

enacting . . . 32 U.S.C. 1320a-2 which blocks any Medicaid Act provision from being deemed unenforceable by an individual merely because the provision contains state plan requirements.") Based on this subsection's implication, the fact that Section 1396a(a)(23), like Section 1396a(a)(30), commences with the same introductory phrase ("A State plan for medical assistance must . . . ."), 42 U.S.C. § 1396a(a), should not be dispositive here, as Defendant maintains, (Hr'g Tr. 16:17–22, Sept. 2, 2016; *see also* Hr'g Tr. 8:10–17, Oct. 16, 2015). Instead, the entire language of the former, consistently construed to award a private cause of action to Medicaid beneficiaries, *see, e.g.*, *supra* Part V.B.1.a; *see also* Doc. 63 at 18, *Bentley* (finding itself persuaded by "these remarkably consistent holdings"), must be honored.

One final fact weighs against *Armstrong*'s extension. Neither revolutionary nor anomalous, *Armstrong* actually aligned with a majority of federal courts in its construction of Section 1396a(a)(30) as to Medicaid providers in *Gonzaga*'s aftermath. *See, e.g.*, *Equal Access for El Paso*, 509 F.3d at 704; *Mandy v. Owens*, 464 F.3d 1139, 1148 (10th Cir. 2006)*; Westside Mothers v. Olszeqski*, 454 F.3d 532, 542–43 (6th Cir. 2006); *Sanchez v. Johnson*, 416 F.3d 1051, 1059 (9th Cir. 2005); *Long Term Pharmacy Alliance v. Ferguson*, 362 F.3d 50, 57 (1st Cir. 2004); Bradley J. Sayles, *Preemption or Bust: A Review of the Recent Trends in Medicaid Preemption Actions*, 27 J. CONTEMP. HEALTH L. & POL'Y 120, 130 & nn. 66–67 (2010) (making this point); Nicole Huberfeld, *Bizarre Life Triangle: The Spending Clause, Section 1983, and Medicaid Entitlements*, 42 U.C. DAVIS L. REV. 413, 447–48 (2008) (same). In contrast, Defendant is now asking this Court to expand *Armstrong* not just beyond its limits but as contrary to precedent's overwhelming weight. In its circumstances, not just its legal reasoning, *Armstrong* can therefore be distinguished from the case at bar. *See , e.g.*, *Townsend*, 2008 U.S. Dist. LEXIS 52549, at *23–24, 2008 WL 2743284, at *12 (dismissing some claims under the

Medicaid Act but not plaintiffs' Section 1396a(a)(23) one, among others).

(c)     *Defendant's Misplaced Argument on Section 1396a(a)(23)'s Ambiguity and for*

        *Deference*

Defendant argues that, even if the Individual Plaintiffs have the right to choose a

qualified provider and enforce that right via Section 1983, PPGC is not "qualified" under Section

1396a(a)(23) because DHH can deem it so by exercising Section 46:437.11(D)(2). (Hr'g Tr.

11:3–7, Oct. 16, 2015; Doc. 53-1 at 21; Hr'g Tr. 9:18–10:5, Sept. 2, 2015.) In clear and

persuasive terms, the court in *Selig* rightly rejected that argument.

> Here, the dispute is whether the Government, either through the Governor or
> through [Arkansas Department of Human Services' ("ARDS")] actions,
> impermissibly interfered with the Jane Does' choice of a qualified provider when
> it terminated PHH as a provider in the manner and for the reason it articulates. If
> this right found in 42 U.S.C. § 1396a(a)(23) and conferred on Medicaid recipients
> is to have the meaning, and if it is to have the meaning ascribed to it by the Court
> in *O'Bannon* [*v. Town Ct. Nursing Ctr.,* 447 U.S. 773, 787 (1980)], ADHS cannot
> be permitted to declare a provider unqualified and then to use that declaration  to
> put out of reach any future challenges to its conduct by Medicaid recipients.

Doc. 45 at 19, *Selig*.[33] Based on the filings made, Defendant's defense relies on one of two

assumptions: either "qualified" is so vague as to fail the *Blessing* test or so ambiguous as to

effectively award it discretion to define "qualified" according to a standard of competence

circumscribed by her own whims. Her success on this ground depends on showing first that

"qualified to perform the service or services required" in Section 1396a(a)(23) is inherently

---

[33] Indeed, when she first relied on Section 46:437.11(D)(1), counsel for Defendant conceded her
reading of Section 1396a(a)(23) is "circular." (Hr'g Tr. 21:12-13, Sept. 2, 2015.) If so, then it
cannot stand, for no statute can be interpreted so as to render its specific terms superfluous or
divorced from "the phrase in which it is embedded." *Betlach*, 727 F.3d at 960. This Court's duty
"to give effect, if possible, to every . . . word of a statute" compels rejecting an interpretation that
Defendant herself concedes makes Section 1396a(a)(23) either absurd or illogical. *United States
v. Menasche*, 348 U.S. 528, 538, 75 S. Ct. 513, 520, 99 L. Ed. 615 (1955).

ambiguous and, if so regarded, as an implicit grant of lexicographical discretion by Congress to DHH. Both her first premise and second inference, however, fall before the plain import of Section 1396a(a)(23).

In cases of statutory interpretation, no deference is owed where the term in question is clear on its face. In determining the meaning of a statutory term, the rules of interpretation and construction are clear: a court must begin with the relevant language. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685, 105 S. Ct. 2297, 2301, 85 L. Ed. 2d 692 (1985); *see also Temp. Emp't Servs. v. Trinity Marine Grp.*, 261 F.3d 456, 462 (5th Cir. 2001) (citing *id.*). If the meaning is plain and unambiguous and the statutory scheme is both "coherent and consistent," *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S. Ct. 843, 846, 136 L. Ed. 2d 808 (1997); *see also Salazar v. Maimon*, 750 F.3d 514, 518 (5th Cir. 2014) (citing *id.*), "the sole function of the courts is to enforce it according to its terms," *Caminetti* v. *United States*, 242 U.S. 470, 485, 37 S. Ct. 192, 194, 61 L. Ed. 442 (1917); *see also, e.g.*, *Meredith v. Time Ins. Co.*, 980 F.2d 352, 356 & n.18 (9th Cir. 1993) (quoting *id.*); *In re McCarthy*, 391 B.R. 372, 375 (Bankr. N.D. Tex. 2008) (same).

Under these rules, Section 1396a(a)(23) is no quandary. Linguistically, "qualified" means "[p]ossessing the necessary qualifications; capable and competent." *Qualified*, Black's Law Dictionary (10th ed. 2014). Inputting this definition of "qualified" into § 1396a(a)(23), it is clear that a provider  "qualified to perform the service or services required" is one who is "capable and competent" of "perform[ing]" the "service or services" for which he, she, or it has been contracted by the Medicaid eligible individual seeking "medical assistance." 42 U.S.C. § 1396a(a)(23). If it is competent to offer those services, an individual "may" choose them without a state intruding, and if a state attempts to render it unqualified based on activities that it does not

undertake, it has stripped "qualified" of its natural meaning and effectively removed the phrase "to perform the service or services required" from the explicit text of Section 1396a(a)(23). It requires no specialized agency expertise to reach this conclusion; no factual development is necessary for this language to be so understood. Rather, it follows naturally from this provision's plain meaning, as illuminated by the surrounding text. *See Betlach*, 727 F.3d at 965. "[I]f the intent of Congress is clear," as evidenced by the use of an unambiguous word so clarified, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43, 104 S. Ct. 2778, 2781, 81 L. Ed. 2d 694 (1984).

With this law in mind, one fact matters greatly. On September 2, 2015, Defendant conceded that PPGC is competent to provide the services required by the Agreements and by the Medicaid Act. (Hr'g Tr. 12:17–20, Sept. 2, 2015.) Thereafter, this concession was never retracted. (Hr'g Tr. 22:4–23:5, Oct. 2, 2016.) In so doing, Defendant has admitted that PPGC is "qualified" within the statute's most minimal and straightforward meaning. In concluding that Plaintiffs will likely show that Defendant has contravened Section 1396a(a)(23), this Court echoes the Ninth Circuit: "Nowhere in the Medicaid Act has Congress . . . indicated that each state is free to define . . . ['qualified'] for purposes of its own Medicaid program however it sees fit." *Betlach*, 727 F.3d at 970.

Even if this Court were to regard "qualified" as ambiguous, however, DHH's interpretation would deserve no deference. In essence, Defendant contends that "qualified" is an ineradicably ambiguous term, so unfettered in content that no outer bounds but her own opinion can be set, (Doc. 13 at 8; Doc. 53-1 at 21), so that this one word has become "an interpretive wormhole, whose supposed ambiguity leads to a galaxy of unfettered agency discretion,"

*Wheaton v. McCarthy*, 800 F.3d 282, 288 (6th Cir. 2015). But, for deference to be extended under well-settled jurisprudence, certain prerequisites must be satisfied. Thus, "[a] precondition to deference under *Chevron* is a congressional delegation of administrative authority" to the particular agency. *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649, 110 S. Ct. 1384, 1391, 108 L. Ed. 2d 585 (1990), *cited in, e.g.*, *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1219 (9th Cir. 2015). In addition, that same interpretation must be precedential, carrying "the force of law." *Dhuka v. Holder*, 716 F.3d 149, 155 (5th Cir. 2013). If not precedential, a lower form of deference applies, with the weight of an agency's judgment "in a particular case" dependent "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* at 154 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed. 124 (1944)); *accord Rubio v. Lynch*, 787 F.3d 288, 291 (5th Cir. 2015). Even if these requirements are satisfied, deference is only accorded if the statute is truly "ambiguous" regarding the precise "question at issue" and if the agency's interpretation is a "reasonable" and hence "permissible construction of the statute" at hand. *Orellana-Monson v. Holder*, 685 F.3d 511, 517 (5th Cir. 2012); *see also, e.g.*, *Siew v. Holder*, 742 F.3d 603, 607 n.27 (5th Cir. 2014) (citing *id.*); *United States v. Baptiste*, 34 F. Supp. 3d 662, 670 (W.D. Tex. 2014) (same); *cf.* Carl Sunstein, *Law and Administration after* Chevron, 90 COLUM. L. REV. 2071, 2087 (1990) (elaborating upon the reasons for deference to administrative agencies).

Assuming "qualified" is truly "ambiguous," DHH's interpretation does not meet these established predicates. Not the product of considered rulemaking or reflected in a history of enforcement, DHH has yet to provide even one bit of evidence that it has ever so construed "qualified" to exclude a provider whose competence is not at issue. For example, while Section

46:437(D)(1) had been used on "three prior distinguishable occasions," (Doc. 34 at 3), all three involved overpayment that DHH allowed the offender to correct pre-termination, (Doc. 34-1 at 2, 4, 6). The limited case law available to this Court, meanwhile, suggests that Section 46:437.11(D)(2) has been limited to instances where criminal infractions have been credibly alleged and/or financial malfeasance has been plausibly evidenced. *See, e.g.*, *Midtown Med. v. Dep't of Health & Hosps.*, 2012 La. App. Ct. Briefs LEXIS 1889 (La. Ct. App. Oct. 26, 2012) (termination predicated on DHH's attempted "monetary recoupment" and assessment of a "monetary penalty"); *Cmty. Care-Bossier, Inc. v. Foti*, No. 5:06CV181, 2006 WL 811944 (W.D. La. Feb. 7, 2006) ("On or about January 24, 2006, DHH was notified that several employees and/or owners of CCB had been arrested, that bank accounts in the names of CCB and the arrested employees/owners had been frozen, and that medical records in the possession of CCB had been seized by agents of the Louisiana Department of Justice.").

Additionally, Defendant's present position is not even "embodied in opinion letters, policy statements, agency manuals, and enforcement guidelines," which though "lack[ing] the force of law," elicit some judicial respect. *Christensen v. Harris Cnty.*, 529 U.S. 576, 587, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000). Indeed, in citing the various meanings that "qualified" may have, she gives no source to credit her unique interpretation, (Doc. 13 at 8; Doc. 53-1 at 21), and her own lawyer admitted that at least her original denotation of "qualified" was "circular," (Hr'g Tr. 21:12–13, Sept. 2, 2015), thereby rendering it unpersuasive and raising doubt about her present reasoning's thoroughness. *White v. Black*, 190 F.3d 366, 368-69 (5th Cir. 1999); *see also FAA v. Cooper*, 132 S. Ct. 1441, 1449, 182 L. Ed. 2d 497 (2012) (rejecting the use of "a general (and notably circular) definition"). This decision to adopt a definition of "qualified" divorced from a provider's "competence," then, bears none of the marks of considered rulemaking or

evidence the exercise of some agency particular expertise, as the most minimal deference doctrines require. *See Vigil v. Leavitt*, 381 F.3d 826, 835 (9th Cir. 2004).

Lastly, this Court finds no merit in Defendant's factual contentions regarding the recent nature of CMS' interpretation. Before this Court, Defendant has claimed that her counsel's conversation with CMS provided "some contending views . . . as to what qualified mean[s]." (Hr'g Tr. 19:2–7, Sept. 2, 2015.) In Defendant's Reply, she adds an additional accusation, claiming that CMS has propounded an interpretation of "qualified" in the Statement of Interest never before evidenced or proclaimed. (Doc. 31 at 4.) Both these statements, however, are disingenuous.

The first assertion appears to be based on the First (and Second and Third) Kennedy Declarations, yet in none did Ms. Kennedy so describe her conversation with CMS. Rather, per the First Kennedy Declaration, CMS did no more than "advise[]" DHH that it "has the authority to withhold federal Medicaid dollars from Louisiana or seek injunctive relief for failure to comply with the Medicaid Act." Such language, even if it is most generously construed in Defendant's favor, simply does not imply that CMS acceded to Defendant's premise (that "qualified" as sufficiently "ambiguous" as to be indefinable) or that CMS acknowledged DHH's authority to define it in a manner inconsistent with CMS' understanding of § 1396a(a)(23).

Meanwhile, DHH has seemingly overlooked an Informational Bulletin, dated June 1, 2011, sent by CMS to every state Medicaid agency.[34] In this short bulletin, a matter of public

---

[34] Pursuant to Federal Rule of Evidence 201(b), this Court may take judicial notice of "publically-available documents and transcripts" produced by a state or federal agency "which were matters of public record directly relevant to the issue at hand." *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011); *see also, e.g.*, *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) ("[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record."); *Benak v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006) (noting that a court can take judicial notice of newspaper articles to "indicate what was in the public realm at the time"); *Denius v. Dunlap*, 330 F.3d 919, 926–27 (7th Cir. 2003) (taking

record, CENTER FOR MEDICAID, CHIP AND SURVEY & CERTIFICATIONS, CMS INFORMATIONAL BULLETIN (June 1, 2011), *available at* http://www.medicaid.gov/Federal-Policy-Guidance/downloads/6-1-11-Info-Bulletin.pdf (last visited on Oct. 28, 2015), CMS addressed "some inquiries as to whether States may exclude certain providers from participating in Medicaid based on their scope of practice," offering a cogent "review of longstanding federal law." CMS, CMCS INFORMATIONAL BULLETIN 1 (June 1, 2011). As this bulletin continues, "[s]tates are not . . . permitted to exclude providers from the program solely on the basis of the range of medical services they provide"; a determination of the extent to which a Medicaid provider is "qualified" for purposes of § 1396a(a)(23), it explains, must be related to the actual "scope of services" offered by the relevant provider. *Id.* at 1–2. In other words, more than four years before DHH attempted to terminate the Agreements, CMS endorsed the interpretation of § 1396a(a)(23) substantially echoed in the Statement of Interest: "[T]erminating PPGC from . . . [Louisiana's] Medicaid program without providing any justification related to PPGC's qualifications to provide medical services would violate . . . § 1396a(a)(23)," (Doc. 24 at 2). Because CMS, not DHH, is the agency charged with the Medicaid Act's management and thus the implementation of, among many, Section 1396a(a)(23), any deference owed would more rightly given to CMS' construction, not DHH's newfangled one, assuming the existence of even minor statutory ambiguity.[35] *See Hood*, 391 F.3d at 590–91 (citing to CMS' interpretation of the Medicaid Act and rejecting a construction advanced by DHH); *see, e.g., St. Mary's Hosp. of*

---

judicial notice of information on official government website*); Cali v. E. Coast Aviation Servs., Ltd.*, 178 F. Supp. 2d 276, 287 n. 6 (E.D.N.Y. 2001) (taking judicial notice of documents from Pennsylvania state agencies and the Federal Aviation Administration). CMS' own informational bulletins surely qualify.

[35] It is worth noting that Congress' delegation to CMS does not necessarily and automatically imply a concurrent delegation to a state actor of the unfettered prerogative to promulgate official and binding interpretations of a federal statute superior to any advanced by the actual federal agency assigned this interpretive power. Defendant has offered no support for such a proposition.

*Rochester v. Leavitt*, 416 F.3d 906, 914 (8th Cir. 2005) (holding that CMS' interpretation of the Medicaid Act respect, but not deference); *Ctr. for Special Needs Trust Admin., Inc. v. Olson*, 676 F.3d 688, 700–01 (8th Cir. 2012) (emphasizing that even if a CMS letter has persuasive power it cannot override the Medicaid Act's plain language).

### (d)     Considering Defendants' Reasons for Claiming PPGC is Unqualified

Like the *Selig, Herbert* and *Bentley* courts, this Court finds it likely that Plaintiffs will prevail on their Section 1396a(a)(23) claim. This subsection allows a private cause of action, and Defendant has already conceded that PPGC is competent to provide the services it renders in Louisiana. Thus, PPGC is "qualified" as that term must be naturally (and plainly) defined, as the Seventh and Ninth Circuits concluded in *Indiana* and *Betlach.* For the purposes of a preliminary injunction, their likelihood of success has been established. Plaintiffs have provided more than enough precedent, evidence and argument to lead this Court to believe they have a reasonable probability of success.

Nonetheless, given Defendant's recent invocation of Section 46:437.11(D)(2) and not Section 46:437.11(D)(1), this Court feels compelled to address the facial credibility of Defendant's new grounds for termination. In the Second Termination Letters, Defendant gives three "violations" justifying its terminations: first, PPGC's settlement of an FCA suit in Texas which it did not report to DHH; second, the involvement of a PPGC affiliate in a pending Texas case which survived a Rule 12(b)(6) dismissal and third, PPGC's alleged misrepresentations in a letter responding to inquiries about the video tapes. (Doc. 39-1.) Having subjected these reasons to scrutiny, this Court concludes that, even if Defendant's definition of "qualified" prevails, DHH's reasons for disqualifying PPGC likely will not.

The first of Defendant's reasons, the *Reynolds* Settlement, is likely to fail. The claim was brought by an FCA plaintiff, not the government, which choose not to intervene.[36] The settlement expressly disavows PPGC's liability. (Doc. 54-1 at 5.) It therefore falls into the exception set forth in Title 50 for certain FCA actions: "If a False Claims Act action or other similar civil action is brought by a Qui-Tam plaintiff, no violation of this provision has occurred until the defendant has been ***found*** liable in the action." LA. ADMIN. CODE tit. 50, § 4147(12)(c) (emphasis added). Title 50 plainly and unambiguously requires that liability be "found," whether by admission or by some fact-finder. Since *Reynolds* involved no such finding, Defendant's first stated reason contradicts DHH's own code. With no citation to authority, Defendant's counsel asks the Court to reject the "literal" language of § 4147(12)(c) , (Hr'g Tr. 37:12–14, Oct. 16, 2015), in defiance of every well-known rule of interpretation. Urging the Court to adopt what he "think[s] that means," he asks this Court to revise a plain provision, a task far beyond a judge's proper province and the Secretary's prescribed powers.

One other fact undercuts the *Reynolds* Settlement's significance. Plaintiffs have credibly shown that DHH was aware of the *Reynolds* Settlement long before October 14, 2015, with Defendant's own emails suggesting that it did not find it sufficient to provide "credible evidence" of Medicaid fraud. (Doc. 46-3 at 2.) Thus, in spite of the Second Termination Letters' implications to the contrary, (Doc. 39-1 at 2, 5, 8, 11), DHH knew, having been "notified," of this settlement, (Doc. 46-3 at 2; Hr'g Tr. 41:23–42:11, Oct. 16, 2015). Based on Title 50's simple terms and Defendant's own words from 2013, Plaintiffs are likely to succeed on proving the irrelevance of the *Reynolds* Settlement.

---

[36] That the government had to sign off on an agreement and the case's dismissal is a statutory requirement. 31 USCS § 3730(b)(1). It does not mean that the government was an active party or litigant. *See United States ex rel. Carter v. Bridgepoint Educ., Inc.*, 305 F.R.D. 225, 230–31 (S.D. Cal. 2014) (explaining the complex subtleties involved in the FCA).

Defendant's second ground for alleging fraud—the *Carroll* case—rests on a quote drawn from a judge's ruling on a motion to dismiss. As revealed by that opinion's full text, per Rule 12(b), "[t]he court concludes that Carroll has adequately pleaded factual content that allows the court to draw the reasonable inference that Planned Parenthood knowingly filed false claims." Doc. 31 at 17, *Carroll*. Defendant's allegation that the court in *Carroll* found "that the information already provided allows the court to draw the reasonable inference" that fraud took place, (Doc. 39-1 at 2) is clearly wrong. Rather, as counsel for Defendant conceded in oral argument, for purposes of the motion before that court, the plaintiff's allegations were only *assumed* to be true, as Rule 12(b) requires. (Hr'g Tr. 36:2–11, Oct. 16, 2015.) That court never made a factual finding of fraud, as the Second Termination Letters imply by citing to this opinion as proof of "violations and misconduct by affiliates and providers-in-fact" of PPGC, (Doc. 39-1 at 2, 5, 8, 11). Instead, this court ruled only that the plaintiff had plead his case "adequate[ly]." Doc. 31 at 17, *Carroll*. Even today, *Carroll* appears either to still be in discovery or to have not yet been tried, (Hr'g Tr. 27:15–20, Oct. 16, 2015), so that no liability—and no fraud or a violation of the Medicaid Act or relevant regulations—has actually been "found" by a single factfinder. In other words, the second ground in the Second Termination letters cannot satisfy the language of Title 50.

Defendant's third asserted ground is that PPGC made unspecified misrepresentations in violation of Section 46:437.14(A)(1), in response to her letter inquiries. MAPIL defines "misrepresentation" with precision as "the knowing failure to truthfully or fully disclose any and all information required, or the concealment of any and all information required on a claim or a provider agreement or the making of a false or misleading statement to the department relative to the medical assistance programs." LA. R.S. § 46:437.3(15); *see also Caldwell ex rel. State v.*

*Janssen Pharmaceutica, Inc.*, 144 So. 3d 898, 910 (La. 2014) (citing *id.*). Not one misrepresentation is specified or substantiated in her letter or by her attorneys, and each, on the record now before the Court, has been credibly contradicted in PPGC's August Letter, (Doc. 39-1 at 3, 6, 9, 12; Doc. 46-1 at 63–66.) If this plain statutory law, as interpreted by this state's highest court, is to be respected, it impliedly demands that a misrepresentation be plausibly alleged. None has been so, Defendant merely asserting the existence of "clear violations" without either detail or substantiation. As the evidence is currently constituted, therefore, Defendant's third ground will not likely stand.

In this Court's opinion, two other facts are telling. First, the Second Termination Letters cite no "found" violation of licensure or certification requirements or any specific failure to meet any condition of enrollment. (Doc. 39-1 at 3, 6, 9, 12.) Second, Defendant cites to the final clause of Section 46:437.11(D)(2), which allows for termination if a provider is "the subject of a sanction or of a criminal, civil, or departmental proceeding," and deems sufficient an allusion to investigations by DHH and the Louisiana Office of Inspector General. (Hr'g Tr. 34:8–15, Oct. 16, 2015; *see also* Doc. 39-1 at 3.) That an investigation by DHH can suffice under Section 46:436(D)(2) has been rejected once before. *See New Orleans Home for Incurables, Inc. v. Greenstein*, 911 F. Supp. 2d 410, 411–12 (E.D. La. 2012). As for the second, when this Court asked Defendant's counsel to offer some detail regarding these alleged misrepresentations, he could not. (Hr'g Tr. 38:23–39:10, Oct. 16, 2015.) Considering her failure to articulate one relevant misrepresentation within MAPIL's meaning, and on the record as it now stands, Plaintiffs will likely succeed on this issue.

In fact, the apparent fragility of the Second Termination Letters' stated reasons raises another specter, for not one appears to be a supported factual allegation of the kind of fraud and

ill-practice with which MAPIL is concerned. *See Mortg. Elec. Registration Sys. v. Bynum*, 879

So. 2d 807, 811 (La. Ct. App. 2004). Here, this apparent vacuum cannot be ignored, for as the

Supreme Court of Louisiana explained in the spring of 2015, "[a]n agency exercising delegated

authority is not free to pursue any and all ends, but can assert authority only over those ends

which are connected with the task delegated by the legislative body." *Dep't of Children &*

*Family Servs. ex rel. A. L. v. Lowrie*, 167 So. 3d 573, 587–88 (La. 2015); *see also State v.*

*Alfonso*, 753 So. 2d 156, 161 (La. 1999) ("When the legislative body, in delegating powers,

clearly expresses its policy and provides sufficient standards, judicial review of the exercise of

the means chosen by the agency in exercising its delegated power provides a safeguard against

abuse by the agency.") "The open-ended discretion to choose ends is the essence of legislative

power; it is this power that the legislative body possesses, but its agents lack." *Lowrie*, 167 So.

3d at 587.

 Section 46:437.11(D)(2) is but one part of a law directed towards specific ills. It is

reasonable to conclude that the legislature logically expected the powers awarded by this

provision to be employed so as "to combat and prevent fraud and abuse" and to secure the "fiscal

and programmatic integrity" of a program otherwise endangered by "persons who engage in

fraud, misrepresentation, abuse, or other ill practices" as expressly defined in MAPIL alone. *See*

LA. R.S. § 46:437.2.

 But, based on the evidence so far presented, no actual evidence of a MAPIL-worthy-

misdeed has been presented. Indeed, no misconduct of any kind has been alleged, let alone

shown, as it pertains to PPGC's operations in Louisiana. The Parties have stipulated that, for

purposes of the Court's consideration of a preliminary injunction, no additional evidence need be

offered and no additional argument need be made; consequently, evidentiary support for a single

one of Defendant's contentions is absent by Defendant's own volition. By highlighting the suspect underpinning the Second Termination Letters, Plaintiffs have therefore met their burden of showing a likely success on this issue, regardless and apart from the Individual Plaintiffs' likely success on the other issues previously discussed. *See supra* Part V.B.1.a–c.

## C.   SECOND ELEMENT: IRREPARABLE HARM

"'Irreparable' in the injunction context means not rectifiable by the entry of a final judgment." *Walgreen Co. v. Sara Creek Prop. Co*., 966 F.2d 273, 275 (7th Cir. 1992). On the record before the Court, Plaintiffs have met their burden of showing irreparable harm.

Based on their uncontroverted affidavits, the Individual Plaintiffs depend on PPGC. (Doc. 4-3, 4-4, 4-5.) And if the Agreements are terminated, they (and Jane Doe #3's daughter) will be unable to visit their Medicaid provider of choice. (Doc. 4-3 ¶¶ 6–7 at 2; Doc. 4-4 ¶¶ 7–8 at 2; Doc. 4-5 ¶¶ 5–6 at 2.) Approximately, 5,200 other women visit BRHC and NOHC and likely depend upon to some degree. (Doc. 41-1 ¶¶ 12–18 at 4–5.) At this stage of the proceeding, the Court is persuaded that, absent this termination, the patients of PPGC in Louisiana will have their healthcare disrupted. Counsel for Defendant has already conceded this to be the case. (Hr'g Tr. 13:1–12, Sept. 2, 2015.) Like the court in *Selig*, this Court credits these women's "statements in the form submitted." Doc. 45 at 20, *Selig*. Presented with similar facts, other courts have found irreparable harm. *See, e.g.*, Doc. 63 at 51–54, *Bentley*; Doc. 45 at 22, *Selig*; Doc. 12 at 1–2, *Herbert*; *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 794 F. Supp. 2d 892, 912–13 (S.D. Ind. 2012), *aff'd in part and rev'd in part on other grounds*, 699 F.3d 962; *Camacho*, 325 F. Supp. 2d 794 at 802.

Based on its own unquestioned assertions, PPGC will also likely suffer irreparable harm.

Regardless of the precise dollars in revenue it may receive from the state, PPGC has made clear that it may have to close BRHC upon the Agreements' termination. (Doc. 46 at 27.) Often, such results have been considered irreparable. *Planned Parenthood of Ind., Inc.*, 794 F. Supp. 2d at 912; *see also Canterbury Career Sch., Inc. v. Riley*, 833 F. Supp. 1097, 1105 (D.N.J. 1993) ("Where the result of denying injunctive relief would be the destruction of an on-going business, such a result generally constitutes irreparable injury."). The fact that the Eleventh Amendment forbids PPGC from ever collecting monetary damages, even if Defendant's conduct is later found illegal, also militates in favor of deeming its likely harm to be irreparable, *Green*, 474 U.S. at 68. In addition, "potential reputational harm is present," Doc. 12 at 1, *Herbert*, as Defendant's termination may lead others to believe PPGC is not a competent provider despite her own failure to offer up relevant and specific evidence to the contrary, (Hr'g Tr. 11:12–16, Sept. 2, 2015). Cumulatively, these harms are irreparable. *See, e.g.*, *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002); *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d Cir. 1998). This conclusion is especially true when, as here, (Doc. 43 ¶¶ 64–67 at 20), a plaintiff asserts constitutional claims under the First and Fourteenth Amendment. *See, e.g.*, Doc. 12 at 2, *Herbert*.

Defendant has sought to allay these concerns with the First, Second, and Third Kennedy Declarations. (Doc. 13-2 at 1–41; Doc. 31-1 at 1–2; Doc. 34 at 1–2; Doc. 34-2 ¶¶ 8a–8b at 2.) Yet, these declarations' manifold oversights and constant tinkering leave this Court with the decided impression that not even DHH can ensure that PPGC's current patients will have some ready and convenient outlet. Indeed, even the most recent version contains a number of specialized providers who do not accept patients like PPGC's own. *See supra* Part II.C.3.

Furthermore, even if Individual Plaintiffs could get family planning and other comparable

care elsewhere (and that has not been convincingly shown), "this does not diminish the injury that will result from [their] inability to see the provider of their choice." Doc. 63 at 54, *Bentley* (citing Doc. 45 at 22, *Selig* ("[D]enial of . . . freedom of choice is more likely than not exactly the injury Congress sought to provide when it enacted [the free-choice-of-provider provision].")). On the record before it, the Court finds the second element for a preliminary injunction to have been sufficiently shown.

## D.   THIRD ELEMENT: BALANCE OF HARMS

By contrast  to the Plaintiffs' enumerated harms, Defendant points the Court to only two that it maintains it will suffer if the motion is granted: (1) "The granting of a TRO would prevent the []DHH from their ability to govern the Medicaid program under the authority granted by the Medicaid Act," and, (2) "It would also contravene the Louisiana Legislature's intent to give the []DHH a right to terminate a Medicaid provider agreement at-will when she chooses to do so." (Doc. 13 at 20.) The second obviously bears no more relevance since Defendant has rescinded her letters of termination under Section 46:436.11(D)(1). An injunction will have no financial effect, as DHH will still need to pay the Medicaid benefits of every PPGC Medicaid-eligible patient. *See* Doc. 12 at 1, *Herbert*; *Marlo M. ex rel. Parris v. Cansler*, 679 F. Supp. 2d 635, 638 (E.D.N.C. 2010). In dollars and cents, maintaining this status quo costs DHH nothing.

Furthermore, in terms of her ability to "govern the Medicaid program," an injunction will not strip DHH of its statutory powers. It will not suddenly deprive her of the ability to pursue legitimate claims of Medicaid fraud or ensure that Louisiana citizens are obtaining "competent" medical care; she will still be able "to govern the Medical program." At worst, it will halt its exercise of a particular power as to a single provider as to whose medical competency it has

admitted. Indeed, at worst, such an injunction will do no more than convince DHH to invoke its powers under MAPIL more clearly and consistently in the future. *See New Orleans Home for Incurables, Inc.*, 911 F. Supp. 2d at 411–12. It would, in other words, force DHH to act as the statute implicitly demands. Other cases have so ruled. *See, e.g.*, Doc. 45 at 30, *Selig*. With them, this Court agrees.

At the same time, this Court is not persuaded by Defendant's efforts to distinguish Plaintiffs' cases. One case that Defendant previously attempted to distinguish as being predicated on Section 46:437.11(D)(2), (Doc. 13 at 21), involved the very section she has now invoked. *New Orleans Home for Incurables, Inc.*, 911 F. Supp. 2d at 410–11. By now relying on this very section, Defendant's latest termination has now made this case particularly relevant. It is true that Plaintiffs' second cited case—*Giovanni Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002)—"involved a State that enforced restrictions likely to be found unconstitutional." (Doc. 13 at 21.) But the balance still favors Plaintiffs where, as here, the injunction is intended to foreclose application of restrictions likely to be found contrary to preeminent federal statutory law designed to help the neediest of this state's citizens.

In sum, even if Defendant's criticism is given weight, the balance of harms would still favor Plaintiffs.

**E.     FINAL ELEMENT: PUBLIC INTEREST**

In light of Plaintiffs' likely irreparable harm and the balanced equities, this final factor favors an injunctive relief too. For decades, PPGC has served numerous at-risk individuals and helped DHH combat a host of diseases, and, in the process, become the regular provider of over 5,000 women, including the Individual Plaintiff. Like its brethren, this Court "believes that . . .

vulnerable population[s] should only be uprooted if practically necessary and legally warranted." *Greenstein*, 911 F. Supp. 2d at 412. As the Ninth Circuit stated in considering this same factor in a Medicaid case, the public interest is most acute in regards to "ensuring access to health care" absent any misdeed's demonstration. *Indep. Living Ctr. of S. Cal, Inc. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2002), *vacated and remanded on other grounds*, 132 S. Ct. 1204, 182 L. Ed. 2d 101 (2012). Defendant herself has urged this Court to employ this factor: "[I]t is certainly true that the public has an interest in the neediest of its members having access to healthcare." (Doc. 13 at 21.) Like *Selig* and *Herbert*, this Court adopts this reasoning and finds the public interest favors Plaintiffs.

In contesting Plaintiffs' public interest arguments, Defendant has offered up only the following statement of purported fact: "[T]here has been no evidence presented that shows Medicaid recipients in the New Orleans and Baton Rouge areas will not have access to family planning and related services." (Doc. 13 at 21.) As support, she asked this Court to rely upon the First Kennedy Declaration. (*Id.* at 21–22.) As noted above, *see supra* Parts II.C.3, V.C, a Kennedy Declaration has been tendered, retracted, and again proposed, leaving this Court wary of relying on Defendant's protean assertions of fact. It instead turns to the uncontested and unquestioned facts—PPGC serves 5,200 poor and needy women, and PPGC has repeatedly been deemed a "competent" provider by DHH—and honors the public interest in affording these women access to their provider of choice.

## F.    CONCLUSION

Four elements are necessary before a court may issue an injunction. Every element has been shown by Plaintiffs in this proceeding in regards to their Section 1396a(a)(23) claim. A

preliminary injunction will therefore issue.


## VI.    FINAL ISSUES

### A.    NO NEED FOR SECURITY

Rule 65 allows a court to "issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). This requirement, however, may be waived where the gravity of interest is great and no proper showing of a harm's likelihood or a probable loss is made. *See, e.g.*, *Kaepa, Inc. v. Achilles Corp.,* 76 F.3d 624, 628 (5th Cir. 1996) ("In holding that the amount of security required pursuant to Rule 65(c) is a matter for the discretion of the trial court, we have ruled that the court may elect to require no security at all." (internal quotation marks omitted)); *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) (same). Here, as in other courts, *see, e.g.*, Doc. 45 at 31, *Selig*, Defendant has neither requested a security were this Court to issue an injunction nor presented any evidence that it would be financially harmed if it were wrongfully enjoined. In addition, as Plaintiffs note, "[w]hether these individuals obtain these services at PPGC (their provider of choice) or elsewhere will have no effect on Louisiana's budget." (Doc. 46 at 28.) Based on these facts and on Defendant's failure to ask for a bond or plead an economic harm, this Court sees no credible reason to force a bond's execution.


### B.    CLASS INJUNCTION

Plaintiffs argue that they have been singled out because of the alleged (but disputed) conduct of a separate but connected company that appeared in one of CMP's videos and that

Plaintiffs played no role in that conduct. (Doc. 46 at 1–3.) Plaintiffs argue that Defendant has attempted to terminate its contracts because of the personal animus against it. This animus, they contend, is unrelated to the admittedly competent services that it renders in Louisiana which are, in turn, unrelated to the conduct in the videos. It is, moreover, being punished for being associated with various other Planned Parenthood entities, though it itself has not been demonstrated to have engaged in a single proscribed or illegal action. In fact, the uncontradicted evidence in the record at this time is that PPGC does not perform abortions in Louisiana and is not involved in the sale of fetal tissue and that none of the conduct in question occurred at PPGC's two Louisiana facilities. As such, based on this existing record, it appears likely that Plaintiff will be able to prove that the attempted terminations against it are motivated and driven, at least in large part, by reasons unrelated to its competence and unique to it. However, the Court finds it is not necessary and therefore it need not at this time rule on Plaintiffs' equal protection argument. *See, e.g.*, *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445, 108 S. Ct. 1319, 1323, 1323, 99 L. Ed. 2d 534 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."); *cf.* BRYAN A. GARNER & ANTONINA SCALIA, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 249–51 (2012) (discussing this rule's bases).

Nonetheless, the uncontradicted evidence in the record is that BRHC relies to a significant degree on Medicaid reimbursements. (*See, e.g.*, Doc. 4-1 at 10; Doc. 46 at 2.) The Court therefore finds that if the Agreements are terminated, this facility would suffer significant financial loss and might have no choice but to close. In order to insure that meaningful relief is given to the Jane Doe Plaintiffs and that these Individual Plaintiffs have their free choice of provider, which claim they have established (at least at this preliminary stage), the Court's

preliminary injunction will extend to all DHH-PPGC provider agreements applicable to all Medicaid-enrolled patients. In addition, the Court will defer action on Plaintiffs' alternative request for class certification to a more appropriate date and time.

## VII.    CONCLUSION

The Parties have agreed that no additional evidence or argument is necessary and that there is no objection to converting the Court's previous temporary restraining order to a preliminary objection. (Docs. 58, 62.) For the foregoing reasons, as corrected, supplemented and clarified herein, PPGC and the Individual Plaintiffs have met their burden, demonstrating every element necessary for the issuance of a preliminary injunction with credible evidence and persuasive precedent. Accordingly,

Defendant's Motion to Dismiss Complaint for Lack of Subject Matter Jurisdiction and Failure to State a Claim (Doc. 53) is DENIED.

Plaintiffs' Renewed Motion for Temporary Restraining Order and for Preliminary Injunction (Doc. 45) is GRANTED.

Defendant, and all those acting in concert with her, are PRELIMINARILY ENJOINED from terminating any of its Medicaid provider agreements with Planned Parenthood Gulf Coast Inc., including, but not limited to, Provider Numbers 91338, 133689, 45802, and 133673. The preliminary injunction will remain in force until notified by this Court.

Signed in Baton Rouge, Louisiana, on <u>October 29, 2015</u>

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**